## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union and Western Corporate Federal Credit Union, <br><br> Plaintiffs, <br><br> v. <br><br> MORGAN STANLEY & CO. INCORPORATED, MORGAN STANLEY ABS CAPITAL I INC., MORGAN STANLEY CAPITAL I INC., and SAXON ASSET SECURITIES COMPANY, <br><br> Defendants. | Case No. 13-cv-2418 CM/KMH <br><br> **JURY TRIAL DEMANDED** |

## **COMPLAINT**

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ...................................................................1

     Table 1 ......................................................................................3

     Table 2 ......................................................................................4

II.  PARTIES AND RELEVANT NON-PARTIES ................................5

III. JURISDICTION AND VENUE ...........................................................7

IV.  MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION...............8

     Figure 1
     *Illustration of the Securitization Process* ...........................................11

V.   RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT ....................................11

     Table 3
     *Credit Ratings* .....................................................................12

VI.  THE CREDIT UNIONS' PURCHASES...........................................14

     Table 4
     *Credit Ratings for the Credit Unions' RMBS Purchases*....................................14

VII. THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS...........................................................16

     A.   The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards...............................................................17

     Table 5
     *Delinquency and Default Rates for the Credit Unions' RMBS Purchases* ....................................18

     Table 6
     *Originator "Originate-to-Distribute" Percentages* .........................................24

i

B.     The Surge in Actual Versus Expected Cumulative Gross Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards ...................................................................25

Figure 2
*Illustration of Expected Gross Losses v. Actual Gross Losses for The Credit Unions' RMBS Purchases*...................................................................28

C.     The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines ................................37

D.     Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards ...................................................................................................38

1.     The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse .........................................38

2.     American Home's Systematic Disregard of Underwriting Standards ...................................................................43

3.     Countrywide's Systematic Disregard of Underwriting Standards ...................................................................47

4.     Decision One's Systematic Disregard of Underwriting Standards ...................................................................55

5.     First Magnus Financial Corporation's Systematic Disregard of Underwriting Standards ........................................56

6.     Fremont Investment and Loan's Systematic Disregard of Underwriting Standards ........................................57

7.     GreenPoint Mortgage Funding Inc.'s Systematic Disregard of Underwriting Standards ........................................60

8.     Homecomings's Systematic Disregard of Underwriting Standards ...................................................................67

9.     IndyMac Bank F.S.B.'s Systematic Disregard of Underwriting Standards ...................................................................73

10.    The Morgan Stanley Originators' Systematic Disregard of Underwriting Standards ........................................77

11.    National City Mortgage's Systematic Disregard of Underwriting Standards ...................................................................83

12.    New Century's Systematic Disregard of Underwriting
       Standards...........................................................................83

13.    NovaStar's Systematic Disregard of Underwriting
       Standards...........................................................................92

14.    People's Choice Home Loan Inc.'s Systematic
       Disregard of Underwriting Standards ........................................95

15.    Saxon Funding Management, Inc.'s Systematic
       Disregard of Underwriting Standards ........................................98

16.    WMC Mortgage Corp.'s Systematic Disregard of
       Underwriting Standards .........................................................99

E.    Loans That Did Not Meet the Originators' Underwriting
      Guidelines Were  Routinely Collateral for Morgan Stanley-
      Underwritten RMBS .................................................................103

F.    Additional Evidence Confirms that Defective Loans Were
      Routinely  Packaged into Morgan Stanley's RMBS.............................106

VIII.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS
        OF MATERIAL FACT..................................................................108

A.    Untrue Statements in the Offering Documents About Weighted
      Average LTV Ratios, Weighted Average Combined LTV
      Ratios and Weighted Average Mixed LTV Ratios .............................108

Table 7
*Untrue Statements in the Offering Documents About Weighted
Average LTV Ratios* .......................................................................110

Table 8
*Untrue Statements in the Offering Documents About Weighted
Average CLTV*...............................................................................111

Table 9
*Untrue Statements in the Offering Documents About Weighted
Average Mixed LTV* .......................................................................112

B.    Untrue Statements in the Offering Documents About Owner
      Occupancy Rates......................................................................113

Table 10
*Untrue Statements in the Offering Documents About Owner-
Occupancy Status*..........................................................................115

iii

C.      Other Untrue Statements in the Offering Documents..........................................116

Table 11
*Originators Supplying Loans for Each RMBS at Issue* ...................................116

    1.      Untrue Statements Concerning Evaluation of the
        Borrower's Capacity and Likelihood to Repay the
        Mortgage Loan......................................................................................118

    2.      Untrue Statements Concerning Reduced Documentation
        Programs .................................................................................................140

    3.      Untrue Statements Concerning Loan-to-Value Ratios ............................150

IX.     THE CLAIMS ARE TIMELY...........................................................................154

Table 12
*Purchases Subject to Tolling Under American Pipe* ......................................156

X.      CLAIMS FOR RELIEF....................................................................................158

COUNT ONE
Section 11 of the Securities Act of 1933
        (Alternative Loan Trust 2006-28CB,
        NovaStar Mortgage Funding Trust, Series 2006-1,
        Sequoia Mortgage Trust 2007-1).........................................................158

COUNT TWO
Section 11 of the Securities Act of 1933
        (American Home Mortgage Assets Trust 2007-3 and
        IndyMac INDX Mortgage Loan Trust 2006-AR25)...........................159

COUNT THREE
Section 11 of the Securities Act of 1933
        (Morgan Stanley ABS Capital I Inc. Trust 2006-HE7,
        Morgan Stanley ABS Capital I Inc. Trust 2006-HE8,
        Morgan Stanley ABS Capital I Inc. Trust 2006-NC5) ........................160

COUNT FOUR
Section 11 of the Securities Act of 1933
        (Morgan Stanley Mortgage Loan Trust 2006-13ARX,
        Morgan Stanley Mortgage Loan Trust 2007-2AX,
        Morgan Stanley Mortgage Loan Trust 2007-5AX) ............................162

COUNT FIVE
Section 11 of the Securities Act of 1933
        (RALI Series 2006-QS4 Trust,
        RALI Series 2006-QS5 Trust,
        RALI Series 2006-QS11 Trust) ........................................................................163

COUNT SIX
Section 11 of the Securities Act of 1933
        (Saxon Asset Securities Trust 2006-3) ...............................................................164

COUNT SEVEN
Section 12(a)(2) of the Securities Act of 1933
        (Morgan Stanley ABS Capital I Inc. Trust 2006-HE7,
        Morgan Stanley ABS Capital I Inc. Trust 2006-HE8,
        Morgan Stanley ABS Capital I Inc. Trust 2006-NC5) ......................................165

COUNT EIGHT
Section 12(a)(2) of the Securities Act of 1933
        (Saxon Asset Securities Trust 2006-3) ...............................................................167

COUNT NINE
Section 12(a)(2) of the Securities Act of 1933
        (Morgan Stanley Mortgage Loan Trust 2007-2AX,
        Morgan Stanley Mortgage Loan Trust 2007-5AX) ............................................169

COUNT TEN
Violation of the California Corporate Securities Law of 1968
Cal. Corp. Code §§ 25401 and 25501
        (IndyMac INDX Mortgage Loan Trust 2006-AR25,
        Ixis Real Estate Capital Trust, 2005-HE4,
        Morgan Stanley Mortgage Loan Trust 2004-11AR,
        Morgan Stanley Mortgage Loan Trust 2006-13ARX,
        Morgan Stanley Mortgage Loan Trust 2007-2AX,
        Morgan Stanley Mortgage Loan Trust 2007-5AX) ............................................170

COUNT ELEVEN
Violation of the Kansas Blue Sky Law
Kan. Stat. Ann. § 17-12a509
        (Morgan Stanley ABS Capital I Trust 2006-HE7,
        Morgan Stanley ABS Capital I Inc. Trust 2006-HE8,
        Morgan Stanley ABS Capital I Inc. Trust 2006-NC5,
        Saxon Asset Securities Trust 2006-3).................................................................172

Plaintiff, the National Credit Union Administration Board ("NCUA Board"), brings this action in its capacity as Liquidating Agent of U.S. Central Federal Credit Union ("U.S. Central") and Western Corporate Federal Credit Union ("WesCorp") (collectively "the Credit Unions") against Morgan Stanley & Co. Incorporated ("Morgan Stanley") as underwriter and seller, and against Morgan Stanley ABS Capital I Inc., Morgan Stanley Capital I Inc., and Saxon Asset Securities Company (collectively, the "Issuer Defendants"), as issuers of certain residential mortgage-backed securities ("RMBS") purchased by the Credit Unions, and alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action arises out of the sale of RMBS to the Credit Unions where Morgan Stanley acted as underwriter and/or seller of the RMBS.

2.    Virtually all of the RMBS sold to the Credit Unions were rated as triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

3.    The Issuer Defendants issued and Morgan Stanley underwrote and sold the RMBS pursuant to registration statements, prospectuses, and/or prospectus supplements (collectively, the "Offering Documents").  These Offering Documents contained  untrue statements of material fact or omitted to state material facts in violation of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) ("Section 11" and "Section 12(a)(2)," respectively), Article 5 of the Kansas Uniform Securities Act, Kan. Stat. Ann. § 17-12a509 ("Kansas Blue Sky law") and the California Corporate Securities Law of 1968, Cal. Corp. Code §§ 25000, 25501 ("California Corporate Securities Law).

4.    The Offering Documents described, among other things, the mortgage underwriting standards of the originators who made the mortgages that were pooled and served as the collateral for the RMBS purchased by the Credit Unions ("the Originators").

5.    The Offering Documents represented that the Originators adhered to the

1

underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.

6.    The Offering Documents also represented that the loan pools underlying the RMBS had certain characteristics.  These material representations included the weighted average loan-to-value ("LTV") ratios, certain weighted average combined loan-to-value ("CLTV") ratios, certain weighted average mixed loan-to-value ("mixed LTV") ratios, and certain owner occupancy rates ("OOR").

7.    LTV represents the amount of the loans as a percentage of the value of the mortgaged properties.  A lower LTV indicated that the loans were less likely to default because the borrower had greater equity, and in the event of default, that the balance of the loans could be recovered by selling the properties.

8.    OOR represents the percentage of borrowers who occupied the mortgaged properties.  A higher OOR indicated that the loans were less likely to default, as borrowers are much less likely to default on their primary residence than an investment property or vacation home.

9.    In fact, the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents.  Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented.  Also, in many of the Offerings, properties were routinely overvalued at the time of origination, rendering the average LTV, CLTV and mixed LTV ratios inaccurate.  In many of the Offerings, the Offering Documents represented that a significant number of properties were owner-occupied, when in fact, they were not.  Indeed, a material percentage of the loans collateralizing the RMBS were all

2

but certain to become delinquent or default shortly after origination.  As a result, the RMBS were destined from inception to perform poorly.

10.     These untrue statements and omissions were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS.  Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

11.     The Credit Unions purchased the RMBS listed in Table 1 (*infra*) through initial offerings directly from Morgan Stanley by means of prospectuses or oral communications. Thus, Morgan Stanley is liable for material untrue statements and omissions of fact under Section 11, Section 12(a)(2) and/or the California Corporate Securities Law and Kansas Blue Sky law for the RMBS listed in Table 1 (*infra*).

**Table 1**

| CUSIP[1] | ISSUING ENTITY | DEPOSITOR DEFENDANT | PURCHASER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 45071KCP7 | Ixis Real Estate Capital Trust 2005-HE4 | - | WesCorp | 10/25/2005 | $21,252,000 |
| 61750MAF2 | Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | Morgan Stanley ABS Capital I Inc. | U.S. Central | 10/12/2006 | $35,000,000 |
| 61750SAF9 | Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | Morgan Stanley ABS Capital I Inc. | U.S. Central | 11/16/2006 | $13,000,000 |
| 61749BAE3 | Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | Morgan Stanley ABS Capital I Inc. | U.S. Central | 10/27/2006 | $43,000,000 |
| 61748HGT2 | Morgan Stanley Mortgage Loan Trust 2004-11AR | - | WesCorp | 12/16/2004 | $21,149,000 |
| 61751TAE9 | Morgan Stanley Mortgage Loan Trust 2007-2AX | Morgan Stanley Capital I Inc. | WesCorp | 1/17/2007 | $11,500,000 |
| 61751GAE7 | Morgan Stanley Mortgage Loan Trust 2007-5AX | Morgan Stanley Capital I Inc. | WesCorp | 2/21/2007 | $20,308,000 |
| 80556AAD9 | Saxon Asset Securities Trust 2006-3 | Saxon Asset Securities Company | U.S. Central | 9/28/2006 | $25,000,000 |

[1] "CUSIP" stands for "Committee on Uniform Securities Identification Procedures."  A CUSIP number is used to identify most securities, including certificates of RMBS.  *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

12.     The Credit Unions purchased the RMBS listed in Table 2 (*infra*) pursuant to and traceable to registration statements containing untrue statements of material fact or that omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  Morgan Stanley was an underwriter for each of the securities listed in Table 2 and is therefore liable under Section 11.  Morgan Stanley also sold certain of the securities directly to the Credit Unions as indicated in Table 2 (*infra*).  Morgan Stanley is therefore liable under the California Corporate Securities Law for any untrue statements made in connection with the sale of those certificates.

**Table 2**

| CUSIP | ISSUING ENTITY | UNDERWRITER/ (SELLER) | DEPOSITOR DEFENDANT | PURCHASER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|---|
| 02147TAK2 | Alternative Loan Trust 2006-28CB | - | - | U.S. Central | 8/21/2006 | $35,000,000 |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | - | - | WesCorp | 6/01/2007 | $30,339,000 |
| 45661HBD8 | IndyMac INDX Mortgage Loan Trust 2006-AR25 | Morgan Stanley | - | WesCorp | 10/23/2006 | $25,029,034 |
| 61750PAD0 | Morgan Stanley Mortgage Loan Trust 2006-13ARX | Morgan Stanley | Morgan Stanley Capital I Inc. | WesCorp | 1/18/2007 | $16,817,268 |
| 669884AD0 | NovaStar Mortgage Funding Trust, Series 2006-1 | - | - | U.S. Central | 4/20/2006 | $40,000,000 |
| 669884AE8 | NovaStar Mortgage Funding Trust, Series 2006-1 | - | - | U.S. Central | 4/20/2006 | $32,621,000 |
| 749228AM4 | RALI Series 2006-QS4 Trust | - | - | U.S. Central | 8/10/2006 | $18,940,844 |
| 749228AM4 | RALI Series 2006-QS4 Trust | - | - | U.S. Central | 9/15/2006 | $22,394,323 |
| 75114TAG6 | RALI Series 2006-QS5 Trust | - | - | U.S. Central | 5/15/2006 | $40,970,000 |
| 75115EAB9 | RALI Series 2006-QS11 Trust | - | - | U.S. Central | 9/8/2006 | $25,000,000 |
| 75115EAB9 | RALI Series 2006-QS11 Trust | - | - | U.S. Central | 11/29/2006 | $20,000,000 |
| 81744HAD5 | Sequoia Mortgage Trust 2007-1 | - | - | U.S. Central | 2/23/2007 | $25,000,000 |
| 81744HAE3 | Sequoia Mortgage Trust 2007-1 | - | - | U.S. Central | 2/23/2007 | $44,641,000 |

13.     The RMBS the Credit Unions purchased suffered a significant drop in market value.  The Credit Unions have suffered significant losses from those RMBS purchased despite the NCUA Board's mitigation efforts.

## II.     PARTIES AND RELEVANT NON-PARTIES

14.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation.  The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021 through assessments against all federally insured credit unions in the country.  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions.  The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF.  The NCUA is under the management of the NCUA Board. *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

15.     U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.  As a corporate credit union, U.S. Central provided investment and financial services to other corporate credit unions.

16.     WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.  As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

17.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009 pursuant to the FCUA, 12 U.S.C. § 1751 *et seq.*  On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation and appointed itself

Liquidating Agent.

18.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the Credit Unions and of any member, account holder, officer or director of the Credit Unions, with respect to the Credit Unions and their assets, including the right to bring the claims asserted in this action.  As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the Credit Unions, and succeeds to all rights, titles, powers, and privileges of the Credit Unions.  *See* 12 U.S.C. §1787(b)(2)(A).  The NCUA Board may also sue on the Credit Unions' behalf.  *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

19.     Prior to being placed into conservatorship and involuntary liquidation, the Credit Unions were the two largest corporate credit unions in the United States.

20.     Any recoveries from this legal action will reduce the total losses resulting from the failure of the Credit Unions.  Losses from the Credit Unions' failures must be paid from the NCUSIF or the TCCUSF.  Expenditures from these funds must be repaid through assessments against all federally insured credit unions.  Because of the expenditures resulting from the Credit Unions' failures, federally insured credit unions will experience larger assessments, thereby reducing federally insured credit unions' net worth.  Reductions in net worth can adversely affect the dividends that individual members of credit unions receive for the savings on deposit at their credit union.  Reductions in net worth can also make loans for home mortgages and automobile purchases more expensive and difficult to obtain.  Any recoveries from this action will help to reduce the amount of any future assessments on credit unions throughout the system, reducing the negative impact on federally insured credit unions' net worth.  Recoveries from this action will benefit credit unions and their individual members by increasing net worth resulting in more

efficient and lower-cost lending practices.

21.     Defendant Morgan Stanley is a United States Securities and Exchange Commission ("SEC") registered broker-dealer.  Morgan Stanley acted as an underwriter of all the RMBS that are the subject of this Complaint, listed in Tables 1 and 2 (*supra*).  Morgan Stanley is a Delaware corporation with its principal place of business in New York.

22.     Morgan Stanley ABS Capital I Inc. is the depositor and issuer of certain offerings as indicated in Table 1 (*supra*).  Morgan Stanley ABS Capital I Inc. is a Delaware corporation with its principal place of business in New York.

23.     Morgan Stanley Capital I Inc. is the depositor and issuer of certain offerings as indicated in Tables 1 and 2 (*supra*).  Morgan Stanley Capital I Inc. is a Delaware corporation with its principal place of business in New York.

24.     Saxon Asset Securities Company is the depositor and issuer of the Saxon Asset Securities Trust 2006-3 offering.  Saxon Assets Securities Company is a Virginia corporation with its principal place of business in Virginia.

## III.   JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

26.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a), because many of the transactions at issue occurred in Lenexa, Kansas, the headquarters

of U.S. Central.  This Court has personal jurisdiction over each Defendant because they offered/sold the RMBS at issue in this Complaint to U.S. Central in this District; prepared/disseminated the Offering Documents containing untrue statements or omissions of material fact as alleged herein to U.S. Central in this District; and/or are residents of/conduct business in this District.

## IV.     MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION

27.     RMBS are asset-backed securities.  A pool or pools of residential mortgages are the assets that back or collateralize the RMBS certificates purchased by investors.

28.     Because residential mortgages are the assets collateralizing RMBS, the origination of mortgages commences the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting.  The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.  The underwriting guidelines consist of a variety of metrics, including: the borrower's debt, income, savings, credit history and credit score; whether the property will be owner-occupied; and the LTV ratio, among other things.  Loan underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

29.     Historically, originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan.  Originators profited as they collected monthly principal and interest payments directly from the borrower.  Originators also retained the risk that the borrower would default on the loan.

30.     This changed in the 1970s when the Government National Mortgage Association

("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively government sponsored enterprises or "GSEs") began purchasing "conforming" or "prime" loans —so-called because they conformed to guidelines set by the GSEs.  The GSEs either sponsored the RMBS issuance (Ginnie Mae) or issued the RMBS themselves after purchasing the conforming loans (Fannie Mae and Freddie Mac).  The GSEs securitized the mortgage loans by grouping mortgages into "loan pools," then repackaging the loan pools into RMBS where investors received the cash flow from the mortgage payments.  The GSEs guarantee the monthly cash flow to investors on the agency RMBS.

31.    More recently, originators, usually working with investment banks, began securitizing "non-conforming loans"—loans originated (in theory) according to private underwriting guidelines adopted by the originators.  Non-conforming loans are also known as "nonprime loans" or "private label" and include "Alt-A" and "subprime" loans.  Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

32.    All of the loans collateralizing the RMBS at issue in this Complaint are non-conforming mortgage loans.

33.     The issuance of RMBS collateralized by non-conforming loans peaked in 2006. The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages, to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS.  This practice is known as "originate-to-distribute" ("OTD").

34.     Securitization begins with a "sponsor" who purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

35.     The depositor transfers the loans to a trust called the "issuing entity."

36.     The issuing entity issues "notes" and/or "certificates," representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

37.     The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

38.     One or more "underwriters"—like Morgan Stanley—then sell the notes or certificates to investors.

39.     A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

40.     Figure 1 (*infra*) depicts a typical securitization process.

**Figure 1**
*Illustration of the Securitization Process*



41.     Because securitization, as a practical matter, shifts the risk of default on the mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V.     RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

42.     RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk.  RMBS certificates denote the particular tranches of the security purchased by the investor.

43.     The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.  Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit rating agencies that assigned credit ratings to the RMBS in this case.

44.     The credit rating agencies use letter-grade rating systems as shown in Table 3 (*infra*).

**Table 3**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | **Prime (Maximum Safety)** | |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | **High Grade, High Quality** | **INVESTMENT GRADE** |
| A1<br>A2<br>A3 | A+<br>A<br>A- | **Upper Medium Grade** | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | **Medium Grade** | |
| Ba2<br>Ba3 | BB<br>BB- | **Non-Investment Grade, or Speculative** | **SPECULATIVE GRADE** |
| B1<br>B2<br>B3 | B+<br>B<br>B- | **Highly Speculative, or Substantial Risk** | |
| Caa2<br>Caa3 | CCC+ | **In Poor Standing** | |
| Ca | CCC<br>CCC- | **Extremely Speculative** | |
| C | - | **May be in Default** | |
| - | D | **Default** | |

45.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk."  Moody's Investors Services, Inc., Moody's Rating Symbols & Definitions at 6 (August 2003), *available at* http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf.  Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the obligation is

extremely strong."  Standard & Poor's, Ratings Definitions, *available at*

https://www.globalcreditportal.com/ratingsdirect/renderArticle.do?articleId=1019442&SctArtId

=147045&from=CM&nsl_code=LIME.

46.　　In fact, RMBS could not be sold unless they received one of the highest

"investment grade" ratings on most tranches from one or more credit rating agencies, because the

primary market for RMBS is institutional investors, such as the Credit Unions, which are

generally limited to buying only securities with the highest credit ratings.  *See*, *e.g.*, NCUA

Credit Risk Management Rule, 12 C.F.R. 704.6(d)(2) (2010) (prohibiting corporate credit unions

from investing in securities rated below AA-); *but see*, *e.g.*, Alternatives to the Use of Credit

Ratings, 77 Fed. Reg. 74,103 (Dec. 13, 2012) (to be codified at 12 C.F.R. pts. 703, 704, 709, and

742).

47.　　 While the pool of mortgages underlying the RMBS may not have been sufficient

to warrant a triple-A credit rating, various forms of "credit enhancement" were used to obtain a

triple-A credit rating on the higher tranches of RMBS.

48.　　One form of credit enhancement is "structural subordination."  The tranches, and

their risk characteristics relative to each other, are often analogized to a waterfall.  Investors in

the higher or "senior" tranches are the first to be paid as income is generated when borrowers

make their monthly payments.  After investors in the most senior tranche are paid, investors in

the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or

lowest tranche.

49.　　In the event mortgages in the pool default, the resulting loss is absorbed by the

subordinated tranches first.

50.　　Accordingly, senior tranches are deemed less risky than subordinate tranches and

therefore receive higher credit ratings.

51.     Another form of credit enhancement is overcollateralization.  Overcollateraliza-tion is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security.  The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

52.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.  Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Finally, some RMBS are "cross-collateralized," *i.e.*, when a loan group in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.     THE CREDIT UNIONS' PURCHASES

53.     The Credit Unions purchased only the highest-rated tranches of RMBS.  All but two were rated triple-A at the time of issuance.  These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 4).

**Table 4**
*Credit Ratings for the Credit Unions' RMBS Purchases*

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 02147TAK2 | Alternative Loan Trust 2006-28CB | U.S. Central | AAA | Aaa | B 10/31/2008 | Caa1 2/20/2009 | D 2/25/2011 | Caa3 7/12/2010 |

14

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | WesCorp | AAA | Aaa | B 10/30/2008 | C 2/2/2009 | D 2/24/2010 | Withdrawn 1/5/2012 |
| 45661HBD8 | IndyMac INDX Mortgage Loan Trust 2006-AR25 | WesCorp | AAA | Aaa | B 10/27/2008 | B2 8/19/2008 | D 12/24/2009 | Withdrawn 1/4/2012 |
| 45071KCP7 | Ixis Real Estate Capital Trust 2005-HE4 | WesCorp | AA+ | Aa2 | BB 1/9/2009 | Caa2 3/13/2009 | CC 7/8/2009 | C 8/2/2010 |
| 61750MAF2 | Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | U.S. Central | AAA | Aaa | BB 9/16/2008 | B3 10/30/2008 | CCC 8/11/2011 | Ca 7/15/2010 |
| 61750SAF9 | Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | U.S. Central | AAA | Aaa | BB 12/19/2008 | Ba2 10/30/2008 | CCC 8/4/2009 | Ca 7/15/2010 |
| 61749BAE3 | Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | U.S. Central | AAA | Aaa | BB 12/19/2008 | B2 10/30/2008 | CCC 8/11/2011 | Ca 7/15/2010 |
| 61748HGT2 | Morgan Stanley Mortgage Lon Trust 2004-11AR | WesCorp | AA | NR | CCC 11/3/2009 | NR 1/27/2005 | CC 11/30/2011 | NR 1/27/2005 |
| 61750PAD0 | Morgan Stanley Mortgage Loan Trust 2006-13ARX | WesCorp | AAA | Aaa | B 8/20/2008 | Caa2 8/21/2008 | CC 7/9/2009 | C 8/12/2010 |
| 61751TAE9 | Morgan Stanley Mortgage Loan Trust 2007-2AX | WesCorp | AAA | Aaa | B 10/6/2008 | Caa1 8/21/2008 | CCC 7/24/2009 | C 8/12/2010 |
| 61751GAE7 | Morgan Stanley Mortgage Loan Trust 2007-5AX | WesCorp | AAA | Aaa | B 9/17/2008 | Caa3 8/21/2008 | CCC 7/24/2009 | C 8/12/2010 |
| 669884AD0 | NovaStar Mortgage Funding Trust, Series 2006-1 | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ba3 3/13/2009 | CCC 8/4/2009 | Caa3 8/20/2012 |
| 669884AE8 | NovaStar Mortgage Funding Trust, Series 2006-1 | U.S. Central | AAA | Aaa | CCC 8/4/2009 | B1 3/13/2009 | CCC 8/4/2009 | Ca 8/20/2012 |
| 749228AM4 | RALI Series 2006-QS4 Trust | U.S. Central | AAA | Aaa | CCC 3/24/2009 | Caa2 2/26/2009 | D 7/22/2010 | Caa3 12/23/2010 |
| 75114TAG6 | RALI Series 2006-QS5 Trust | U.S. Central | AAA | Aaa | CCC 7/24/2009 | Caa2 2/26/2009 | D 4/19/2010 | Caa3 12/23/2010 |
| 75115EAB9 | RALI Series 2006-QS11 Trust | U.S. Central | AAA | Aaa | B 10/27/2008 | Caa1 2/26/2009 | D 5/25/2010 | Ca 5/31/2012 |
| 80556AAD9 | Saxon Asset Securities Trust 2006-3 | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Caa2 3/13/2009 | CCC 8/4/2009 | Caa3 7/16/2010 |

15

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 81744HAD5 | Sequoia Mortgage Trust 2007-1 | U.S. Central | AAA | NR | B+ 8/7/2009 | NR | CCC 2/22/2010 | NR |
| 81744HAE3 | Sequoia Mortgage Trust 2007-1 | U.S. Central | AAA | NR | CCC 8/7/2009 | NR | D 12/27/2011 | NR |

54.     At the time of purchase, the Credit Unions were not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS.   If the Credit Unions had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering Documents—they would not have purchased the certificates.

55.      The securities' substantial loss of market value has injured the Credit Unions and the NCUA Board.

## VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

56.     The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages.  The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on the underlying mortgage loans.

57.     With respect to RMBS collateralized by loans written by originators who systematically disregarded their stated underwriting standards, the following pattern is present:

> a.   a surge in borrower delinquencies and defaults on the mortgages in the pools (*see infra* Section VII.A and Table 5);
>
> b.   actual gross losses to the underlying mortgage pools within the first 12 months after the offerings exceeded expected gross losses (*see infra* Section VII.B and

Figure 2);

    c.  a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 6 and accompanying allegations); and

    d.  downgrades of the RMBS by credit rating agencies from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings (*see infra* Section VII.C and *supra* Table 4).

58.    These factors support a finding that the Originators failed to originate the mortgages in accordance with the underwriting standards stated in the Offering Documents.

59.    This conclusion is further corroborated by reports that the Originators who contributed mortgage loans to the RMBS at issue in this Complaint abandoned the underwriting standards described in the Offering Documents (*see infra* Section VII.D).

60.    This conclusion is further corroborated by evidence from due diligence firms that the RMBS underwritten by Morgan Stanley at issue in this Complaint were collateralized by a substantial number of defective loans (*see infra* Sections VII.E-F).

    **A.**    **The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards**

61.    Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

62.    The surge of delinquencies and defaults following the Offerings evidences the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

63.    The Offering Documents reported zero or near zero delinquencies and defaults at

the time of the Offerings (*see infra* Table 5).

64.      The pools of mortgages collateralizing the RMBS experienced delinquency and default rates up to 11.05% within the first three months, up to 23.04% at six months, and up to 43.78% at one year (*see infra* Table 5).

65.      As of June 2013, 36.24% of the mortgage collateral across all the RMBS that the Credit Unions purchased was in delinquency, bankruptcy, foreclosure, or real estate owned ("REO"), which means that a bank or lending institution owns the property after a failed sale at a foreclosure auction (*see infra* Table 5).

66.      Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint.  The data presented in the last five columns are from the trustee reports (dates and page references are indicated in the parentheticals).  The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by the Credit Unions; however, some trustee reports include only the aggregate data.  For RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

**Table 5**
***Delinquency and Default Rates for the Credit Unions' RMBS Purchases***

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 02147TAK2 | Alternative Loan Trust 2006-28CB (P.S. dated Aug. 29, 2006) | As of the cut-off date, no mortgage loan was 30 or more days delinquent. (S-28) | 0.12% (Sep., p.7) | 2.10% (Nov., p.7) | 2.7% (Feb., p.6) | 4.74% (Aug., p.6) | 29.78% (June 2013, p.15) |
| | American Home Mortgage Assets Trust 2007-3: Aggregate (P.S. dated June 5, 2007) | Zero. (S-40) | 0% (June p.10) | 4.99% (Aug. p.10) | 13.90% (Nov. p.10) | 27.47% (May p. 10) | 45.25% (June 2013, p.11) |

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | American Home Mortgage Assets Trust 2007-3: Group I-1 | Zero. (S-40) | 0% (June p.12) | 2.62% (Aug. p.12) | 8.63% (Nov. p.12) | 23.58% (May p.12) | 47.88% (June 2013, p.12) |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3: Group I-2 *Class I-2A-2 in Group I-2 (S-12) | Zero. (S-40) | 0% (June p.12) | 9.63% (Aug. p. 12) | 23.04% (Nov. p.12) | 43.78% (May p. 12) | 56.31% (June 2013, p.12) |
| | American Home Mortgage Assets Trust 2007-3: Group II-1 | Zero. (S-40) | 0% (June p.13) | 2.04% (Aug. p.13) | 5.74% (Nov. p.13) | 15.73% (May p.13) | 41.81% (June 2013, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group II-2 | Zero. (S-40) | 0% (June p.13) | 3.72% (Aug. p.13) | 12.44% (Nov. p.13) | 25.55% (May p.13) | 45.30% (June 2013, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group III | Zero. (S-40) | 0% (June p.14) | 5.16% (Aug. p. 14) | 16.35% (Nov. p.14) | 18.05% (May p. 14) | 11.60% (June 2013, p.14) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR25: Aggregate (P.S. dated July 27, 2006) | Zero. (S-28) | 1.92% (Aug., p.19) | 3.45% (Oct., p.19) | 5.00% (Jan., p.19) | 7.81% (July, p.19) | 26.34% (June 2013, p.19) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR25: Group 1 | Zero. (S-28) | 3.59% (Aug., p.20) | 3.41% (Oct., p.20) | 4.65% (Jan., p.20) | 4.84% (July, p.20) | 23.03% (June 2013, p.24) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR25: Group 2 | Zero. (S-28) | 6.52% (Aug., p.21) | 4.95% (Oct., p.21) | 6.66% (Jan., p.21) | 5.53% (July, p.21) | 19.63% (June 2013, p.30) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR25: Group 3 | Zero. (S-28) | 1.24% (Aug., p.22) | 3.54% (Oct., p.22) | 5.77% (Jan., p.22) | 9.38% (July, p.22) | 25.82% (June 2013, p.34) |
| 45661HBD8 | IndyMac INDX Mortgage Loan Trust 2006-AR25: Group 4 *Class 4-A-5 in Group 4. (S-12) | Zero. (S-28) | 1.16% (Aug., p.23) | 3.78% (Oct., p.23) | 5.12% (Jan., p.23) | 6.52% (July, p.23) | 24.06% (June 2013, p.39) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR25: Group 5 | Zero. (S-28) | 1.62% (Aug., p.24) | 3.72% (Oct., p.24) | 4.40% (Jan., p.24) | 8.29% (July, p.24) | 33.69% (June 2013, p.45) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR25: Group 6 | Zero. (S-28) | 3.78% (Aug., p.25) | 2.30% (Oct., p.25) | 3.22% (Jan., p.25) | 5.88% (July, p.25) | 25.92% (June 2013, p.51) |

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 45071KCP7 | Ixis Real Estate Capital Trust 2005-HE4 (P.S. dated November 18, 2005) | Zero. (S-95) | .02% (Dec., p.10) | 3.21% (Feb., p.10) | 5.25% (May, p.10) | 11.19% (Nov., p.10) | 55.95% (June 2013, p.11) |
| | Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Aggregate (P.S. dated Oct. 12, 2006) | 0.37% of the mortgage loans, were more than 30 days but less than 60 days delinquent. (S-28) | 2.44% (Nov., p.11) | 8.87% (Jan., p.11) | 14.10% (Apr., p.11) | 28.66% (Oct., p.11) | 60.52% (June 2013, p.10) |
| | Morgan Stanley ABS Capital I Inc. Trust 2006-HE7: Group 1 | | 2.33% (Nov., p.12) | 9.31% (Jan., p.12) | 13.97% (Apr., p.12) | 28.62% (Oct., p.12) | 59.41% (June 2013, p.15) |
| 61750MAF2 | Morgan Stanley ABS Capital I Inc. Trust 2006-HE7: Group 2 *Class A-2d in Group 2. (S-6) | | 2.47% (Nov., p.13) | 8.74% (Jan., p.13) | 14.15% (Apr., p.13) | 28.67% (Oct., p.13) | 60.86% (June 2013, p.21) |
| | Morgan Stanley ABS Capital I Inc. Trust 2006-HE8: Aggregate (P.S. dated November 21, 2006) | 0.83% were more than 30 days but less than 60 days delinquent. (S-29) | 2.62% (Dec., p.10) | 9.09% (Feb., p.10) | 13.56% (May, p.10) | 27.39% (Nov., p.10) | 45.97% (June 2013, p.10) |
| | Morgan Stanley ABS Capital I Inc. Trust 2006-HE8: Group 1 | | .76% (Dec., p.11) | 7.67% (Feb., p.11) | 11.03% (May, p.11) | 22.12% (Nov., p.11) | 35.46% (June 2013, p.11) |
| 61750SAF9 | Morgan Stanley ABS Capital I Inc. Trust 2006-HE8: Group 2 *Class A-2d in Group 2. (S-7) | | 3.06% (Dec., p.11) | 9.43% (Feb., p.11) | 14.15% (May, p.11) | 28.57% (Nov., p.11) | 48.53% (June 2013, p.11) |
| | Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Aggregate (P.S. dated Oct. 27, 2006) | 0.20% of the mortgage loans in the final mortgage loan pool, were more than 30 days but less than 60 days delinquent (S-27) | 1.61% (Dec., p.11) | 8.91% (Feb., p.11) | 14.54% (May, p.11) | 30.08% (Nov., p.11) | 56.80% (June 2013, p.11) |
| | Morgan Stanley ABS Capital I Inc. Trust 2006-NC5: Group 1 | | 1.39% (Dec., p.12) | 7.39% (Feb., p.12) | 11.99% (May, p.12) | 28.23% (Nov., p.12) | 51.43% (June 2013, p.16) |
| 61749BAE3 | Morgan Stanley ABS Capital I Inc. Trust 2006-NC5: Group 2 *Class A-2c in Group 2. (S-5) | | 1.69% (Dec., p.13) | 9.50% (Feb., p.13) | 15.52% (May, p.13) | 30.79% (Nov., p.13) | 58.78% (June 2013, p.22) |
| | Morgan Stanley Mortgage Loan Trust 2004-11AR Aggregate  (P.S. dated Dec. 22, 2004) | Zero. (S-27) | 0.26% (Jan., p.7) | 0.81% (Mar., p.7) | 1.47% (June, p.7) | 4.07% (Dec., p.11) | 20.6% (June 2013, p.11) |
| 61748HGT2 | Morgan Stanley Mortgage Loan Trust 2004-11AR: Group 1 | Zero. (S-27) | 0.14% (Jan., p.8) | 0.56% (Mar., p.8) | 1.60% (June, p.8) | 4.51% (Dec., p.12) | 23.0% (June 2013, p.13) |

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Morgan Stanley Mortgage Loan Trust 2004-11AR: Group 2 | Zero. (S-27) | 0.64% (Jan., p.8) | 2.14% (Mar., p.8) | 1.15% (June, p.8) | 3.26% (Dec., p.12) | 31.9% (June 2013, p.13) |
| | Morgan Stanley Mortgage Loan Trust 2004-11AR Group 3 | Zero. (S-27) | 0.16% (Jan., p.9) | 0.56% (Mar., p.9) | 1.38% (June, p.9) | 3.91% (Dec., p.13) | 16.5% (June 2013, p.14) |
| | Morgan Stanley Mortgage Loan Trust 2004-11AR Group 4 | Zero. (S-27) | 1.96% (Jan., p.9) | 1.63% (Mar., p.9) | 3.23% (June, p.9) | 4.34% (Dec., p.13) | 28.51% (June 2013, p.14) |
| | Morgan Stanley Mortgage Loan Trust 2004-11AR Group 5 | Zero. (S-27) | 0% (Jan., p.10) | 0.35% (Mar., p.10) | 0% (June, p.10) | 2.23% (Dec., p.14) | 5.07% (June 2013, p.15) |
| 61750PAD0 | Morgan Stanley Mortgage Loan Trust 2006-13ARX (P.S. dated September 26, 2006) | Zero. (S-31) | 7.12% (Oct. p. 9) | 11.05% (Dec. p.9) | 8.32% (Mar. p.9) | 19.95% (Sep. p.9) | 34.12% (June 2013, p.9) |
| | Morgan Stanley Mortgage Loan Trust 2007-2AX: Aggregate (P.S. dated January 24, 2007) | Zero. (S-35) | .08% (Feb., p.9) | 2.30% (Apr., p.9) | 7.48% (July, p.9) | 18.03% (Jan. 2008, p.9) | 33.98% (June 2013, p.9) |
| | Morgan Stanley Mortgage Loan Trust 2007-2AX: Group 1 | Zero. (S-35) | .15% (Feb., p.10) | 1.72% (Apr., p.10) | 5.65% (July, p.10) | 16.25% (Jan. 2008, p.10) | 28.67% (June 2013, p.10) |
| 61751TAE9 | Morgan Stanley Mortgage Loan Trust 2007-2AX: Group 2 *Class 2-A-4 in Group 2. (S-72) | Zero. (S-35) | .05% (Feb., p.10) | 2.50% (Apr., p.10) | 8.14% (July, p.10) | 18.67% (Jan. 2008, p.10) | 36.20% (June 2013, p.10) |
| | Morgan Stanley Mortgage Loan Trust 2007-5AX: Aggregate (P.S. dated February 26, 2007) | Zero. (S-35) | 0.0% (Mar., p.9) | 4.65% (May, p.9) | 13.29% (Aug., p.9) | 28.04% (Feb., p.9) | 38.14% (June 2013, p.9) |
| | Morgan Stanley Mortgage Loan Trust 2007-5AX: Group 1 | Zero. (S-35) | 0.0% (Mar., p.10) | 4.22% (May, p.10) | 9.51% (Aug., p.10) | 26.72% (Feb., p.10) | 36.20% (June 2013, p.10) |
| 61751GAE7 | Morgan Stanley Mortgage Loan Trust 2007-5AX: Group 2 *Class 2-A-4 in Group 2. (S-73) | Zero. (S-35) | 0.0% (Mar., p.10) | 4.79% (May, p.10) | 14.50% (Aug., p.10) | 28.45% (Feb., p.10) | 38.69% (June 2013, p.10) |
| | NovaStar Mortgage Funding Trust, Series 2006-1: Aggregate (P.S. dated Apr. 20, 2006) | .2% were at least 30 but less than 90 days delinquent. (S-27) | .45% (May, ps.7-12) | 2.21% (July, ps.6-10) | 5.87% (Oct., ps.6-10) | 11.35% (Apr., ps.6-10) | 36.11% (June 2013, ps.7-9) |

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | NovaStar Mortgage Funding Trust, Series 2006-1: Group 1 | .2% were at least 30 but less than 90 days delinquent. (S-27) | .21% (May, ps.7-12) | 1.78% (July, ps.6-10) | 5.06% (Oct., ps.6-10) | 9.52% (Apr., ps.6-10) | 33.13% (June 2013, ps.7-9) |
| 669884AD0 669884AE8 | NovaStar Mortgage Funding Trust, Series 2006-1: Group 2 | .2% were at least 30 but less than 90 days delinquent. (S-27) | .96% (May, ps.7-12) | 3.07% (July, ps.6-10) | 7.48% (Oct., ps.6-10) | 14.89% (Apr., ps.6-10) | 44.51% (June 2013, ps.7-9) |
| 749228AM4 | RALI Series 2006-QS4 Trust (P.S. dated April 26, 2006) | As of the cut-off date, none of the mortgage loans will be 30 or more days delinquent. (S-41) | 0.64% (May, p.7) | 1.66% (July, p.6) | 3.67% (Oct., p.6) | 5.89% (Apr., p .7) | 26.45% (June 2013, p.7) |
| 75114TAG6 | RALI Series 2006-QS5 Trust (P.S. dated May 25, 2006) | Zero. (S-38) | .79% (June, p.7) | 2.06% (Aug., p.6) | 2.91% (Nov., p.7) | 6.82% (May, p.7) | 24.44% (June 2013, p.7) |
| | RALI Series 2006-QS11 Trust (P.S. dated Aug. 28, 2006) | Zero. (S-41) | 0.42% (Sep., p.8) | 2.45% Nov., p.8) | 3.89% (Feb., p.8) | 7.61% (Aug., p.8) | 28.55% (June 2013, p.8) |
| 75115EAB9 | RALI Series 2006-QS11 Trust Group 1 *Class I-A-2 in Group 1 (S-29) | Zero. (S-41) | 0.41% (Sep., p.9) | 2.46% (Nov., p.9) | 3.73% (Feb., p.9) | 7.56% (Aug., p.9) | 28.42% (June 2013, p.9) |
| | RALI Series 2006-QS11 Trust Group 2 | Zero. (S-41) | 0.60% (Sep., p.10) | 2.45% (Nov., p.10) | 6.76% (Feb., p.10) | 8.66% (Aug, p.10) | 30.89% (June 2013, p.10) |
| 80556AAD9 | Saxon Asset Securities Trust 2006-3 (P.S. dated October 5, 2006) | 1.50% were at least 30 but less than 60 days delinquent. (S-48) | 0.0% (Oct., p.10) | 3.14% (Dec., p.10) | 9.44% (Mar., p.10) | 21.62% (Sept., p.10) | 29.58% (June 2013, p.11) |
| | Sequoia Mortgage Trust 2007-1 Aggregate (P.S. dated March 29, 2007) | As of February 28, 2007, all of the Mortgage Loans will be less than 30 days delinquent in payment. (S-30) | 0.15% (Apr., p.10) | 0.88% (June, p.10) | 1.46% (Sep., p.10) | 3.63% (Mar., p.10) | 21.52% (June 2013, p.10) |
| | Sequoia Mortgage Trust 2007-1: Pool 1 | As of February 28, 2007, all of the Mortgage Loans will be less than 30 days delinquent in payment. (S-30) | 0.43% (Apr., p.11) | 0.25% (June, p.11) | 0.90% (Sep., p.11) | 5.81% (Mar., p.11) | 17.23% (June 2013, p.11) |
| 81744HAD5 81744HAE3 | Sequoia Mortgage Trust 2007-1: Pool 2 * Classes 2A-1 and 2A-2 in Pool 2. (S-4) | As of February 28, 2007, all of the Mortgage Loans will be less than 30 days delinquent in payment. (S-30) | 0.19% (Apr., p.11) | 1.33% (June, p.11) | 1.24% (Sep., p.11) | 3.72% (Mar., p.11) | 21.01% (June 2013, p.11) |
| | Sequoia Mortgage Trust 2007-1: Pool 3 | As of February 28, 2007, all of the Mortgage Loans will be less than 30 days delinquent in payment. (S-30) | 0% (Apr., p.12) | 0% (June, p.12) | 3.15% (Sep., p.12) | 2.77% (Mar., p.12) | 23.28% (June 2013, p.12) |
| | Sequoia Mortgage Trust 2007-1: Pool 4 | As of February 28, 2007, all of the Mortgage Loans will be less than 30 days delinquent in payment. (S-30) | 0.16% (Apr., p.12) | 0.63% (June, p.12) | 0.52% (Sep., p.12) | 3.31% (Mar., p.12) | 32.79% (June 2013, p.12) |
| | Sequoia Mortgage Trust 2007-1: Pool 5 | As of February 28, 2007, all of the Mortgage Loans will be less than 30 days delinquent in payment. (S-30) | 0% (Apr., p.13) | 0.40% (June, p.13) | 2.22% (Sep., p.13) | 3.31% (Mar., p.13) | 15.25% (June 2013, p.13) |

67.     This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by the Credit Unions, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

68.     The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default."  Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process, resulting from the systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

69.     A November 2008 Federal Reserve Board study attributed the rise in defaults, in part, to "[d]eteriorating lending standards" and posits that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

70.     In January 2011, the Financial Stability Oversight Council ("FSOC"), chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy.  *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report").  The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy."  *Id*. at 2.

71.     The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the originators to the

investors, while obscuring critical information concerning the actual nature of the risk.  The

FSOC Risk Retention Report stated:

> The securitization process involves multiple parties with varying incentives and information, thereby breaking down the traditional direct relationship between borrower and lender.  The party setting underwriting standards and making lending decisions (the originator) and the party making structuring decisions (the securitizer) are often exposed to minimal or no credit risk. By contrast, the party that is most exposed to credit risk (the investor) often has less influence over underwriting standards and may have less information about the borrower. As a result, originators and securitizers that do not retain risk can, at least in the short run, maximize their own returns by lowering underwriting standards in ways that investors may have difficulty detecting.  The originate-to-distribute model, as it was conducted, exacerbated this weakness by compensating originators and securitizers based on volume, rather than on quality.

*Id*. at 3.

72.     Indeed, originators that wrote a high percentage of their loans for distribution

were more likely to disregard underwriting standards, resulting in poorly performing mortgages,

in contrast to originators that originated and then held most of their loans.

73.     High OTD originators profited from mortgage origination fees without bearing

the risks of borrower default or insufficient collateral in the event of default.  Divorced from

these risks, high OTD originators were incentivized to push loan quantity over quality.

74.     Table 6 (*infra*) shows the percentage of loans originated for distribution relative to

all the loans made by the Originators for the years 2005, 2006 and 2007, for those Originators in

this Complaint with high OTD percentages.   The data was obtained from the Home Mortgage

Disclosure Act database.

**Table 6**
*Originator "Originate-to-Distribute" Percentages*

| Originator | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| ABN AMRO Mortgage Group, Inc. | 79.9 | 69.5 | 85.7 |

| Originator | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| Countrywide Home Loans | 98.5 | 96.5 | 98.4 |
| Decision One Mortgage Company, LLC | 97.5 | 88.2 | 97.3 |
| Encore Credit Corp. | 79.5 | 100 | |
| First Horizon Home Loan Corp. | 98.9 | 98.3 | |
| First Magnus Financial Corp. | 100 | 100 | |
| Fremont Investment & Loan | 91.2 | 85.2 | 94 |
| GreenPoint Mortgage Funding Inc. | 89 | 87.1 | 95.6 |
| Homecomings Financial Network, Inc. | 97.4 | 97.9 | 99.9 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| Lime Financial Services, Ltd. | 65.6 | 88 | 99.3 |
| Morgan Stanley Credit Corp. | 37.1 | 49.4 | 60.3 |
| New Century Mortgage Corporation | 92.4 | 84.2 | |
| NovaStar Mortgage, Inc. | 89.2 | 80.0 | 98.5 |
| People's Choice Home Loan, Inc. | 83.4 | 87.8 | |
| Saxon Funding Management, Inc. | 94.8 | 91 | 98.4 |
| Wachovia Mortgage Corporation | 82.6 | 74.1 | 69.6 |
| Wilmington Finance | 100 | 100 | 99.9 |
| WMC Mortgage Corp. | 100 | 100 | 100 |

**B.**     **The Surge in Actual Versus Expected Cumulative Gross Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

75.     The actual defaults in the mortgage pools underlying the RMBS the Credit Unions

purchased exceeded expected defaults so quickly and by so wide a margin that a significant

portion of the mortgages could not have been underwritten as represented in the Offering Documents.

76.     Every month, the RMBS trustee reports the number and outstanding balance of all loans in the mortgage pools that have defaulted.  The running total of this cumulative default balance is referred to as the "gross loss."

77.     When defaulted loans are foreclosed upon, the proceeds from the foreclosures are distributed to the investors and any shortfall on the defaulted loan balances is realized as a loss. The running total of this cumulative realized loss (defaulted loan balance minus recovery in foreclosure) is referred to as the "net loss."

78.     "Actual loss" is the economic loss the mortgage pool experiences *in fact*.  So "actual gross loss" is the *actual* cumulative sum of the balance of the loans in default for a particular security.  Likewise, "actual net loss" is the *actual* cumulative realized loss on defaulted loans after foreclosure.

79.     At the time a security is rated, the rating agency calculates an amount of "expected loss" using a model based on historical performance of similar securities.  So "expected gross loss" is the *expected* cumulative sum of the balance of the loans in default for a particular security.  Likewise, "expected net loss" is the *expected* cumulative realized loss on defaulted loans after foreclosure.  The amount of expected net loss drives the credit ratings assigned to the various tranches of RMBS.

80.     Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected net loss (in equation form:  $CE/ENL = RF$).  Thus, the rating factor expresses how many times the expected net loss is covered by credit enhancement.  A "triple-A" rated security would have a rating factor of "5," so would require

credit enhancement of five times the amount of the expected net loss.  A "double-A rating" would have a rating factor of "4," and thus would require credit enhancement equaling four times the expected net loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected net loss.  A "Baa" rating would require credit enhancement of  2—1.5 times expected net loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected net loss.

81.     Accordingly, by working backwards from this equation, one can infer expected net loss in an already-issued offering.  For example, assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million.  This means the non-senior tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior tranches in this hypothetical offering serves as the credit enhancement for the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected net loss would be $5 million, which is the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5.  The following equation illustrates: $25,000,000/5 = $5,000,000.

82.     Expected gross loss can be then mathematically derived by applying an "expected recovery rate" to the expected net loss (EGL = ENL/(1 − ERR)).

83.     A comparison of actual gross losses to expected gross losses for a particular security can be made graphically by plotting the actual versus expected loss data on a line graph.  Figure 2 (*infra*) is a series of such line graphs.  Figure 2 illustrates the actual gross loss (again, actual defaults) the pools backing the RMBS purchased by the Credit Unions experienced in the first twelve months after issuance compared to the expected gross loss (again, expected defaults) for those pools during the same time period.

27

84.     The actual gross loss data in Figure 2 (*infra*) was obtained from ABSNET, a resource for asset-backed securities related data.  The expected gross losses were calculated by "grossing up" the rating-implied expected net losses using an expected recovery rate of 85%.

85.     As the graphs show, the actual gross losses (the solid lines) far exceeded the expected gross losses (the dotted lines) for the period analyzed.  That means that the actual balance of defaulted loans in the first twelve months following issuance far exceeded the expected balance of defaulted loans based on historical performance.

**Figure 2**
***Illustration of Expected Gross Losses v. Actual Gross Losses for***
***The Credit Unions' RMBS Purchases***

| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Alternative Loan Trust 2006-28CB | 38892 | 1 | $                   - | $            78,102 |
| Alternative Loan Trust 2006-28CB | 38892 | 2 | $                   - | $            85,307 |
| Alternative Loan Trust 2006-28CB | 38892 | 3 | $                   - | $            93,162 |
| Alternative Loan Trust 2006-28CB | 38892 | 4 | $                   - | $          101,722 |
| Alternative Loan Trust 2006-28CB | 38892 | 5 | $          823,705 | $          111,046 |
| Alternative Loan Trust 2006-28CB | 38892 | 6 | $       1,170,840 | $          121,200 |
| Alternative Loan Trust 2006-28CB | 38892 | 7 | $       1,347,068 | $          132,253 |
| Alternative Loan Trust 2006-28CB | 38892 | 8 | $       1,515,186 | $          144,277 |
| Alternative Loan Trust 2006-28CB | 38892 | 9 | $       2,235,827 | $          157,352 |
| Alternative Loan Trust 2006-28CB | 38892 | 10 | $       2,443,578 | $          171,562 |
| Alternative Loan Trust 2006-28CB | 38892 | 11 | $       2,926,033 | $          186,995 |
| Alternative Loan Trust 2006-28CB | 38892 | 12 | $       4,947,196 | $          203,746 |



28

| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| American Home Mortgage Assets Trust 2007-3 | 41708 | 1 | $ - | $ 2,232,609 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 2 | $ 20,399,980 | $ 2,438,567 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 3 | $ 49,464,549 | $ 2,663,093 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 4 | $ 76,378,883 | $ 2,907,778 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 5 | $ 103,585,268 | $ 3,174,333 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 6 | $ 126,194,666 | $ 3,464,595 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 7 | $ 133,739,946 | $ 3,780,536 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 8 | $ 156,844,114 | $ 4,124,262 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 9 | $ 179,998,082 | $ 4,498,024 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 10 | $ 178,962,347 | $ 4,904,215 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 11 | $ 199,782,543 | $ 5,345,381 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 12 | $ 219,602,705 | $ 5,824,213 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 1 | $ - | $ 2,085,272 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 2 | $ - | $ 2,277,639 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 3 | $ - | $ 2,487,348 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 4 | $ 433,765 | $ 2,715,885 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 5 | $ 2,168,181 | $ 2,964,849 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 6 | $ 5,227,316 | $ 3,235,956 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 7 | $ 8,947,566 | $ 3,531,046 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 8 | $ 10,357,559 | $ 3,852,089 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 9 | $ 13,530,092 | $ 4,201,185 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 10 | $ 12,661,351 | $ 4,580,571 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 11 | $ 22,966,385 | $ 4,992,623 |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 | 38485 | 12 | $ 25,810,286 | $ 5,439,855 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 1 | $ 128,770 | $ 4,151,397 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 2 | $ 2,780,486 | $ 4,534,364 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 3 | $ 3,221,729 | $ 4,951,856 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 4 | $ 9,299,314 | $ 5,406,832 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 5 | $ 1,767,073 | $ 5,902,474 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 6 | $ 9,147,104 | $ 6,442,199 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 7 | $ 20,276,518 | $ 7,029,671 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 8 | $ 20,086,318 | $ 7,668,809 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 9 | $ 28,987,626 | $ 8,363,795 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 10 | $ 31,892,960 | $ 9,119,083 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 11 | $ 34,681,610 | $ 9,939,404 |
| IXIS Real Estate Capital Trust 2005-HE4 | 36014 | 12 | $ 39,198,067 | $ 10,829,762 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 1 | $ 344,317 | $ 6,121,957 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 2 | $ 1,948,031 | $ 6,686,708 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 3 | $ 20,675,997 | $ 7,302,372 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 4 | $ 45,185,575 | $ 7,973,313 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 5 | $ 58,862,755 | $ 8,704,223 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 6 | $ 79,653,064 | $ 9,500,142 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 7 | $ 90,536,538 | $ 10,366,471 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 8 | $ 88,917,416 | $ 11,308,990 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 9 | $ 94,716,207 | $ 12,333,868 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 10 | $ 104,601,836 | $ 13,447,673 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 11 | $ 127,160,178 | $ 14,657,377 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | 40376 | 12 | $ 140,581,842 | $ 15,970,365 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 1 | $ - | $ 7,324,817 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 2 | $ 3,653,378 | $ 8,000,532 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 3 | $ 14,446,351 | $ 8,737,164 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 4 | $ 22,703,118 | $ 9,539,934 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 5 | $ 35,012,345 | $ 10,414,455 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 6 | $ 67,677,065 | $ 11,366,758 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 7 | $ 88,044,852 | $ 12,403,306 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 8 | $ 98,125,004 | $ 13,531,014 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 9 | $ 112,721,735 | $ 14,757,263 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 10 | $ 122,464,531 | $ 16,089,911 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 11 | $ 134,204,331 | $ 17,537,302 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | 39736 | 12 | $ 130,029,937 | $ 19,108,269 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 1 | $ - | $ 7,048,988 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 2 | $ 1,771,389 | $ 7,699,257 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 3 | $ 4,232,637 | $ 8,408,151 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 4 | $ 26,493,872 | $ 9,180,690 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 5 | $ 63,017,031 | $ 10,022,280 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 6 | $ 80,731,990 | $ 10,938,722 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 7 | $ 94,159,007 | $ 11,936,237 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 8 | $ 98,672,779 | $ 13,021,480 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 9 | $ 107,983,807 | $ 14,201,552 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 10 | $ 134,541,971 | $ 15,484,017 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 11 | $ 144,452,619 | $ 16,876,903 |
| Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | 40351 | 12 | $ 143,272,455 | $ 18,388,713 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 1 | $ - | $ 2,186,529 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 2 | $ - | $ 2,388,237 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 3 | $ - | $ 2,608,129 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 4 | $ - | $ 2,847,763 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 5 | $ 1,670,498 | $ 3,108,816 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 6 | $ 1,670,498 | $ 3,393,088 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 7 | $ 2,179,353 | $ 3,702,508 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 8 | $ 2,179,353 | $ 4,039,140 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 9 | $ 2,776,253 | $ 4,405,187 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 10 | $ 3,201,739 | $ 4,802,995 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 11 | $ 3,558,447 | $ 5,235,056 |
| Morgan Stanley Mortgage Loan Trust 2004-11AR | 33289 | 12 | $ 7,333,160 | $ 5,704,005 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 1 | $ - | $ 210,450 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 2 | $ - | $ 229,864 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 3 | $ 12,115,526 | $ 251,029 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 4 | $ 9,203,512 | $ 274,093 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 5 | $ 9,977,309 | $ 299,219 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 6 | $ 18,713,129 | $ 326,580 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 7 | $ 26,453,940 | $ 356,361 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 8 | $ 32,372,892 | $ 388,761 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 9 | $ 37,703,796 | $ 423,993 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 10 | $ 43,878,845 | $ 462,281 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 11 | $ 56,828,746 | $ 503,867 |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 39177 | 12 | $ 70,534,919 | $ 549,002 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 1 | $ - | $ 948,853 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 2 | $ - | $ 1,036,385 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 3 | $ 4,928,713 | $ 1,131,808 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 4 | $ 5,879,696 | $ 1,235,798 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 5 | $ 10,597,650 | $ 1,349,083 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 6 | $ 18,218,029 | $ 1,472,444 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 7 | $ 22,375,002 | $ 1,606,718 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 8 | $ 26,550,797 | $ 1,752,800 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 9 | $ 30,017,658 | $ 1,911,648 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 10 | $ 31,416,630 | $ 2,084,279 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 11 | $ 40,412,878 | $ 2,271,773 |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 40277 | 12 | $ 48,068,423 | $ 2,475,275 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 1 | $ - | $ 870,623 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 2 | $ - | $ 950,938 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 3 | $ 13,975,475 | $ 1,038,493 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 4 | $ 11,371,439 | $ 1,133,910 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 5 | $ 11,292,547 | $ 1,237,855 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 6 | $ 11,132,627 | $ 1,351,045 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 7 | $ 33,610,576 | $ 1,474,248 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 8 | $ 45,979,921 | $ 1,608,287 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 9 | $ 52,847,155 | $ 1,754,038 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 10 | $ 59,008,722 | $ 1,912,435 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 11 | $ 56,889,404 | $ 2,084,471 |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 40994 | 12 | $ 63,358,578 | $ 2,271,195 |



33

| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 1 | $ 1,646,389 | $ 4,974,617 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 2 | $ 4,032,393 | $ 5,433,526 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 3 | $ 6,726,832 | $ 5,933,807 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 4 | $ 15,806,704 | $ 6,479,004 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 5 | $ 21,528,450 | $ 7,072,932 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 6 | $ 30,090,209 | $ 7,719,684 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 7 | $ 38,102,644 | $ 8,423,651 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 8 | $ 46,177,816 | $ 9,189,530 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 9 | $ 54,521,610 | $ 10,022,331 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 10 | $ 63,454,001 | $ 10,927,393 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 11 | $ 67,173,907 | $ 11,910,383 |
| Novastar Mortgage Funding Trust 2006-1 | 37646 | 12 | $ 66,946,534 | $ 12,977,298 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2005-QS4 Trust | 37897 | 1 | $ - | $ 589,561 |
| RALI Series 2005-QS4 Trust | 37897 | 2 | $ - | $ 643,948 |
| RALI Series 2005-QS4 Trust | 37897 | 3 | $ - | $ 703,238 |
| RALI Series 2005-QS4 Trust | 37897 | 4 | $ 208,806 | $ 767,852 |
| RALI Series 2005-QS4 Trust | 37897 | 5 | $ 635,777 | $ 838,240 |
| RALI Series 2005-QS4 Trust | 37897 | 6 | $ 1,035,846 | $ 914,889 |
| RALI Series 2005-QS4 Trust | 37897 | 7 | $ 2,163,275 | $ 998,319 |
| RALI Series 2005-QS4 Trust | 37897 | 8 | $ 3,662,812 | $ 1,089,086 |
| RALI Series 2005-QS4 Trust | 37897 | 9 | $ 6,365,895 | $ 1,187,785 |
| RALI Series 2005-QS4 Trust | 37897 | 10 | $ 6,577,044 | $ 1,295,047 |
| RALI Series 2005-QS4 Trust | 37897 | 11 | $ 7,920,219 | $ 1,411,545 |
| RALI Series 2005-QS4 Trust | 37897 | 12 | $ 8,906,654 | $ 1,537,989 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QS5 Trust | 37938 | 1 | $ - | $ 555,643 |
| RALI Series 2006-QS5 Trust | 37938 | 2 | $ - | $ 606,901 |
| RALI Series 2006-QS5 Trust | 37938 | 3 | $ - | $ 662,781 |
| RALI Series 2006-QS5 Trust | 37938 | 4 | $ 279,369 | $ 723,677 |
| RALI Series 2006-QS5 Trust | 37938 | 5 | $ 2,505,871 | $ 790,016 |
| RALI Series 2006-QS5 Trust | 37938 | 6 | $ 3,091,538 | $ 862,255 |
| RALI Series 2006-QS5 Trust | 37938 | 7 | $ 3,663,843 | $ 940,885 |
| RALI Series 2006-QS5 Trust | 37938 | 8 | $ 3,662,175 | $ 1,026,431 |
| RALI Series 2006-QS5 Trust | 37938 | 9 | $ 2,969,698 | $ 1,119,451 |
| RALI Series 2006-QS5 Trust | 37938 | 10 | $ 4,776,628 | $ 1,220,543 |
| RALI Series 2006-QS5 Trust | 37938 | 11 | $ 4,827,349 | $ 1,330,338 |
| RALI Series 2006-QS5 Trust | 37938 | 12 | $ 6,190,161 | $ 1,449,508 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QS11 Trust | 39303 | 1 | $ - | $ 582,004 |
| RALI Series 2006-QS11 Trust | 39303 | 2 | $ - | $ 635,694 |
| RALI Series 2006-QS11 Trust | 39303 | 3 | $ - | $ 694,224 |
| RALI Series 2006-QS11 Trust | 39303 | 4 | $ 266,942 | $ 758,010 |
| RALI Series 2006-QS11 Trust | 39303 | 5 | $ 869,457 | $ 827,496 |
| RALI Series 2006-QS11 Trust | 39303 | 6 | $ 2,965,110 | $ 903,163 |
| RALI Series 2006-QS11 Trust | 39303 | 7 | $ 4,561,514 | $ 985,523 |
| RALI Series 2006-QS11 Trust | 39303 | 8 | $ 5,226,097 | $ 1,075,127 |
| RALI Series 2006-QS11 Trust | 39303 | 9 | $ 6,786,128 | $ 1,172,560 |
| RALI Series 2006-QS11 Trust | 39303 | 10 | $ 8,833,966 | $ 1,278,448 |
| RALI Series 2006-QS11 Trust | 39303 | 11 | $ 9,638,553 | $ 1,393,452 |
| RALI Series 2006-QS11 Trust | 39303 | 12 | $ 9,198,116 | $ 1,518,276 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 1 | $ - | $ 5,432,370 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 2 | $ 327,276 | $ 5,933,507 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 3 | $ 4,305,699 | $ 6,479,823 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 4 | $ 9,014,672 | $ 7,075,188 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 5 | $ 22,717,913 | $ 7,723,767 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 6 | $ 37,770,729 | $ 8,430,032 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 7 | $ 53,181,184 | $ 9,198,777 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 8 | $ 64,540,228 | $ 10,035,129 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 9 | $ 76,576,022 | $ 10,944,563 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 10 | $ 87,776,109 | $ 11,932,907 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 11 | $ 103,067,331 | $ 13,006,349 |
| Saxon Asset Securities Trust 2006-3: SAST 2006-3 | 39060 | 12 | $ 119,657,870 | $ 14,171,440 |



| Deal Name | ABSNet Deal Id | Period | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Sequoia Mortgage Trust 2007-1 | 40814 | 1 | $ - | $ 883,644 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 2 | $ - | $ 965,160 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 3 | $ 580,000 | $ 1,054,026 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 4 | $ 719,999 | $ 1,150,869 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 5 | $ 939,177 | $ 1,256,369 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 6 | $ 2,655,545 | $ 1,371,252 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 7 | $ 1,989,484 | $ 1,496,298 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 8 | $ 4,205,545 | $ 1,632,341 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 9 | $ 7,007,087 | $ 1,780,272 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 10 | $ 6,553,656 | $ 1,941,039 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 11 | $ 3,439,371 | $ 2,115,648 |
| Sequoia Mortgage Trust 2007-1 | 40814 | 12 | $ 5,034,887 | $ 2,305,165 |



86.     As clearly shown in Figure 2 (*supra*), actual gross losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS's credit enhancement.  For example, in the American Home Mortgage Assets Trust 2007-3 offering, actual gross losses at month 12 exceeded $219 million, or more than 37 times the expected gross losses of approximately $5.8 million.  (*See supra* Figure 2).

87.     This immediate increase in actual losses—at a rate far greater than expected losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

88.     Because credit enhancement is designed to ensure triple-A performance of triple-A rated RMBS, the evidence that credit enhancement has failed (*i.e.*, actual losses swiftly surged past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

**C.     The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines**

89.     Virtually all of the RMBS certificates the Credit Unions purchased were rated triple-A at issuance.

90.     Moody's and S&P have since downgraded the RMBS certificates the Credit Unions purchased to well below investment grade (*see supra* Table 4).

91.     Triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations.  A historical example of such a scenario is the Great Depression in the U.S." *Understanding Standard & Poor's Rating Definitions*, June 3, 2009, at 14.  The Certificate purchased in the American Home Mortgage Assets Trust 2007-3 offering

(CUSIP 026935AD8, *see supra* Table 2) has defaulted, meaning the Certificate has failed to pay out to RMBS investors as promised, because the income stream generated from the borrower's mortgage loan payments was insufficient and credit enhancement failed to make up for the shortfall.

92.    A rating downgrade is material.  The total collapse in the credit ratings of the RMBS certificates the Credit Unions purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these RMBS were impaired from the outset.

> **D.    Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards**

93.    Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

> **1.    The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse**

94.    Mortgage originators experienced unprecedented success during the mortgage boom.  Yet, their success was illusory.  As the loans they originated began to significantly underperform, the demand for their products subsided.  It became evident that originators had systematically disregarded their underwriting standards.

95.    The Office of the Comptroller of the Currency (the "OCC"), an office within the Treasury Department, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report").  In this report the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

96.   Government reports and investigations and newspaper reports have uncovered the extent of pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011).

97.   Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy. *See* FIN. CRISIS INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

98.   The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

99.     During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007."  *Id*. at xxii.  Early Payment Default is a significant indicator of pervasive disregard for underwriting standards.  The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards…."  *Id*.

100.     In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id*.

101.     Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards.  The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay."  *Id*. at xxiii.

102.   In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 12-13 (internal quotation marks omitted).

103.   Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

104.   Investment banks securitized loans that were not originated in accordance with underwriting guidelines and failed to disclose this fact in RMBS offering documents. As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

105.    The lack of disclosure regarding the true underwriting practices of the Originators in the Offering Documents at issue in this Complaint put the Credit Unions at a severe disadvantage.  The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS.  The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

106.    Because investors had limited or no access to information concerning the actual quality of loans underlying the RMBS, the OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived.  The FSOC found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully.  Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold.  By lower underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

FSOC Risk Retention Report at 11 (footnote omitted).

107.     The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry.  The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans… ." *Id.*

108.     In sum, the disregard of underwriting standards was pervasive across originators. The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS.  The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials.  The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

109.     As discussed below, facts have recently come to light that show many of the Originators who contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

## 2.     American Home's Systematic Disregard of Underwriting Standards

110.     American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated and serviced by its subsidiaries.  It was the parent of American Home Mortgage Holdings, Inc., which in turn was the parent of American Home Mortgage Corp., a retail lender of mortgage loans.  Collectively, these entities are referred to herein as "American Home."

111.     American Home originated or contributed a critical number of loans to the mortgage pools underlying the American Home Mortgage Assets Trust 2007-3 offering.  *See*

*infra* Table 11.

112.    Edmund Andrews, an economics reporter for the New York Times, recounted his own experience using American Home as a lender.  According to Andrews, he was looking to purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home.  The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed.  Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife.  Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations— including the mortgage.  Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country.  One of its specialties was serving people just like me:  borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify.  In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.

> I thought I knew a lot about go-go mortgages.  I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages.  I had interviewed people with very modest incomes who had taken out big loans.  Yet for all that, I was stunned at how much money people were willing to throw at me.

> [The American Home loan officer] called back the next morning.  "Your credit scores are almost perfect," he said happily.  "Based on your income, you can qualify for a mortgage of about $500,000."

> What about my alimony and child-support obligations?  No need to mention them.  What would happen when they saw the automatic withholdings in my paycheck?  No need to show them.  If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it.  His job was to make it happen.

> "I am here to enable dreams," he explained to me long afterward.  [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence.  "Who am I to tell you that you shouldn't do what you want to do?  I

am here to sell money and to help you do what you want to do.  At the end of the day, it's your signature on the mortgage—not mine."

Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at MM46.

113.    The American Home loan officer steered Andrews to a stated-income loan so that he would not have to produce paychecks or tax returns that would reveal his alimony and child support obligations.  The loan officer wanted to limit disclosure of Andrews's alimony and child support payments when an existing mortgage showed up under Andrews's name.  Although his ex-wife was solely responsible for that mortgage under the terms of the couple's separation agreement, the only way Andrews could explain that fact would be to produce the agreement, which would also reveal his alimony and child support obligations.  According to Andrews:

> [The American Home loan officer] didn't get flustered.  If Plan A didn't work, he would simply move down another step on the ladder of credibility.  Instead of "stating" my income without documenting it, I would take out a "no ratio" mortgage and not state my income at all.  For the price of a slightly higher interest rate, American Home would verify my assets, but that was it.  Because I wasn't stating my income, I couldn't have a debt-to-income ratio, and therefore, I couldn't have too much debt.  I could have had four other mortgages, and it wouldn't have mattered.  American Home was practically begging me to take the money.

*Id.*

114.    American Home ultimately approved Andrews's application.  Not surprisingly, Andrews was unable to afford his monthly mortgage payments.

115.    American Home's lack of adherence to underwriting guidelines was set forth in detail in a 165-page amended class action complaint filed June 4, 2008, in *In re American Home Mortgage Sec Litig.*, No. 07-md-1898 (TCP) (E.D.N.Y.).  Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from more than 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over

quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness.  *See* Am. Class Action Compl., *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. filed June 4, 2008) ("American Home ACC").

116.    According to the American Home ACC, former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied.  *See id.* ¶¶ 120-121.

117.    The American Home ACC cited to witnesses who were former American Home employees.  These witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud.  *See id.*

118.    Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans.  When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions.  Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval.  *See id.* ¶ 123.

119.    A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations.  *See id.* ¶ 124.

120.    The parties settled the litigation on January 14, 2010, for $37.25 million.

121.    American Home's lending practices landed it in the 2008 "Worst Ten in the

Worst Ten" Report.  American Home came in 8th in Las Vegas, Nevada, and 9th in both Detroit, Michigan, and Miami, Florida.  *See* 2008 "Worst Ten in the Worst Ten" Report.  When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report, American Home again featured prominently, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California).  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 3. Countrywide's Systematic Disregard of Underwriting Standards

122.    Countrywide Home Loans, Inc. ("Countrywide") was one of the largest originators of residential mortgages in the United States during the time period at issue in this Complaint.  Countrywide originated or contributed a material portion of the loans in the mortgage pool underlying the Alternative Loan Trust 2006-28CB offering.  *See infra* Table 11.

123.    In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis." Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

124.    On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their income."  Floyd Norris, A Little Pity, Please, for Lenders,

N.Y. Times, May 9, 2008, at C1.

125.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan,*" Dateline

NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders.  "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

> He said they joked about it:  "If you had a pulse, we gave you a loan.  If you fog the mirror, give you a loan."

> But it turned out to be no laughing matter for Partow.  Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes.  On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

> In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials.  "It's impossible they didn't know."
> …

> During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

> But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated.  "I don't buy the rogue.  I think it was infested."

> He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray.  He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path.  It was not just the matter of stated income loans, said Feinberg.  Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

> In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *'If You Had a Pulse, We Gave You a Loan,'* NBC Dateline (Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen.

126.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud.  Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it

was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.

*See* Compl. for Violations of the Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW

(C.D. Cal. filed June 4, 2009).  Mozilo and the other executives settled the charges with the SEC

for $73 million on October 15, 2010.  *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo,*

*Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

127.    Internal Countrywide e-mails the SEC released in connection with its lawsuit

show the extent to which Countrywide systematically deviated from its underwriting guidelines.

For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives,

Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for

process, compliance with guidelines and irresponsible behavior relative to meeting timelines."

E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006

7:42 PM PDT).  Mozilo also wrote that he had "personally observed a serious lack of compliance

within our origination system as it relates to documentation and generally a deterioration in the

quality of loans originated versus the pricing of those loan[s]."  *Id.* (internal quotation marks

omitted).

128.    Indeed, in September 2004, Mozilo had voiced his concern over the "clear

deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market.  With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."  E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept. 1, 2004 8:17 PM PDT).

129.    To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

130.    In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract.  In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate."  E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets at Countrywide Financial (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic]  It's not only subordinated to the first, but the first is subprime.  In addition, the [FICOs] are below 600, below 500 and some below 400 . . . .  With real estate values coming down . . . the product will become increasingly worse.  There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

*Id.*

131.    Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly

payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that

most of Countrywide's Pay Option ARMs were based on stated income and admitted that

"[t]here is also some evidence that the information that the borrower is providing us relative to

their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos

Garcia, former CFO of Countrywide Financial and Jim Furash, former President of Countrywide

Bank (June 1, 2006 10:38 PM PST).

132.    An internal quality control report e-mailed on June 2, 2006, showed that for stated

income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the

loan application.  *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim

Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

133.    Countrywide, apparently, was "flying blind" on how one of its popular loan

products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any

reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  E-mail

from Angelo Mozilo to Dave Sambol, Managing Director Countrywide (Sept. 26, 2006 10:15

AM PDT).  Yet such loans were securitized and passed on to unsuspecting investors such as the

Credit Unions.

134.    With growing concern over the performance of Pay Option ARM loans in the

waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated

for the Bank."  E-mail from Angelo Mozilo Countrywide to Carlos Garcia, former Managing

Director, Countrywide (Nov. 3, 2007 5:33 PM PST).  In other words, if Countrywide was to

continue to originate Pay Option ARM loans, it was not to hold onto the loans.  Mozilo's

concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite

[Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound

unless they are full doc, no more than 75% LTV and no piggys." *Id.*

135.     In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product.  This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."  E-mail from Angelo Mozilo to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST).

136.     Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors.  In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed.  He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy."  E-mail from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT).  Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines."  *Id.*  Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions.  I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . .  [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry. . . .

*Id.*

137.     Internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive. E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PDT).

138.     In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate.  Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."  E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST).

139.     John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 e-mail that "the exception process has never worked properly."  E-mail from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

140.     Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors.  After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."  E-mail from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

141.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

142.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

143.    According to Zachary, Countrywide pressured employees to approve unqualified borrowers.  Countrywide's mentality, he said, was "what do we do to get one more deal done.  It doesn't matter how you get there [i.e., how the employee closes the deal] . . . ."  NBC Nightly News, Countrywide Whistleblower Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News").  Zachary also stated that the practices were not the work of a few bad apples, but rather:  "It comes down, I think from the very top that you get a loan done at any cost."  *Id.*

144.    Zachary also told of a pattern of:  1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income in order to qualify for loans.

145.    NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices.  Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans.  NBC News quoted a former loan officer:  "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'"  July 1, 2008 NBC Nightly News.

146.    Not surprisingly, Countrywide's default rates reflected its approach to underwriting.  *See* 2008 "Worst Ten in the Worst Ten" Report.  Countrywide appeared on the top ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton, California and Riverside, California; and 10th in Bakersfield, California and Miami, Florida.  When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 4.    Decision One's Systematic Disregard of Underwriting Standards

147.    Decision One Mortgage Co., LLC ("Decision One") was a major lender specializing in "mortgage loans that are commonly referred to as Alt-A lending options, and non-conforming or sub-prime loans."  In 2006, Decision One ranked as the 14th largest subprime lender in the nation.  Decision One contributed a critical number of mortgage loans to Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 and Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 offerings.  *See infra* Table 11.

148.    A complaint filed by Allstate Insurance Company contains allegations based on confidential witness statements in which former Decision One employees "described Decision One's lax attitude towards its own origination and underwriting standards and explained that Decision One had been approving loans that should have never been issued."  *Allstate Ins. Co. v. Morgan Stanley*, Case No. 651840/2011, 2011 WL 2634724, at ¶ 95 (N.Y. Sup. filed July 5, 2011).  On March 15, 2013, the Court granted Morgan Stanley's Motion to Dismiss with respect

to a negligent misrepresentation claim, but denied the Motion in all other respects.

149.    According to testimony and documents submitted to the FCIC by a Clayton executive, during 2006 and the first half of 2007, Clayton reviewed 911,039 loans issued by originators, including Decision One, for securitization.  Clayton determined over 10% of Decision One's loans did not comply with its underwriting guidelines and had no compensating factors.  *See* Clayton All Trending Report at 10, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

150.    Decision One's reckless lending practices earned it a spot on the OCC's 2009 "Worst Ten in the Worst Ten" list.

### 5.    First Magnus Financial Corporation's Systematic Disregard of Underwriting Standards

151.    First Magnus Financial Corporation ("First Magnus") originated or contributed a material portion of the loans in the mortgage pool underlying the Sequoia Mortgage Trust 2007-1 offering.  *See infra* Table 11.

152.    Lehman Brothers and other banks requested that First Magnus repurchase $100 million of non-performing loans which First Magnus had sold to the banks.  This drove First Magnus into Chapter 11 bankruptcy.  Josh Brodesky, *Suit Says First Magnus Officers Fueled Crisis*; Their Reply: "*Absurd*", Arizona Daily Star, at A1 (Feb. 28, 2009), *available at* http://azstarnet.com/article_169e26ed-3c23-5ff7-8e2c-b765b02f8da6.html.

153.    The bankruptcy trustee subsequently filed suit against former First Magnus directors and officers.  The trustee alleged that First Magnus employees "would overstate incomes or assets to qualify potential borrowers."  *Id.*

154.    The trustee's complaint also detailed First Magnus's compensation structure. Starting in January 2005, approximately 60-65% of the loans that First Magnus originated were

referred by mortgage brokers.  First Magnus paid these brokers a fee for approved loans, creating

an incentive for brokers to falsify information in the loan applications and for underwriters to

ignore underwriting guidelines.  *See* Compl. in Adversary No. 09-211, *In re First Magnus Fin.*

*Corp.*, ¶ 88, No. 07-1578 (D. Ariz. Bankr. filed Feb. 26, 2009).

155.    After a lengthy battle, the trustee settled its claims against First Magnus's

directors and officers on confidential terms.  *See* Josh Brodesky, *First Magnus Saga's End*

*Shouldn't Surprise You*, Arizona Daily Star (Apr. 10, 2011), *available at*

http://azstarnet.com/news/local/josh-brodesky-first-magnus-saga-s-end-shouldn-t-

surprise/article_b3e3d446-e111-51d7-8303-c4316de15dfa.html.

### 6.    Fremont Investment and Loan's Systematic Disregard of Underwriting Standards

156.    Fremont Investment and Loan, Inc. ("Fremont") contributed loans to the Ixis Real

Estate Capital Trust 2005-HE4 offering.  *See infra* Table 11.

157.    Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a

lender "'known for poor quality loans.'"  Opening Statement of Sen. Carl Levin, Chairman,

Permanent S. Comm. on Investigations, Hearing on *Wall Street and the Financial Crisis:  The*

*Role of Credit Rating Agencies* (Apr. 23, 2010).  Senator Levin recounted how an analyst with

S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS

offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman
> Sachs using subprime loans from Fremont Investment and Loan, *a subprime*
> *lender known for loans with high rates of delinquency*.  On January 24, 2007, an
> analyst wrote seeking advice from two senior analysts:  "I have a Goldman deal
> with subprime Fremont collateral.  *Since Fremont collateral has been performing*
> *not so good, is there anything special I should be aware of*?"  One analyst
> responded:  "*No, we don't treat their collateral any differently.*"  The other asked:
> "are the FICO scores current?"  "Yup," came the reply.  Then "You are good to
> go."  In other words, *the analyst didn't have to factor in any greater credit risk for*

*an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry.* In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages.  By October, both companies began downgrading the CDO.  Today all five AAA tranches have been downgraded to junk status.

*Id.* (emphasis added).

158.    Fremont was subject to a cease and desist order from the Federal Deposit

Insurance Corporation ("FDIC") in 2007.  A July 1, 2008 article in the BCD News reported:

Ever since the FDIC slapped Fremont Investment & Loan with a cease and desist order in March 2007, a Chapter 11 filing seemed likely.
. . .

When the subprime mortgage market collapsed, Fremont Investment & Loan, once one of the top 10 subprime mortgage originators, found itself mired in financial disaster.  To make matters worse, it also faced scrutiny from the FDIC, and was the subject of numerous lawsuits alleging that Fremont engaged in deceptive practices in connection with its origination and servicing of residential mortgage[s]…

In March 2007, the company exited the residential subprime loan business in light of an FDIC cease and desist order.  The FDIC determined, among other things, that Fremont had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default.

*Former Subprime Lender's Parent Throws in the Towel*, 50 BCD NEWS & COMMENT, July 1,

2008.

159.    In July 2009, The New Yorker reported that Sheila Bair, Chairman of the FDIC,

initiated the first federal government action against Fremont in 2007 that culminated in the cease

and desist order to Fremont:

In March, 2007, she initiated the first government action against a subprime lender, instructing Fremont Investment & Loan, a California bank, to cease operations.  Fremont was among the worst of the subprime offenders, using all the now familiar practices:  targeting people with bad credit, *ignoring traditional standards for underwriting home loans*, paying third-party brokers handsomely to

58

> bring in gullible customers, and then infecting the larger financial system by selling off the hazardous loans.  "We ordered them out of the business," she said. "And they weren't happy about it."

Ryan Lizza, *The Contrarian; Sheila Bair and the White House financial debate*, NEW YORKER, July 6, 2009, at 30 (emphasis added).

160.    Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc., which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.
>
> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.
>
> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*, MYRTLE BEACH SUN-NEWS, Jan. 13, 2011, at A.  On September 28, 2012, the court denied in principal part Defendants' Joint Motion to Dismiss For Failure to State a Claim.  *See Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co., Inc., et al.*, Case No. 10-2741 (Mass. Super).

161.    On December 21, 2011, the Federal Housing Finance Agency ("FHFA") filed an amended complaint against UBS Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie Mac and Fannie Mae.  In the complaint, the FHFA alleged:

> A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans.  He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this."  The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved.  The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams.  He explained that like many Fremont

59

employees, he quit because he was uncomfortable with the company's practices.

*See Federal Housing Fin. Agency v. UBS Americas, Inc.*, Case No. 11 Civ. 05201 (S.D.N.Y.) (Second Amended Complaint, filed Dec. 21, 2011).  The court denied a motion to dismiss the complaint in May 2012.  *See Federal Housing Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012).  On July 25, 2013, the FHFA announced that it had reached an agreement to settle the case for $885 million.

162.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee.  *See* 2008 "Worst Ten in the Worst Ten" Report.  In the 2009 "Worst Ten of the Worst Ten" Report, Fremont holds the following positions:  2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 7.    GreenPoint Mortgage Funding Inc.'s Systematic Disregard of Underwriting Standards

163.    GreenPoint Mortgage Funding Inc. ("GreenPoint") contributed a material portion of the loans in the mortgage pool underlying the Morgan Stanley Mortgage Loan Trust 2007-2AX offering.  *See infra* Table 11.

164.    GreenPoint, based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One").  Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006.  Capital One

shut down GreenPoint's operations less than one year later on August 21, 2007.

165.    According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector."  Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

166.    When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5%.  A September 12, 2008, article on Bloomberg reports on GreenPoint's underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.

> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries.
> . . .

> "To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage Finance.  "Once the door was opened, it was abused."
> . . .

> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*, Bloomberg, Sept. 12, 2008, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=arb3xM3SHBVk.

167.    U.S. Bank, the indenture trustee of GreenPoint Mortgage Funding Trust 2006-HE1, sued GreenPoint in order to force GreenPoint to repurchase the loans that GreenPoint had

contributed to the RMBS.  U.S. Bank alleged that GreenPoint "pervasive[ly] fail[ed] to follow its underwriting guidelines during the origination of the Loans."  *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, No. 600352/09, 2010 WL 841367, at *7 (N.Y. Sup. Ct. Mar. 3, 2010); *see also* Compl., *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, 2009 WL 6084150, ¶ 35 (N.Y. Sup. Ct. Feb. 5, 2009) (alleging pervasive misrepresentations of borrowers' income, assets, employment, intent to occupy the property, inflated appraisal values, and violations of GreenPoint's underwriting guidelines regarding credit scores, debt-to-income ratios, and loan-to-value ratios).

168.    U.S. Bank based its allegations on its forensic analysis of GreenPoint-originated loans.  Of 1,030 randomly sampled loans, U.S. Bank found that 93% were in violation of GreenPoint's underwriting guidelines.  *See id.* at *7 n.4.  Its complaint survived a motion to dismiss.  *See id.* at *8.

169.    Syncora Guarantee, a monoline insurer, sued J.P. Morgan Securities, LLC, as successor to Bear Stearns & Co., Inc., in connection with an RMBS underwritten by Bear Stearns and exclusively collateralized by GreenPoint-originated loans.  After sustaining large losses due to the poor performance of GreenPoint loans, Syncora hired an independent consultant to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected without regard to payment status.  Over 92% of the 1,431 loans contained misrepresentations, and over 85% of the randomly selected 400 loans contained misrepresentations.  The misrepresentations uncovered include:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and,

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

*See* Compl., *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, ¶¶ 7, 181-82, No. 651566/2011 (N.Y. Sup. Ct. filed June 6, 2011).  Syncora's lawsuit survived a combined motion to dismiss and motion for summary judgment.  *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

170.     GreenPoint's own employees have corroborated the findings of U.S. Bank and Syncora.  A confidential witness in *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc.*, confirmed that (1) GreenPoint employees faced intense pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that contained exceptions for which there were no reasonable compensating factors; and (4) GreenPoint failed to adhere to sound underwriting guidelines.  This confidential witness was a senior loan underwriter at GreenPoint from October 1997 through August 2007.  *See* Compl., *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Secs., Inc.*, ¶ 265, No. 49D051010PL045071 (Ind. Sup. Ct., Marion Cnty. filed Oct. 15, 2010) ("FHLB Indianapolis").

171.     According to that confidential witness, sales staff and managers at GreenPoint

Mortgage received bonuses based on the number of loans closed.  As she said, "sales had tremendous authority" at GreenPoint Mortgage, and "[t]hey were in business to make more money.  They would try to find any way to close a loan."  *Id*. ¶ 266.

172.    Between 2005 and 2007, the confidential witness said that stated income loans became increasingly popular and GreenPoint managers approved loans based upon inflated incomes that she believed should not have been approved.  She saw a lot of loans with stated "income that was more than could be justified by the borrower's employment."  When she denied loans because she believed the income was inflated, sometimes the underwriting managers, operations managers, and the regional operations manager overrode her decisions.  *Id*. ¶ 267.

173.    More often than not, the confidential witness believed that her managers overrode her denials due to the incentives that they received based upon loan volume.  As she said, "They were making the decision because they had to hit certain sales numbers."  She was aware of such targets because of comments made in operations meetings about the company needing to meet certain goals.  *Id*. ¶ 268.

174.    The FHLB Indianapolis suit survived a motion to dismiss, with the Court holding, "the plaintiff has, indeed, stated a claim upon which relief can be granted on the issue of underwriting guidelines."  *Fed. Home Loan Bank of Indianapolis v. Bank of Am. Mortg. Secs., Inc.*, No. 49D051010PL045071, 2012 WL 2844690 (Ind. Sup. Ct., Marion Cnty. July 3, 2012).

175.    In *Allstate Bank v. J.P. Morgan Chase, N.A.*, Allstate, an RMBS investor, sued J.P. Morgan, the RMBS underwriter, for misrepresentations in RMBS offering documents.  Allstate's complaint relied on several confidential witnesses.  One confidential witness, who was an underwriting analyst at GreenPoint from 2003 to 2007, stated that GreenPoint reviewed only

10% of the loans it originated for fraud.  He thought this was a "mistake" because the fraud and misrepresentation uncovered in the 10% sample indicated that many more loans likely contained fraud.  But the remaining 90% of the loans were not reviewed.  Am. Compl., *Allstate Bank v. JPMorgan Chase, N.A.*, ¶ 485, No. 11-1869 (S.D.N.Y. filed May 10, 2012).

176.    That confidential witness also stated that sales personnel ran GreenPoint, and senior management was comprised of people from sales who were incentivized to push the volume of mortgage loans, not adherence to the underwriting guidelines or due diligence. Managers' bonuses were tied to production volume, and they were not penalized if loans were later found to be fraudulent or if the borrower defaulted on the first payment.  He stated that GreenPoint's management deliberately overlooked misrepresentations from mortgage loan brokers, particularly if the broker brought in a high volume of loans.  Problem brokers were rarely suspended, and even when they were, there was never a review of the loans they originated that were already in the pipeline.  *Id*. ¶ 486.

177.    Another confidential witness was a Wholesale Account Manager at GreenPoint from 2004 to 2006.  That confidential witness stated that GreenPoint employees understood that if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund the mortgage loan.  The majority of the loan products originated in the confidential witness's office were stated income-stated asset loans and pay-option ARMs.  Despite the risk inherent in these products, the sales force "never learned of negative loan performance" and their compensation was in no way tied to loan performance.  *Id*. ¶ 487.

178.    Another confidential witness was an Underwriting Supervisor at GreenPoint from 2005 to 2006 and supervised five Underwriters and three Conditions Specialists.  That confidential witness stated that GreenPoint management authorized exceptions to loan

underwriting guidelines in order to approve applications, even when there were no compensating factors justifying the exceptions.  The confidential witness was aware that management overrode decisions to refuse funding in locations known for fraud and property flipping, even when evidence of fraud was found.  According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint.  *Id*. at ¶ 488.

179.    *Allstate's* complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any realistic degree of control.  Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.  *Id*. ¶ 490.

180.    This was problematic because mortgage brokers were known to commit fraud in order to get loan applications approved by originators.  As one former mortgage wholesaler put it, "I'd walk into mortgage shops and see brokers openly cutting and pasting income documents and pay stubs, getting out the Wite-Out and changing Social Security numbers."  Mara Der Hovanesian, *Sex, Lies, and Subprime Mortgages*, Bloomberg Businessweek (Nov. 12, 2008), *available at* http://www.businessweek.com/stories/2008-11-12/sex-lies-and-subprime-mortgages.

181.    GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report.  GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada.  *See* 2008 "Worst Ten in the Worst Ten" Report.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California; 6th worst in

Las Vegas, Nevada; and 9th in Reno, Nevada.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 8.    Homecomings's Systematic Disregard of Underwriting Standards

182.    Homecomings Financial, LLC f/k/a Homecomings Financial Network, Inc.

("Homecomings") originated or contributed a material portion of the loans in the mortgage pool

underlying the RALI 2006-QS5 Trust, RALI 2006-QS4 Trust, and RALI 2006-QS11 Trust

offerings at issue and is a wholly-owned subsidiary of the sponsor of those offerings, Residential

Funding Co., LLC f/k/a Residential Funding Corp. ("RFC").  *See infra* Table 11.

183.    Following the purchase of the RALI offerings by U.S. Central, public disclosures

revealed that Homecomings systematically disregarded its underwriting guidelines in favor of

riskier, fee-driven mortgage lending practices including subprime, Alt-A and option-ARM loans,

and engaged in predatory lending.

184.    The Federal Trade Commission opened an investigation into Homecomings

mortgage lending and underwriting practices, closing the investigation in January 2009, after

Homecomings ceased mortgage loan origination.  *See* Letter from Peggy L. Twohig, Associate

Dir., Div. of Fin. Practices, Bur. of Consumer Protection, Federal Trade Commission, to Andrew

Sandler, Skadden, Arps (counsel for Homecomings) (Jan. 22, 2009).

185.    In March 2009, the Portland Tribune reported that Homecomings lending

practices allowed for the origination of shaky loans that precipitated a wave of foreclosures.  The

article reported:

> "In order to keep your market share, you had to be more aggressive," said Tim Boyd,
> who sold subprime loans in the Portland area for six years and then Alt A loans for
> seven years for Homecomings Financial.

> "The main focus was doing Alt A because that's where the money was," said Boyd,
> who left the industry.  A loan officer arranging a $300,000 Option ARM loan could
> collect $10,500 in fees, he said.

Lenders could unload shaky loans by selling them to investors, who often resold them in what amounted to a worldwide game of financial musical chairs. Wall Street's insatiable appetite for more loans kept the pipeline filled, even if the deals weren't always sound.

"The V.P.s came down to the office beating the drums about Option ARMs," urging mortgage brokers to sell them to customers, [Bill Ridge, owner of Ridge Mortgage Services] said. "I had Wachovia march through there; I had GMAC."
. . . .

He said he knows of loan officers who'd tell title agents to keep quiet about Option ARM loan provisions during document-signing time.

"They'd tell the title officer, 'Don't go over this; just glean through it quickly and get the thing signed.'"

Tim Boyd said he drew the line at selling Option ARMs because he saw how that could get people into trouble. "It made me sick," he said.

Steve Law, *Shaky Loans May Spur New Foreclosure Wave*; *Unraveling 'Alt A' Mortgages Could Keep Portland Housing Market Dismal*, PORTLAND TRIB., Mar. 5, 2009.

186.    The Offering Documents in the RALI Series Offerings indicate that the underlying pools of mortgages were primarily comprised of "payment-option, hybrid adjustable-rate mortgage loans" ("Option ARMs") and/or Alt-A loans.

187.    Homecomings' origination practices are also at issue in *Federal Home Loan Bank of Chicago v. Banc of America Funding Corp.,* No. 10 CH 45033 (Ill. Cir. Ct. Cook Cty. filed Oct. 15, 2010). There, the Federal Home Loan Bank of Chicago ("FHLB Chicago") alleges that Homecomings systemically disregarded its underwriting guidelines when originating mortgages that were subsequently collateralized RMBS. *See* FHLB Chicago Am. Compl.

188.    Statements from confidential witnesses in the FHLB Chicago Complaint represented that Homecomings originated mortgage loans in violation of its stated underwriting standards.

189.    According to two confidential witnesses in the FHLB Chicago Complaint, the

first who was a Homecomings underwriter from January 2006 until December 2006 and the second who was a Homecomings underwriter from May 2005 until October 2007, Homecomings made loans to borrowers who clearly could not make the monthly payments, approved high-risk low-doc or no-documentation loans, approved exceptions with no reasonable compensating factors, and widely abandoned underwriting practices.  *See id.* ¶ 447.

190.    Those two confidential witnesses described the two different automatic underwriting systems that Homecomings employed to underwrite loans: (1) Desktop Underwriter, and (2) Assetwise.  According to the second confidential witness, Homecomings' employees purposefully chose to use Desktop Underwriter for subprime loan applications from low-income applicants because it approved loans with a higher debt-to-income ratio than Assetwise would approve.  *See id*. ¶ 450.

191.    The first confidential witness described how the Assetwise program required an employee to simply enter in a borrower's information and the program would yield its findings.  The confidential witness explained that "one of [her] problems was that [a loan application] would fit inside the guidelines, but if you read between the lines, you could see that the borrower was not going to be able to make the payments."  When the confidential witness raised these pressing concerns to her supervisor, she received unambiguous directions: "It fits, you do the loan.  We're going to do this deal."  *Id.* ¶ 451.

192.    The second confidential witness reported that no matter which automated underwriting system employees chose to use, nearly all of the loan applications were approved.  Once the loan application was approved by the automated underwriting system, the underwriters could not reverse the approval.  *See id.* ¶ 452.

193.    The first confidential witness described how mortgage brokers would appeal loans

initially denied until Homecomings supervisors signed off on the loans.  The second confidential witness said loan officers were instructed to search for compensating factors that would enable them to approve the loan despite the presence of "red flags."  *Id.* ¶¶ 453-54.

194.     The FHLB complaint survived the defendants' motion to dismiss.  FHLB Ill. Order.

195.     Homecomings' underwriting practices are implicated in three lawsuits filed by MBIA, Inc.  MBIA provided monoline insurance, a form of credit enhancement, for RMBS containing Homecomings-originated loans.  In its suits, MBIA alleges misrepresentations regarding the quality of the loans underlying the RMBS that it insured.  Except for one, the RMBS in MBIA's suits were issued in 2006 and 2007.  *See* Compl., *MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (MN Ct., Hennepin Cnty. filed Sept. 17, 2012) ("*MBIA v. Ally* Compl."); Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, No. 600837/2010 (N.Y. Sup. Ct. filed Apr. 1, 2010) ("*MBIA v. GMAC* Compl."); Compl., *MBIA Ins. Corp. v. Residential Funding Co.*, No. 603552/2008 (N.Y. Sup. Ct. filed Dec. 4, 2008) ("*MBIA v. RFC* Compl.").

196.     The defendants in those suits include Ally Financial, Inc., RFC, and GMAC Mortgage, LLC ("GMAC Mortgage").  RFC, GMAC Mortgage, and Homecomings were all subsidiaries of GMAC Mortgage Group, LLC, which is now a subsidiary of Ally Financial.  *See* Ally Financial, Inc., Form 10-K, Ex. 21 (2011); GMAC LLC, Form 10-K, Ex. 21 (2006).

197.     RFC and GMAC Mortgage sponsored the RMBS that MBIA insured.  RFC also sponsored each of the RALI Series RMBS at issue in this suit.

198.     Homecomings originated many of the loans underlying the RMBS at issue in MBIA's suits.  *See also MBIA v. Ally* Compl. ¶¶ 5, 25 (alleging Homecomings originated many of the loans in RMBS sponsored by RFC and GMAC Mortgage).

199.     After sustaining large losses, MBIA conducted forensic analyses of several

thousand loans underlying the RMBS sponsored by RFC and GMAC, many of which were

originated by Homecomings.  MBIA found material misrepresentations in over 89% of those

loans from GMAC-sponsored RMBS and over 93% of those loans from RFC-sponsored RMBS.

The material misrepresentations included, among other things, routine disregard of underwriting

guidelines, debt-to-income and combined loan-to-value ratios that exceeded the amounts allowed

in the underwriting guidelines, failure to verify employment as required by underwriting

guidelines, and improper reliance on the Assetwise program.  *See MBIA v. Ally* Compl. ¶¶ 76-83;

*MBIA v. GMAC* Compl. ¶¶ 70-79; *MBIA v. RFC* Compl. ¶¶ 42-48.

200.     Representative examples of the misrepresentations MBIA uncovered include (1) a

loan that had a debt-to-income ("DTI") ratio of 65.56% and a CLTV ratio of 125.68% when the

underwriting guidelines imposed a maximum DTI ratio of 50% and a maximum CLTV ratio of

100%, and (2) a loan for a borrower with a stated income of $3700 per month and a CLTV of

94.2% when the underwriting guidelines required an income of $4000 per month and a CLTV

not exceeding 80%.  *See MBIA v. GMAC* Compl. ¶ 78; *MBIA v. RFC* Compl. ¶ 47.

201.     All three of MBIA's suits are still pending.  Two have survived motions to

dismiss.  *See MBIA v. GMAC*, 914 N.Y.S.2d 604 (N.Y. Sup. Ct. 2010); *MBIA v. RFC*, Order, No.

603552/08 (N.Y. Sup. Ct. Dec. 22, 2009).  There have been no rulings in the recently filed *MBIA

v. Ally* suit.

202.     A confidential witness, who was an account executive at Homecomings from

August 2001 to September 2008, corroborated the allegations in the *MBIA* complaints regarding

improper use of Assetwise.  As a subsidiary of RFC, Homecomings used Assetwise in its

mortgage origination.  According to the confidential witness, Homecomings employees would

"game" Assetwise.  Assetwise was programmed to make "automated exceptions" that were

purportedly within the RFC and Homecomings underwriting guidelines.  Homecomings did not

monitor what information a loan officer could input in Assetwise, and Assetwise required only a

limited amount of information to process and approve a loan.  If possible, loan officers would

sometimes not submit detrimental information to Assetwise in order to gain approval for a loan

that would not have been approved if all known information had been input into Assetwise.

203.    The confidential witness also stated that Homecomings' employees would run the

same loan through Assetwise several times, making a slight adjustment to the loan application

each time until Assetwise approved the loan.  This was possible because Homecomings did not

place limits on the number of times a loan application could be submitted to Assetwise, and the

software itself had no internal limits on the number of times a loan application could be

submitted.

204.    The confidential witness also corroborated the statements made by the

confidential witnesses in the FHLB Chicago Complaint, stating that the lack of following

underwriting guidelines at Homecomings was much more severe than what was related in the

FHLB Chicago Complaint.  The confidential witness sometimes processed as many as 130 to

200 loans per month and received pervasive pressure to get loans approved.

205.    RFC is also the defendant in several other cases brought by the Financial

Guaranty Insurance Company ("FGIC"), alleging material misrepresentations in the offering

documents concerning the characteristics of the mortgages underlying the securities at issue.

*See* Compl., *Fin. Guar. Ins. Co. v. Residential Funding Co*, No. 653304/2011 (N.Y. Sup. Ct.

filed Nov. 29, 2011). *See also* Nos. 653493/2011, 653621/2011, 653622/2011, 653623/2011,

653303/2011 (related FGIC cases).  The complaints allege that Homecomings originated and

serviced many of the deficient loans underlying the securities at issue in the FGIC complaints, and that disregard of underwriting standards at Homecomings directly led to the losses incurred by FGIC.

206.    As shown by statements from confidential witnesses, former employees in the FHLB Chicago Complaint, and MBIA's forensic analyses of Homecomings' loans, Homecomings' actual mortgage underwriting practices deviated widely from its stated guidelines.  This systematic disregard of underwriting standards led to toxic loans being bundled into securities and sold to investors who did not know, and could not have known, about the true nature of the loans backing their securities.

### 9.    IndyMac Bank F.S.B.'s Systematic Disregard of Underwriting Standards

207.    IndyMac Bank F.S.B. ("IndyMac") originated or contributed a material portion of the loans in the mortgage pool underlying the IndyMac INDX Mortgage Loan Trust 2006-AR25 offering.  *See infra* Table 11.

208.    On July 11, 2008, just four months after IndyMac filed its 2007 Annual Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac's parent, IndyMac Bancorp, Inc., filed for bankruptcy on July 31, 2008.

209.    On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac.  The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

210.    According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale."  IndyMac OIG Report at 2.  The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories.  Appraisals obtained by IndyMac on underlying collateral were often questionable as well."  *Id.*

211.    IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market."  *Id*. at 11, 21.  The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment."  *Id*. at 11.

212.    IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable.  *Id*. at 2-3.

213.    IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios."  *Id*. at 31.

214.    Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market."  *Id*. at 3.  This proved to be a weight it could not bear, and IndyMac ultimately failed.  *See id*.

215.    In June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac:  What Went Wrong?  How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (June 30, 2008) ("CRL Report"), *available at*

http://www.responsiblelending.org/mortgage-lending/research-

analysis/indymac_what_went_wrong.pdf.  The CRL Report detailed the results of the CRL's

investigation into IndyMac's lending practices.  CRL based its report on interviews with former

IndyMac employees and reviewed numerous lawsuits filed against IndyMac.  The CRL Report

summarized the results of its investigation as follows:

> IndyMac's story offers a body of evidence that discredits the notion that the
> mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll
> the purchase of bigger homes or investment properties.  CRL's investigation
> indicates many of the problems at IndyMac were spawned by top-down pressures
> that valued short-term growth over protecting borrowers and shareholders'
> interests over the long haul.

CRL Report at 1.

216.    CRL reported that its investigation "uncovered substantial evidence that

[IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely

making loans without regard to borrowers' ability to repay [the mortgage loans]."  *Id*. at 2.

217.    The CRL Report stated that "IndyMac pushed through loans with fudged or

falsified information or simply lowered standards so dramatically that shaky loans were easy to

approve."  *Id*.

218.    The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more

volume," "the quality of [IndyMac's] loans became a running joke among its employees."  *Id*. at

3.

219.    Former IndyMac mortgage underwriters explained that "loans that required no

documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed

outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information]

. . . and make them look like better credit risks."  *Id*. at 8.  These "shoddily documented loans

were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a

75

Disneyland cashier whose loan application claimed an income of $90,000 a year."  *Id.* at 3.

220.    The CRL also found evidence that:  (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals.  For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed.  "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL.  "And then they pressure you to approve it."
>
> The refrain from managers, Miller recalls, was simple:  "Find a way to make this work."

*Id.* at 9 (footnote omitted).

221.    Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated:  "I would reject a loan and the insanity would begin.  It would go to upper management and the next thing you know it's going to closing."  *Id.* at 1, 3.  Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors."  *Id.* at 8.

222.    Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time.  See id. at 9.  According to Montilla:

> "I would tell them:  'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says.  "There were some loans that were just blatantly overstated. . . .  Some of these loans are very questionable.  They're not going to perform."

*Id.* at 10.

223.     Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process.  *See id.* at 14.

224.     On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral.  *See* Compl. ¶ 6, *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF (C.D. Cal. filed July 2, 2010).  The case was tried in late 2012, and the jury entered verdict in favor of the FDIC.

225.     IndyMac currently faces a class action lawsuit alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS.  *See* Class Action Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y. filed May 14, 2009).  On June 21, 2010, the class action lawsuit survived a motion to dismiss.

226.     IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities.  As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst Ten" Report.  IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.  *See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

### 10.     The Morgan Stanley Originators' Systematic Disregard of Underwriting Standards

227.     Morgan Stanley Mortgage Capital, Inc., ("MSMC") now known as Morgan Stanley Mortgage Capital Holdings, LLC ("MSCH"), did not originate residential mortgages

itself.  Rather it purchased closed, first-lien and subordinate-lien residential mortgage loans for securitization or for its own investment from other lenders.  MSMC acquired residential mortgage loans through bulk purchases and through purchases of single loans through its conduit loan purchase program.  Morgan Stanley Credit Corporation ("MSCC") is an indirect wholly-owned subsidiary of Morgan Stanley and originated loans for borrowers who were Morgan Stanley clients.  Collectively, these entities are called the "Morgan Stanley Originators."

228.  The Morgan Stanley Originators contributed a material portion of the loans underlying many of the offerings at issue in this Complaint.  *See infra* Table 11.

229.  On June 24, 2010, the Attorney General of the State of Massachusetts entered into an Assurance of Discontinuance with "Morgan Stanley & Co. Incorporated (together with its affiliates involved in the mortgage financing and securitization business…"  "concerning its practices for buying and securitizing loans, largely from one key lender – New Century.  The Attorney General found:

- As part of its process for "purchasing and securitizing subprime loans, [Morgan Stanley] engaged in a number of reviews of the quality of the originators' lending practices and loans. These included, inter alia, determining whether the subprime loans were originated in accordance with the originators' underwriting guidelines and assessing compliance with applicable laws ('credit and compliance diligence'), and examining property values ('valuation diligence'). These reviews increasingly demonstrated shortcomings in some of New Century's lending practices and problems with a large number of individual subprime loans."

- Based on an internal analysis run by Morgan Stanley, New Century qualified borrowers based on a teaser interest rate, but when the fully indexed rate was

taken into consideration, 45% of the borrowers in Massachusetts would not have qualified for the loan.

- Morgan Stanley hired the due diligence firm Clayton to analyze a sampling of loans to be purchased to determine whether they were originated in accordance with underwriting guidelines.  Although Clayton's analysis showed that New Century increasingly stretched "underwriting guidelines to encompass or approve loans not written in accordance with the guidelines," Morgan Stanley continued to buy such loans under pressure from New Century to avoid losing New Century's business to another loan buyer.

- During the period from 2006-2007, only 9% of those loans that were granted pursuant to exceptions had adequate compensating factors to offset the exception. Further, Morgan Stanley waived exceptions on a large number of loans Clayton found to be generated in violation of guidelines without adequate compensating factors.

- Although Morgan Stanley had a stated policy not to purchase or securitize loans with a combined LTV ratio of greater than 100%, the reality was about a third of the loans securitized by Morgan Stanley in 2006-2007 had a CLTV greater than 100%.

- Morgan Stanley determined that New Century did not adequately evaluate the borrower's income on "stated income" loans.

- Despite Morgan Stanley's awareness of problems at New Century, it continued to fund, purchase and securitize New Century loans.

230.   Under the Assurance of Discontinuance, Morgan Stanley agreed to institute

procedures to ensure that loans it securitized conformed to underwriting guidelines and to pay $102 million to settle the charges against it.

231.     In September 2011, Morgan Stanley Mortgage Capital Holdings, LLC "MSMCH" entered into a similar Assurance of Discontinuance with the Attorney General of the State of Nevada following an investigation into the origination practices of originators (primarily New Century) who originated loans that MSMCH purchased and sold via securitizations, including whether the originators misrepresented interest rates to borrowers, inflated appraisals, and failed to disclose payment shock to borrowers following expiration of the initial teaser interest rate. Under the agreement, Morgan Stanley agreed to provide relief to consumers valued between $21 million and $40 million and institute a process to review loans purchased for securitization to ensure compliance with the law.

232.     MSMC/MSCH has also been the subject of numerous civil lawsuits alleging it did not adequately conduct due diligence on loans it purchased and securitized.

233.     For instance, in *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC*, Case No. 5140-VCS (Del. Chanc., filed Jan. 29, 2010), a servicer of loans sued MSCH (as "successor in interest" to MSMC) on a number of contract and fraud theories regarding the plaintiff's purchase of the servicing rights to thousands of loans from MSCH.  The complaint alleged that plaintiff paid a premium for the right to service the loans, because MSCH had represented that they were "agency" loans, or loans originated in accordance with Fannie Mae Freddie Mac guidelines.  The complaint alleged that the loans started experiencing high rates of delinquency.  According to the complaint, a representative of Morgan Stanley admitted the loans had not been screened at Morgan Stanley's internal due diligence facility and were of poorer quality than originally represented.  Fannie Mae and Freddie Mac began making

repurchase requests regarding the loans.  After initially honoring the repurchase requests, MSCH eventually stopped doing so despite having a contractual obligation to do so.  The complaint alleged that the plaintiff conducted a review of the loans and found numerous "fields" in the "mortgage loan schedules" that were inaccurate --- borrower DTI, LTV, occupancy status, appraisal, etc.  The complaint further alleged that the Morgan Stanley loans suffered delinquency rates far greater than loans purchased from others (45% v. 13.39%).

234.  On August 18, 2011, the Delaware Supreme Court reversed the Chancery Court's decision dismissing the action, holding that the plaintiff had pleaded sufficient facts on its breach of contract and breach of the implied covenant of good faith and fair dealing claims to survive a motion to dismiss.  *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 533 (Del. Supr. 2011).

235.  In *Federal Housing Finance Agency v. Morgan Stanley, et al.*, Case No. 11-cv-06739-DLC (S.D.N.Y), the FHFA, as conservator of Fannie Mae and Freddie Mac, sued Morgan Stanley & Co., Inc., several of its subsidiaries, including Morgan Stanley Mortgage Capital Holdings LLC d/b/a Morgan Stanley Mortgage Capital, Inc., and others alleging that the defendants "falsely represented" that the mortgages collateralizing certain RMBS sold to Fannie Mae and Freddie Mac "complied with certain underwriting guidelines and standards, and presented a false picture of the characteristics and riskiness of those loans."  The complaint further alleged that the FHFA conducted an analysis of a sampling of the loans, which revealed that a statistically significant rate of owner occupancy/LTV ratios were false.  On Nov. 19, 2012, the court dismissed certain fraud-based aspects of the FHFA's complaint and dismissed other claims as untimely or because the defendant was not the seller of the certificates at issue, but upheld the remainder of the complaint.  *Federal Housing Fin. Agency v. [Morgan] Stanley*, 2012

WL 5868300 (S.D.N.Y. Nov. 19, 2012).

236.     Likewise, in *MBIA Ins. Co. v. Morgan Stanley, et al.*, Index No. 29951/10 (Super. Ct. N.Y. Co., filed Dec. 6, 2010), the monoline insurer MBIA sued Morgan Stanley, Morgan Stanley Mortgage Capital Holdings, LLC and Saxon Mortgage Services, Inc., alleging that its review of loan files securitized by the defendants revealed breaches of representations and warranties including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed.  In May 2011, the court denied a motion to dismiss all but one count of the complaint.  The parties settled the case in December 2011.

237.     In *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F.Supp.2d 650, 672 (S.D.N.Y. 2011), the court upheld the following allegations as adequately alleging actionable misstatements or omissions because the offering documents failed to disclose MSCC's alleged systematic disregard of underwriting guidelines:

> According to a former MSCC underwriter, MSCC's goal was for underwriters to approve and close as many loans as possible rather than determine whether a borrower could repay the loan. (Id. ¶ 77.) The same former underwriter stated that, because most of MSCC's applicants were already Morgan Stanley clients, it accommodated them by approving loans so as to keep applicants from withdrawing already-invested assets and moving them to another company. (Id.) The former underwriter indicated that it was considered unprofessional to question an applicant's stated income relative to his or her job title, and therefore underwriters who had questions or concerns about a borrower's information remained quiet and took no action. (Id. ¶ 78.) MSCC put its underwriters on a quota system; if a certain number of loans were not approved in a given time period, the underwriters would be terminated. (Id. ¶ 79.) In addition, approving a certain number of loans above the quota would result in a bonus, thus incentivizing the underwriters' rapid, unverified approval of loan applications. (Id.).

*Id.* at 658.

### 11. National City Mortgage's Systematic Disregard of Underwriting Standards

238.   National City Mortgage is a division of National City Bank which is a wholly owned subsidiary of National City Corporation.  Collectively these entities are referred to as "National City."  National City originated or contributed loans to the pool of mortgages underlying the RALI Series 2006-QS5 Trust offering.

239.   Investors brought a securities fraud class action lawsuit against National City alleging that National City misrepresented the quality of its mortgage loans.  *See* Am. Class Action Compl., *In Re National City Corp. Sec., Derivative & ERISA Litig.*, No. 08-NC-70004 (N.D. Ohio filed June 13, 2008).  On August 8, 2011, it was announced that the case had settled for $168 million.

240.   National City faced another class action lawsuit alleging, among other things, that National City did not adhere to its underwriting standards.  *See* Second Am. Class Action Compl., *Argent Classic Convertible Arbitrage Fund (Bermuda) LTD. and Argent Classic Convertible Arbitrage Fund L.P. v. National City Corp.*, et. al., No. 08-NC-70016 (N.D. Ohio filed Feb. 19, 2010).  On November 30, 2010, the case settled for $22.5 million.

### 12. New Century's Systematic Disregard of Underwriting Standards

241.   New Century Mortgage Corporation and NC Capital Corporation were subsidiaries of New Century Financial Corp. (collectively "New Century").  New Century was founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime lenders—originating $60 billion in loans in 2006 alone.

242.   New Century originated a material portion of the loans in the pool underlying the Morgan Stanley ABS Capital I Inc. Trust 2006-HE7, Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, and Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 offerings.  *See infra* Table

11.

243. New Century failed amid revelations that its books contained numerous accounting errors, government investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan funding. The circumstances leading to its collapse tell the story of a company— like so many other lenders of the time—that was far more concerned with originating mortgages to fuel the securitization machine than in the quality of those mortgages.

244. A June 2, 2008 article in the Columbus Dispatch summarized New Century's reputation in the industry:

> The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500. Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.

> Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan. They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.

> New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, COLUMBUS DISPATCH, June 2, 2008, at 1A.

245. The article continued:

> Lending experts and consumer advocates say New Century was the poster child for the subprime tsunami -- a company that relaxed lending standards so much that even borrowers with fresh bankruptcies and foreclosures could get a mortgage.

*Id.*

246. New Century's foreclosure rates reflected its inattention to underwriting standards. Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted. Incredibly, New Century appeared in the top five in

84

every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee.

247.    When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in— Reno, Nevada, Bakersfield, California, Riverside-San Bernardino, California and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California, Las Vegas, Nevada, Merced, California, Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida and Vallejo-Fairfield-Napa, California.

248.    The U.S. Bankruptcy Court of the District of Delaware presiding over New Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and all accounting and financial statement irregularities, errors and misstatements" in connection with New Century's practices and procedures.  The Examiner engaged a law firm, forensic accountants and financial advisors to assist in his investigation and reporting.  His final report to the Bankruptcy Court dated February 29, 2008 (the "Examiner's Report") was unsealed and publicly released on March 26, 2008.

249.    The Examiner concluded that New Century "engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."  Examiner's Report, at 2.  The Examiner summarized the findings:

> A.    "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named

'CloseMore University.' Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." *Id*. at 3.

B.     "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id.*

C.     "More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'" *Id.*

D.     "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan.  A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies." *Id.* at 3-4.

E.     "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks.  New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality.  Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market." *Id.* at 4.

F.     "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investor suffered mammoth losses." *Id.*

250.    The Examiner's Report also stated that New Century's underwriting and appraisal systems were antiquated.  Rather than undertaking sophisticated risk assessments, New Century relied on outdated manual systems that, according to a member of New Century management interviewed by the Examiner, allowed New Century to "finagle anything."  *Id*. at 54.

251.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad."  *Id*. at 61-62.

252.    From 2003 to 2006, New Century began peddling riskier and riskier products, yet failed to employ underwriting safeguards that might have mitigated the inherent risk associated with such products.  For instance, from March 2003 to June 2005, the percentage of interest-only loans New Century originated leapt from 0% to 38.49%.  And from 2004 to 2005, the percentage of interest-only ARMs rose from 19.3% to 29.6% of the total volume of New Century's originations and purchases.  New Century qualified borrowers based on their ability to pay the initial interest rate rather than the interest plus principal amortization, which was added after the first several years.  *Id*. at 57, 125-26.

253.    Likewise, from 2004 through 2006, New Century increasingly sold "stated income" loans—with such loans representing at least 42% of New Century's total loan volume. (Table, Missal 57).  "Stated income" loans involve no documentation regarding a borrower's income; instead, the loan is made based on the borrower's statement as to the amount of his or her income.  Stated income loans are often referred to in the industry as "liars' loans," because of the ease with which unscrupulous borrowers or mortgage brokers can overstate income. (Examiner's Report, at 58).  New Century actively discouraged its employees from even seeking

to verify whether a prospective borrower's stated income was reasonable. *Id*. at 127 n.314.

254.    The Examiner identified several "red flags" that were indicative of the poor quality of New Century's loans and the fact that New Century was not adhering to its underwriting guidelines.  Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines." *Id*. at 109.

255.    The Examiner found:

New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004.  For example, in April 2004, New Century's Chief Credit Officer reported that 'the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels' and that 'Investor Rejects [kickouts] are at an incline as well.'  Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that 'we have so many issues pertaining to quality and process!'"

*Id*. at 110.

256.    In 2005, New Century began internal audits of its loan origination and production processes.  An audit of the Sacramento wholesale fulfillment center revealed a number of "high risk" problems, including the fact that 45% of the loans reviewed had improper RESPA disclosures, 42% did not have approval stipulations fully satisfied, 39% had noted exceptions with respect to the calculation or verification of income, and 23% had appraisal exceptions or problems.  *See id*. at 152.

257.    Further adding to the problem was the fact that exceptions were frequently granted to underwriting guidelines, but "New Century had no formal exceptions policy." *Id*. at 174.

258.     With no policy in place, the granting of exceptions was arbitrary.  Despite upper

management's awareness of the tremendous problems regarding loan quality, the Examiner

concluded that "New Century continued to focus on generating greater quantities of ever riskier

loans, devoting little effort to such basic issues as making sure that the Company's loan

origination and underwriting policies and procedures were followed to avoid kickouts of loans

offered for sale."  *Id*. at 111.

259.     The Examiner reported:

New Century's loan originations grew at an enormous rate from 2000 through
2006, becoming the second largest subprime lender by the end of 2004 and
remaining one of the largest in 2005.  The Production Department was highly
motivated and effective in originating such loans and apparently resisted changes
that might have limited loan production volume.  While both the Quality
Assurance and Internal Audit Departments identified loan quality problems, and
kick-out and EPD rates confirmed many of these problems, the Production
Department devoted its resources to generating high volumes of loans, with
relatively little attention to loan quality.

*Id*. at 113.

260.     New Century consistently prioritized the origination of new loans over virtually

all other concerns, including loan quality.  Despite after-the-fact assertions by some company

spokespeople that such disregard was anomalous, New Century leaders articulated priorities

demonstrating that the disregard was, in fact, systematic.  For example, Patrick Flanagan, who

until 2006 was New Century's Head of Loan Production and Secondary Marketing, "emphasized

maintaining New Century's loan production even when field audits revealed loan quality

problems."  *Id*. at 89.  Even after Flanagan left the company, New Century's prioritization of

volume, rather than quality, continued.

261.     The Examiner noted that New Century's Quality Assurance Department would

run audit reports after loans were funded to determine if the loan file evidenced compliance with

New Century's underwriting guidelines.  "The Quality Assurance audit results tended to identify the same sorts of problems as identified in the kickout reports, such as faulty appraisals, undocumented exceptions to underwriting guidelines and missing documentation from loan files."  Despite this fact, "since such post-funding audits did not directly affect profitability, some in Management discounted their importance."  *Id*. at 137.

262.     The Examiner's Report contained pages of findings that management ignored the loan quality issue and resisted efforts to implement strategies that would improve the quality of loans.  For instance, the Examiner reported that management had determined a way to identify underwriters whose actions led to a high number of defective loans in October 2005, but failed to implement the effort until much later.  *See id*. at 169 n.337.

263.     The Examiner's Report found that loan quality trends "worsened dramatically" at New Century in 2006 and early 2007.  Although New Century made a belated effort to improve loan quality late in 2006, it was "too little too late" and even as late as December 2006, "the same sorts of problems, including defective appraisals and missing documentation continued to be the main reasons for investors kicking out increasing quantities of New Century loans."  *Id*. at 157-58.

264.     The Examiner concluded, "New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004.  Yet… the Board of Directors and Senior Management before 2006 took few steps to address the troubling loan quality trends."  *Id*. at 175.

265.     On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC.  She testified that at New Century,

risk managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . . Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed lending decision. These same sales mangers had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. Some of the best sales managers had underwriting backgrounds and were more closely aligned with risk management and better at understanding potential problems, but this was the exception and not the rule.

*Section 2: Subprime Origination and Securitization Before the Fin. Crisis. Inquiry Comm'n*

(Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice President of Corporate Risk, New

Century).

266.    She also testified as to systematic problems in the appraisal process:

> In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value", fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id.*

267.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked

"common sense"—that the business became "volume driven and automated" with a broker being

able to get a loan pre-approved in "12 seconds or less." *Id.*

268.    In December 2009, the SEC filed a complaint charging three former New Century

executives with securities fraud. *See Securities & Exchange Commission v. Morrice, et al.*, Case

No. SACV09-01426 JVS (C.D. Cal. filed Dec. 7, 2009).  The SEC's complaint alleges that the

New Century executives misled investors as to the deterioration of New Century's loan portfolio,

including dramatic increases in early default rates and loan repurchases/repurchase requests.  On

July 30, 2010, the SEC announced it had accepted offers to settle the case, subject to court

approval, with defendants agreeing to (1) pay over $1.5 million in disgorgement and civil

penalties; (2) be permanently enjoined from further securities law violations and (3) a five-year

ban on serving as an officer or director of a public company.

### 13. NovaStar's Systematic Disregard of Underwriting Standards

269.    NovaStar Mortgage, Inc. ("NovaStar"), a former Missouri subprime lender with

offices in several states, originated numerous subprime loans that later defaulted.  NovaStar

routinely and systematically disregarded its own underwriting standards and guidelines in order

to generate more loan origination business, from which it reaped enormous profits.

270.    NovaStar originated or contributed a material portion of loans in the mortgage

pool underlying the NovaStar Mortgage Funding Trust, Series 2006-1 offering.  *See infra* Table

11.

271.    The Wall Street Journal reported that, among other things, NovaStar touted its

"Credit Score Override Program" for loan approval where it "ignored the rules" to qualify more

borrowers:

> Deutsche's disparate dealings with two investor clients in February 2007 illustrate
> how it played both sides of the mortgage-securities market.

> That month, a time when the U.S. housing and mortgage markets were beginning
> to crack, Deutsche was helping put together bond deals backed by subprime
> mortgages.

> They included loans originated by NovaStar Financial Inc., a Missouri subprime
> lender that Deutsche had financed.  A promotional flier from NovaStar in 2003
> said, "Ignore the Rules and Qualify More Borrowers with our Credit Score
> Override Program!"  As housing boomed, NovaStar thrived.

> But on Feb. 20, 2007, NovaStar reported a quarterly loss and said it was
> tightening the spigot on new loans.  It was another piece of evidence the long-
> rising housing market was headed the other way.  That evening, a senior Deutsche
> trader received an email from a hedge-fund manager with the subject line
> "Novastar" and the message:  "It is like the plague."

Carrick MollenKamp and Serena Ng, *Dual Role in Housing Deals Puts Spotlight on Deutsche*,

WALL ST. J., Aug. 3, 2010, *available at*

http://online.wsj.com/article/SB10001424052748703900004575325232441982598.html.

272.    NovaStar regularly originated loans for borrowers who did not have a realistic

capacity to repay the loans, as illustrated in this report from the New York Times:

> The Jordans are fighting a foreclosure on their home of 25 years that they say was
> a result of an abusive and predatory loan made by NovaStar Mortgage Inc.  A
> lender that had been cited by the Department of Housing and Urban Development
> for improprieties, like widely hiring outside contractors as loan officers, NovaStar
> ran out of cash in 2007 and is no longer making loans.
> . . .
> The facts surrounding the Jordans' case are depressingly familiar.  In 2004,
> interested in refinancing their adjustable-rate mortgage as a fixed-rate loan, they
> said they were promised by NovaStar that they would receive one.  In actuality,
> their lawsuit says, they received a $124,000 loan with an initial interest rate of
> 10.45 percent that could rise as high as 17.45 percent over the life of the loan.
>
> Mrs. Jordan, 66, said that she and her husband, who is disabled, provided
> NovaStar with full documentation of their pension, annuity and Social Security
> statements showing that their net monthly income was $2,697.  That meant that
> the initial mortgage payment on the new loan—$1,215—amounted to 45 percent
> of the Jordans' monthly net income.
>
> The Jordans were charged $5,934 when they took on the mortgage, almost 5
> percent of the loan amount.  The loan proceeds paid off the previous mortgage,
> $11,000 in debts and provided them with $9,616 in cash.
>
> Neither of the Jordans knew the loan was adjustable until two years after the
> closing, according to the lawsuit.  That was when they began getting notices of an
> interest-rate increase from Nova- Star.  The monthly payment is now $1,385.
> "I got duped," Mrs. Jordan said.  "They knew how much money we got each
> month.  Next thing I know I couldn't buy anything to eat and I couldn't pay my
> other bills."

Gretchen Morgenson, *Looking for The Lenders' Little Helpers*, N.Y. TIMES, July 12, 2009,

*available at* http://www.nytimes.com/2009/07/12/business/12gret.html?_r=0.

273.    Investor Michael Burry studied NovaStar's underwriting practices, as reported by

The Pitch in this May 13, 2010 article:

> One of the subprime-loan originators that Burry studied was NovaStar, a company that started in Westwood and later moved into an office building off Ward Parkway.  NovaStar specialized in making home loans to people with shaky credit.
>
> Burry noticed when NovaStar began issuing loans of increasingly crappy quality. From early 2004 to late 2005, the number of NovaStar borrowers taking out interest-only loans - no money down! - nearly quintupled.
>
> The charade lasted until home prices stopped growing at an unprecedented clip and sketchy borrowers began to default on their tricked-out loans.
> . . .
> NovaStar, a company that the New York Times labeled "Exhibit A" for anyone interested in the goofy lending practices which precipitated the housing collapse, was eventually delisted from the New York Stock Exchange.

David Martin, *Hailed as a Rebel Reformer, KC Fed Chief Tom Hoenig is Really Neither*, THE

PITCH, May 13, 2010, *available at* http://www.pitch.com/2010-05-13/news/kc-fed-chief-tom-

hoenig-is-no-rebel/.

274.    NovaStar faces a class action suit that alleges it systematically disregarded its

underwriting guidelines when originating mortgages in 2006 and 2007 that were subsequently

securitized into RMBS.  *See* Second Amended Class Action Complaint, *N.J. Carpenters Health*

*Fund v. NovaStar Mortgage, Inc.*, No. 08-cv-5310, Doc. 117 (S.D.N.Y. filed May 18, 2011)

("N.J. Carpenters SAC").

275.    The N.J. Carpenters SAC includes statements concerning NovaStar's systematic

disregard of its underwriting guidelines from former NovaStar employees who worked in the

NovaStar mortgage origination business.  These former employees include a former Vice

President of Operations, Quality Control Auditors and Supervisors, Senior Underwriters,

Account Managers, and Account Executives.  *See id.* ¶ 57.

276.    Former Account Managers, Underwriters, and Quality Control Auditors reported

that the pressure to increase the volume of loan production led to the systematic disregard of

94

NovaStar's underwriting guidelines in mortgage loan origination. *See id.* ¶ 70.

277.     When NovaStar Underwriters and Quality Control Auditors alerted supervisors about loans that were initially rejected because of suspicious or fraudulent documentation, NovaStar management would routinely override these initial loan rejections and approve the loans. *See id.*

278.     For Full Documentation loans, NovaStar Underwriters would reject loan applications where employment could not be adequately verified. In many cases, NovaStar management overrode the initial rejection, disregarding the questionable verification of employment in order to approve the loan application. *See id.* ¶ 75.

279.     The N.J. Carpenters SAC noted that Full Documentation loan applications regularly included unreasonably inflated income. For instance, many loan application files reported income for several housekeepers in South Florida upwards of $200,000 a year. *See id.* ¶ 77.

280.     For Stated Income loans, inflated income was commonplace. Reported income in Stated Income loans was apparently far from reasonable in relation to the applicant's employment. *See id.* ¶ 80. When underwriters denied loan applications because of unreasonable stated income, NovaStar management disregarded the initial rejection and subsequently approved in spite of the unreasonable reported income. *See id.* ¶ 81.

281.     The district court dismissed the complaint for failure to state a claim, but the Second Circuit reversed and the case continues. *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109 (2d Cir. 2013).

### 14.     People's Choice Home Loan Inc.'s Systematic Disregard of Underwriting Standards

282.     People's Choice Home Loan Inc. ("People's Choice") was a subprime mortgage

lender headquartered in Irvine, California.  People's Choice filed for bankruptcy in March 2007, seeking Chapter 11 protection. People's Choice originated a material portion of the loans in the pool underlying the Saxon Asset Securities Trust 2006-3 offering.  *See infra* Table 11.

283.    People's Choice was prominently featured in a March 22, 2009 program on Dateline NBC which highlighted the underhanded lending practices committed by various mortgage companies:

> James LaLiberte joined People's Choice in 2004 as the chief credit officer, overseeing the underwriting. Later, he was promoted to one of the top positions, chief operating officer, and was in charge of all operations and setting credit guidelines.
>
> He presented Dateline with a list of nearly 13,000 loans People's Choice funded in one year from April 2004 through March 2005, totaling more than $2 billion. Many of the loans, he said, were questionable; some possibly fraudulent.
>
> In an interview, he said that when he came on board, the company's reputation was "spotty at best," though he acknowledged the company was more conservative than many other subprime lenders.
>
>           …
>
> Income discrepancies Dateline independently researched dozens of the stated income loans on the list LaLiberte presented and found many instances where incomes apparently were inflated.
>
> Examples on the People's Choice list included a registered massage therapist who claimed an income of $15,000 a month ($180,000 a year) and whom People's Choice loaned $640,000. According to the Web site Salary.com, which is often used by lenders, the median income in the zip code where the borrower lived is $3,799 a month, about one quarter of the amount the borrower claimed.
>
> A manicurist who borrowed $445,500 in 2004 claimed monthly income of $16,800, more than $200,000 a year. Later, she filed for bankruptcy and submitted papers to the court reporting her 2005 annual income as $27,092, meaning $2,258 a month (plus approximately $4,500 a year in child support).
>
> Another borrower in 2005 listed herself as director of development for a charity earning $15,500 a month ($186,000 a year) and obtained $655,000. But a review of the charity's publicly-filed tax returns shows that the director of development that year was paid $69,808, or $5,817 a month. Surprisingly, that person has a different name from the borrower. A call to the charity elicited the information

that the borrower indeed had worked there at the time the loan was issued, but held a position below director of development.

Former People's Choice COO LaLiberte said that he used the list of loans as a training tool. He put the spreadsheet up on a screen to highlight the types of loans the company should stop issuing.

"The initial reaction was laughter," LaLiberte said. "And then I said, 'Well, wait a minute here. Y'all think it's funny. I think it's funny, too, sort of. But these are loans that we funded. These are loans that we wired the money on.'"

He said that when he tried to implement more controls, he ran into resistance. "The chief appraiser once said, 'Fraud is what we do.' That's how we got where we are today.'" Another former executive told Dateline he was present when the comment was made and confirmed the accuracy of LaLiberte's account.

   …

Eileen Loiacono was an underwriter at People's Choice from 2003 until September 2005. She said LaLiberte tried to do the right thing, but lost out to more powerful forces.

She and several other underwriters told Dateline that they felt pressured by sales staff to approve questionable applications. While their work as underwriters was supervised by a chief credit officer, they said that for administrative and basic personnel matters, they reported to sales managers.

One former People's Choice manager who spoke on condition of anonymity said, "That place was run by the sales people," some making $200,000 to $300,000 a month. That did create pressure on underwriters, the former manager said. "There was a lot of 'keep your mouth shut' going on, meaning you just didn't ask questions about things you knew were wrong."

Loiacono said that the problems and pressure were not restricted to stated income loans, but also involved full documentation applications for which borrowers submitted records to prove how much they made.

Falsified documents
She said she saw numerous instances of falsified W-2s, tax returns, and bank statements, including crude cut-and-paste jobs. "They would use someone else's tax returns, and then they'd put someone else's name in them," she said.

She said that she challenged about a third of all loan applications but was overruled by company executives the vast majority of the time.

According to Loiacono and several other underwriters, in a few instances, sales people offered incentives to sign off on loans.  Loaicono claimed the offers

included breast implants, cars, and cash. She said she declined all such offers and reported them to the human resources department. She said nothing was done, as far as she knows.

Loiacono said that some sales people engaged in intimidation, threatening, for instance, to slash the tires of an uncooperative underwriter. Another underwriter, who requested anonymity, told Dateline her car was scratched up with a key by a sales person she crossed.

The environment became too uncomfortable, Loiacono said, so she quit in September 2005. "I wanted to be able to sleep at night without feeling like I was coming into a fight every day about something that I knew needed to be done right, and was not being done right."

Chris Hansen, '*If You Had a Pulse, We Gave You a Loan*,' NBC Dateline (Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen/.

### 15.   Saxon Funding Management, Inc.'s Systematic Disregard of Underwriting Standards

284.   Saxon Funding Management, Inc. ("Saxon") originated a material portion of the loans in the pool underlying the Saxon Asset Securities Trust 2006-3 offering. *See infra* Table 11.

285.   Saxon, headquartered in Fort Worth, Texas, is the subprime originating and servicing arm of Morgan Stanley, which purchased Saxon in December 2006. Amid the turmoil that struck the mortgage market shortly after the purchase, Morgan Stanley shut down the wholesale lending division at Saxon and drastically cut back lending in general as a mounting number of lawsuits and Congressional Reports begin to focus on the former "King of Subprime."

286.   Saxon also featured prominently in the news when it became the subject of a lawsuit filed by the Attorney General of New Mexico in May 2009. The New Mexico Office of Attorney General issued a press release announcing the lawsuit concerning, in part, the underwriting standards of Saxon:

> The Office of Attorney General Gary King today filed two separate legal actions that include stopping a foreclosure proceeding; seeking civil penalties; and restitution for alleged mortgage loan fraud. The lawsuits allege violations of the state's Mortgage Loan Company & Loan Broker Act, Unfair Practices Act and Home Loan Protection Act.
>
> …
>
> The first case involves a 78-year-old Chimayo, N.M. woman, existing on a $501 per month Social Security benefit whose home is in foreclosure. The monthly mortgage payments are about $1500 per month for a $175,000 mortgage. In a complaint filed with the state, the woman claims her signature was forged and other mortgage application information was falsified. The Attorney General's lawsuit seeks to stop the foreclosure and to sue for damages to prevent this from reoccurring. Deutsche Bank, US Bancorp, Saxon Mortgage Brokerage, North American Specialty Insurance Co., Orlinda Martinez, Angelica Duran and Mountain View Mortgage are listed as defendants.

News Release, New Mexico Office of Attorney General, May 8, 2009, *available at*

http://www.nmag.gov/Articles/newsArticle.aspx?ArticleID=687 (last visited 11/2/10).

### 16. WMC Mortgage Corp.'s Systematic Disregard of Underwriting Standards

287. In 2004, when General Electric ("GE") purchased it from a private equity firm, WMC Mortgage Corporation ("WMC") was the sixth-largest subprime lender in the country. WMC specialized in nonprime loans and jumbo loans of up to $1 million. WMC originated a material portion of the loans in the pool underlying the Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 and Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 offerings. *See infra* Table 11.

288. On January 20, 2012, the Huffington Post reported that the FBI and the Department of Justice are investigating possible fraud at WMC.

289. Another article published that same day on iwatchnews.org elaborated on the investigation. According to the article, "the government is asking whether WMC used falsified paperwork, overstated borrowers' income and other tactics to push through questionable loans" with the probe focused on whether "senior managers condoned improper practices that enabled

fraudulent loans to be sold to investors."  The article reports:

> The FBI's San Francisco office indicated that it has been looking into WMC's business practices for nearly two years, according to one of the people who has knowledge of the investigation. The bureau has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sale of mortgages to investors, this person said.

Michael Hudson, "Feds investigating possible fraud at GE's former subprime unit,"

iwatchnews.org, Jan. 20, 2012, *available at* http://www.publicintegrity.org/2012/01/20/7908/

feds-investigating-possible-fraud-ge-s-former-subprime-unit.

290.    In another iwatchnews.org article, Hudson provided a lengthy report on GE's

purchase of WMC and the practices of WMC's sales staff to push through loans at any cost.

According to the article, several ex-employees claim that many WMC sales staff "embraced

fraud as a tool for pushing through loans that borrowers couldn't afford" and that WMC ignored

reports of loans supported by falsified documents and inflated incomes.  The article continues:

> Dave Riedel, a former compliance manager at WMC, says sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors. One WMC official, Riedel claims, went so far as to declare: "Fraud pays."
>
> . . . .
>
> [Riedel] supervised a quality-control team of a dozen or more people who watched over WMC's lending in a broad area of Southern California where salespeople were pushing subprime loans as well as "Alt-A" mortgages, another type of risky home loan.
>
> The team, Riedel says, found many examples of fraud committed by in-house staffers or the independent mortgage brokers who helped bring in customers to the lender.  These included faking proofs of loan applicants' employment and faking verifications that would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents.
>
> Some employees also fabricated borrowers' incomes by creating bogus W-2 tax forms, he says. Some, he says, did it old-school, cutting and pasting numbers from one photocopy to another. Others, he says, had software on their computers that allowed them to create W-2s from scratch.

. . . .

'Business as usual'

While Dave Riedel was fighting battles inside WMC's California headquarters, Gail Roman was losing battles on the other side of the country.

Roman worked as a loan auditor at WMC's regional offices in Orangeburg, N.Y. She and other colleagues in quality control, she says, dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications.

It did little good. Management ignored their reports and approved the loans anyway, she says.

"They didn't want to hear what you found," Roman told iWatch News. "Even if you had enough documentation to show that there was fraud or questionable activity."

If GE made any progress against fraud at WMC, Roman says, she didn't notice it. Fraud was as bad at WMC in 2006 as it was when she started at the lender in 2004, she says.

"I didn't really see much of a change," Roman says.

Victor Argueta, the former risk analyst, says he didn't see much change either.

Meetings would be held. Executives from GE would agree fraud was a problem and something needed to be done. "But the next month it was business as usual," Argueta says.
. . . .

Argueta says one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved.

"Bank statements, W-2s, you name it, pretty much anything that goes into a file," Argueta says. "Anything to make the loan look better than what was the real story."

In one instance, Argueta says, he sniffed out salespeople who were putting down fake jobs on borrowers' loan applications — even listing their own cell phone numbers so they could pose as the borrowers' supervisors and "confirm" that the borrowers were working at the made-up employers.

Management gave him a pat on the back for pointing out the problem, he says, but did nothing about the salespeople he accused of using devious methods to make borrowers appear gainfully employed.

Nightmare loans

Roman and Argueta weren't alone in their concerns, according to other ex-employees who spoke on the condition they remain anonymous, because they still work in banking and fear being blackballed within the industry.

"It was ugly," one former fraud investigator at WMC recalls. "I would have nightmares about some of the things I'd find in a file.  I'd wake up in the middle of the night going, 'Oh my God, how did this happen?' "

A former manager who worked for WMC in California claims that company officials transferred and essentially demoted her after she complained about fraud, including the handiwork of a sales rep who used an X-Acto knife to create bogus documents, cutting numbers from one piece of paper and pasting them onto another, then running the mock-up through a photocopier.

. . . .

By early 2006, Dave Riedel had begun to rebuild his career inside WMC.

He helped put together a presentation in May 2006 aimed at giving GE officials a sense of how serious WMC's fraud problems were.  Riedel says an audit of soured loans that investors had asked WMC to repurchase indicated that 78 percent of them had been fraudulent; nearly four out of five of the loan applications backing these mortgages had contained misrepresentations about borrowers' incomes or employment.

Michael Hudson, "*Fraud and folly: The untold story of General Electric's subprime debacle*," iwatchnews.org, Jan. 6, 2012, *available at* http://www.publicintegrity.org/2012/01/06/7802/ fraud-and-folly-untold-story-general-electric-s-subprime-debacle.

291.    On the radio program "This American Life," broadcast May 9, 2008, reporter Alex Blumberg interviewed a WMC sales manager who made over a million dollars a year by making loans to "people [who] didn't have a pot to piss in."  Blumberg reported that the manager "didn't worry about whether the loans were good.  That's someone else's problem."

292.    In June 2008, the Washington State Department of Financial Institutions filed a

"Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees" against WMC and its owners. The Statement of Charges stemmed from an investigation that found WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on multiple loans, understated amounts of payments made to escrow companies, understated annual percentage rates by almost 5%, and committed numerous other violations of Washington State deceptive and unfair practices laws.  In July 2009, WMC entered a consent order under which it agreed to pay fines, restitution and the costs of the investigation to settle the matter.

293.    WMC's lack of underwriting landed it fourth in the Comptroller of the Currency's 2009 "Worst Ten of the Worst Ten" list.

### E.    Loans That Did Not Meet the Originators' Underwriting Guidelines Were Routinely Collateral for Morgan Stanley-Underwritten RMBS

294.    A February 2010 report from J.P. Morgan noted that "[t]he outstanding balance of [private-label] mortgages grew from roughly $600 billion at the end of 2003 to $2.2 trillion at its peak in 2007."  Gary J. Madich et al, *Non-Agency Mortgage-Backed Securities:  Managing Opportunities and Risks*, J.P. Morgan Asset Management, at 2 (Feb. 2010), *available at* http://www.jpmorganinstitutional.com/cm/BlobServer/Non-Agency_Mortgage-Backed_Securities.pdf?blobkey=id&blobwhere=1321504668623&blobheader=application%2Ppdf&blobcol=urldata&blobtable=MungoBlobs&isAMIA=yes.  While unknown to reasonable investors at that time, it now is apparent that this massive expansion in the origination of loans over a short period of time was accomplished by ignoring underwriting standards.  The J.P. Morgan report also noted that home prices rose, requiring larger loans:  "[private-label] mortgage providers initially met this need for larger loans while maintaining stringent qualifications.

However, investment banks were willing to buy lower quality mortgages and bundle them for issuance into new and innovative forms of Asset Backed Securities (ABS) and Collateralized Debt Obligations (CDOs)." *Id.*

295.    During the FCIC investigation referenced above (*supra* at Section VII.D.1), Clayton Holdings provided evidence that Morgan Stanley securitized a significant number of loans that did not comply with  the stated underwriting guidelines.

296.    Clayton was the leading provider of due diligence services for RMBS offerings during the relevant time period.  This gave Clayton "a unique inside view of the underwriting standards that originators were actually applying."  FCIC Report at 166.

297.    Banks routinely hired Clayton to inspect the mortgage loans that the banks securitized into RMBS.  Clayton would determine whether the loans complied with the originators' stated underwriting guidelines, and prepare a report of its findings for the bank.  *See* FCIC Testimony of Vicki Beal, Senior Vice President of Clayton Holdings (Sept. 23, 2010), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Beal.pdf.

298.    From January 1, 2006 through June 30, 2007, Clayton reviewed 911,039 loans. Only 54% of those met the originators' underwriting guidelines.  Clayton's former President and CEO, Keith Johnson, testified that the "54% says there [was] a quality control issue in the [originators]."  FCIC Report at 166; Audiotape of FCIC Interview with Keith Johnson, former President of Clayton ("Johnson FCIC Interview") (Sept. 2, 2010) ("Even if the guideline was bad, [the loans] didn't adhere to the guideline . . . .  To me in hindsight, [the data] just said there was a . . . fundamental breakdown."), *available at* http://fcic.law.stanford.edu/interviews/view/220.  Another 18% of the loans failed the underwriting guidelines but were deemed to have adequate compensating factors.  That left a

large number – 28% – that did not meet the underwriting guidelines and had no compensating factors. *See* All Clayton Trending Reports, 1st Quarter 2006 – 2nd Quarter 2007, at 1 (2007), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf ("All Clayton Trending Report").

299.    Clayton confirmed that the RMBS sold by Morgan Stanley from the beginning of 2006 through the middle of 2007—which includes all but two of the Certificates listed in Tables 1 and 2 of this Complaint—contained a substantial number of loans that were not originated in conformity with underwriting guidelines. *See* All Clayton Trending Report at 8.  The Morgan Stanley Mortgage Loan Trust 2004-11AR and Ixis Real Estate Capital Trust 2005-HE4 offerings were issued in late 2004 and late 2005.

300.    As revealed during the FCIC investigation in 2010, Clayton routinely found large numbers of loans that were not properly originated under the applicable underwriting guidelines. Despite identifying these defectively originated loans, Clayton stated that they often were included into the RMBS that was being sold to investors.  *See* FCIC Report at 166-67; All Clayton Trending Report at 1.

301.    Clayton reviewed 62,940 loans for Morgan Stanley.  It found that 23,154 (36.8%) did not comply with stated underwriting guidelines and did not have compensating factors. Morgan Stanley waived the defects for 13,035 of the 23,154 (56.3%).  *See* All Clayton Trending Report at 8.

302.    Clayton typically performed due diligence on a small sample of the loans that were being securitized into an RMBS offering – approximately 10%.  FCIC Testimony of Vicky Beal at 2.  No due diligence was performed on the remaining loans.  Thus, of the small sample of loans that Clayton did review, approximately 10% did not comply with the underwriting

guidelines and did not have compensating factors, but were nonetheless securitized. Extrapolating Clayton's results shows that for the remaining 90% of loans that were not reviewed, nearly 20% did not comply with the underwriting guidelines and did not have compensating factors, but were nonetheless securitized.  In total, Clayton's data shows that between 15-20% of the loans Morgan Stanley securitized were defective.  All Clayton Trending Reports at 8.

> **F.**      **Additional Evidence Confirms that Defective Loans Were Routinely Packaged into Morgan Stanley's RMBS**

303.    Clayton officials offered an explanation for why so many defective loans were packaged into RMBS.  When asked what caused the financial crisis, one pointed to the banks belief that they had no liability for loans' compliance with underwriting guidelines: "When it came to the underwriting [guidelines] . . . and [securitizers] could perhaps distribute that risk quickly, then that wasn't as high on their priorities."  Johnson FCIC Interview.

304.    During the course of the FCIC investigation, Clayton also explained that the practice of putting rejected loans into RMBS was particularly prevalent among banks, such as Morgan Stanley, that extended warehouse lines of credit to originators.  Warehouse lending is a short-term revolving line of credit provided to an originator to fund the closing of mortgages. Clayton's former president stated "I think our data would show that, you know, we saw bigger exceptions to any client that had warehouse lines."  *Id.*  This was so because if the investment bank forced an originator to take back too many defective loans, the originator would go bankrupt and default on the warehouse line of credit.  On the other hand, the bank could waive the loan into the RMBS pool, and thereby pass the risk of default onto the RMBS investors.  As Johnson explained:  "if Bob was originating for me as the client and I had a warehouse line to you, I think what happened is a conflict of interest.  That if I put back loans to you, Bob and you

don't have the financial capability to honor those, then I'm kind of caught; right? […] I'm going to take a loss on the warehouse line." *Id.*

305.     Morgan Stanley provided warehouse lines of credit to at least one prominent originator at issue in this suit – New Century.  Accordingly, Morgan Stanley had an incentive to accept loans that did not meet the applicable underwriting guidelines.  *See* FCIC Report at 142.

306.     A number of loan originators had an express policy of attempting to sell loans that had already been rejected.  Because only a small percentage of the pools were reviewed by a due diligence firm like Clayton (or its chief competitor, Bohan), there was a very strong likelihood that those defective loans would enter the pool on the second or third attempt.  Clayton referred to this practice as the "three strikes, you're out rule."  Transcript, FCIC Hearing, The Financial Crisis at the Community Level—Sacramento, CA at 178 (Sept. 23, 2010) (testimony of D. Keith Johnson, former President of Clayton), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-transcript.pdf.

307.     The FCIC Report also concluded that banks like Morgan Stanley that securitized RMBS "were reluctant to review or reject loans in greater numbers because doing so would endanger their relationship with originators."  FCIC Report at 166 ("[Clayton's former CEO] concluded that his clients often waived in loans to preserve their business relationship with the loan originator—a high number of rejections might lead the originator to sell the loans to a competitor."); Paul Muolo and Matthew Padilla, Chain of Blame 228 (2010) ("There were two reasons the [Wall] Street firms reviewed only a small sample of the loans they were buying . . . . The most important reason was the relationship with the lender.  'The lower the sample you requested [of the lender], the more likely it was that you'd win the bid.'").

## VIII.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

308.    The Offering Documents included material untrue statements or omitted facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

309.    For purposes of Section 11 liability, the prospectus supplements are part of and included in the registration statements of the offerings pursuant to 17 C.F.R. §§ 230.158, 230.430B (2008); *see also* Securities Offering Reform, 70 Fed. Reg. 44722-01, 44768-69 (Aug. 3, 2005).

### A.   Untrue Statements in the Offering Documents About Weighted Average LTV Ratios, Weighted Average Combined LTV Ratios and Weighted Average Mixed LTV Ratios

310.    The Offering Documents included detailed representations regarding the weighted average LTV ratios for the pools underlying the RMBS.

311.    The LTV ratio is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  For instance, if a borrower borrows $80,000 to purchase a house estimated to be worth $100,000, the LTV ratio is $100,000/$80,000 or 80%.

312.    A "weighted average" is an average in which each value to be averaged is assigned a weight that determines the relative importance of each value to the average.  A weighted average can be contrasted with a straight arithmetic mean in which each of the values to be averaged contributes equally to the average.  In the context of LTVs, the higher the balance of the loan(s) secured by the property, the more "weight" it is given in relation to the average. To calculate the weighted average LTV ratio for a pool of loans, each loan's LTV ratio is multiplied by the loan balance, and the sum of those numbers is divided by the total loan balance of the pool.  The weighted average LTV ratio is a factor in describing the risk of a particular

RMBS.

313.     The NCUA Board commissioned a forensic review that calculated LTV ratios for those loans that could be identified in the pools backing most of the RMBS at issue in this Complaint.  The forensic review used a retrospective automated valuation model ("AVM").  A retrospective AVM calculates the value of a property at a point in time in the past using data that was available at that time, such as comparable property values, comparable sales, and home price indices at the time of loan origination. That is, a retrospective AVM is able to calculate the value of a property in 2006 using the data that was available in 2006.

314.     The forensic review commissioned by the NCUA Board calculated the value of the mortgaged properties underlying the RMBS at the time the mortgage loans were originated. For each Offering in Table 7, below, a minimum of 49% of the loans were analyzed.

315.     The forensic review demonstrated that for the Offerings in Table 7, the Offering Documents materially understated the LTV ratios, and thus the risks, of the mortgage pools. Further, for the Offerings in Table 7, the appraised values given to the mortgaged properties were significantly higher than what the properties were actually worth at the time of origination.

316.     For the Offerings in Table 7, below, the Offering Documents contained representations about the purported weighted average LTV ratios for the loan pools.  The forensic review found that for the Offerings in Table 7, below, on average, the actual weighted average LTV ratio was 16.73% higher than the weighted average LTV ratio reported in the Offering Documents.  *See infra*, Table 7.

**Table 7**
*Untrue Statements in the Offering Documents About Weighted Average LTV Ratios*

| ISSUING ENTITY | Represented Weighted Average LTV Ratio | Actual Weighted Average LTV Ratio | Actual Weighted Average LTV ___% Higher than Represented |
|---|---|---|---|
| American Home Mortgage Assets Trust 2007-3 (Group I-2) | 77.59% | 100.04% | 28.93% |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 (Group 4) | 72.11% | 86.01% | 19.28% |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX (All Groups) | 77.52% | 87.19% | 12.47% |
| Morgan Stanley Mortgage Loan Trust 2007-2AX (Group 2) | 76.98% | 87.98% | 14.29% |
| Morgan Stanley Mortgage Loan Trust 2007-5AX (Group 2) | 77.44% | 91.57% | 18.25% |
| RALI Series 2006-QS5 Trust (All Groups) | 74.88% | 81.35% | 8.64% |
| Saxon Asset Securities Trust 2006-3 (All Groups) | 77.32% | 89.13% | 15.27% |

317.    The discrepancy between the reported weighted average LTV ratio and the ratio calculated using the retroactive AVM provides additional evidence that the Originators systematically disregarded underwriting standards contrary to representations in the Offering Documents for the Offerings in Table 7, above.  Where the weighted average LTV is close to or exceeds 100% for the RMBS, the borrowers collectively had virtually no equity in the mortgaged properties, increasing the risk of losses when the borrowers defaulted on the mortgaged properties.  The actual weighted LTV ratio shows that the RMBS were significantly riskier than represented in the Offering Documents for many of the Offerings.

318.    The Offering Documents for the Offering in Table 8, below, contained aggregated loan-by-loan statistics about the weighted average CLTV ratio for the pool underlying that Offering.  The related CLTV ratio takes into account other liens on the property, such as a second mortgage.  The CLTV ratio adds additional specificity to the basic LTV ratio by indicating that additional liens on the property have been considered in the calculation of the ratio.  Like the LTV ratio, the CLTV ratio is a key statistic for investors in evaluating both the price and the risk of the RMBS.

319. Because the representation in the Offering Documents regarding the CLTV ratio on the Offering in Table 8 was based on false loan-level information, the aggregated statistic was also false.

320. Table 8, below, shows the difference between the weighted average CLTV ratio represented in the Offering Documents and the actual weighted average CLTV ratio as revealed by the forensic review. For the Offering in Table 8, 57% of the loans were analyzed by the forensic review commissioned by the NCUA Board. The forensic review shows that for the Offering in Table 8, the actual weighted average CLTV ratio was 23.82% higher than the weighted average CLTV ratio represented in the Offering Documents.

**Table 8**
***Untrue Statements in the Offering Documents About Weighted Average CLTV***

| ISSUING ENTITY | Represented Weighted Average CLTV Ratio | Actual Weighted Average CLTV Ratio | Actual Weighted Average CLTV ___% Higher than Represented |
|---|---|---|---|
| Saxon Asset Securities Trust 2006-3 (All Groups) | 79.92% | 98.96% | 23.82% |

321. The discrepancy between the reported weighted average CLTV ratio and the ratio calculated using the retroactive AVM on the Offering in Table 8, above, provides additional evidence that the Originators systematically disregarded underwriting standards contrary to representations in the Offering Documents. Where the weighted average CLTV is close to or exceeds 100% for the RMBS, the borrowers collectively had virtually no equity in the mortgaged properties, increasing the risk of losses when the borrowers defaulted on the mortgaged properties. The actual weighted CLTV ratio shows that the RMBS was significantly riskier than represented in the Offering Documents.

322. The Offering Documents for the Offerings in Table 9, below, contained aggregated loan-by-loan statistics about the "mixed" LTV ratios where the group of loans

underlying the RMBS included both first-lien loans and second-lien or junior loans. In such circumstances, the Offering Documents stated that the weighted average LTV ratio figure represented the original LTV ratio for the first-lien loans and the CLTV ratio for the second lien loans. Like LTV and CLTV ratios, mixed LTV ratios are a key statistic for investors in evaluating both the price and the risk of the RMBS.

323. Because the representations in the Offering Documents for the Offerings in Table 9, below, regarding mixed LTV ratios were based on false loan-level information, the aggregated statistics were also false.

324. Table 9, below, shows the difference in the weighted average mixed LTV ratios represented in the Offering Documents and the actual weighted average mixed LTV ratios as revealed by the forensic review. For each Offering in Table 9, below, a minimum of 56% of the loans were analyzed by the forensic review commissioned by the NCUA Board. The forensic review shows that for the Offerings in Table 9, the actual weighted average mixed LTV ratio was, on average, 11.93% higher than the weighted average mixed LTV ratio represented in the Offering Documents.

**Table 9**
*Untrue Statements in the Offering Documents About Weighted Average Mixed LTV*

| ISSUING ENTITY | Represented Weighted Average Mixed LTV Ratio | Actual Weighted Average Mixed LTV Ratio | Actual Weighted Average Mixed LTV ___% Higher than Represented |
|---|---|---|---|
| Ixis Real Estate Capital Trust 2005-HE4 (All Groups) | 79.81% | 88.02% | 10.29% |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 (Group 2) | 82.35% | 93.52% | 13.56% |

325. The discrepancy between the reported weighted average mixed LTV ratio and the ratio calculated using the retroactive AVM for the Offerings in Table 9 provides additional evidence that the Originators systematically disregarded underwriting standards contrary to

representations in the Offering Documents.  Where the weighted average mixed LTV is close to

or exceeds 100% for the RMBS, the borrowers collectively had virtually no equity in the

mortgaged properties, increasing the risk of losses when the borrowers defaulted on the

mortgaged properties.  The actual weighted average mixed LTV ratio on these Offerings shows

that the RMBS were significantly riskier than represented in the Offering Documents.

### B.  Untrue Statements in the Offering Documents About Owner Occupancy Rates

326.    The Offering Documents represented the percentage of properties that would be

occupied by the borrower for the loans underlying each RMBS.

327.    Representations regarding the occupancy type of a mortgaged property are

material because borrowers are less likely to default on mortgages on their primary residences.

Barclays Capital explained:

> Most home owners become anchored to their communities through the schools
> their children attend and the friends they make.  As a result, defaulting on the
> mortgage backing one's primary residence can be a jarring experience, one that
> most people would choose to avoid.  By contrast, an investment property
> primarily represents a stream of income or speculative opportunity, making the
> decision to default more one of dollars and cents than of a major life change.  As a
> result, all else being equal, borrowers are less likely to default on a mortgage
> backed by their primary residence than on one backed by an investment property.

Barclays Capital, Barclays Loan Transition Model, at 9 (Nov. 30, 2010).

328.    The forensic review used borrower- and property-specific public records to test

loan-level occupancy data for the Offerings in Table 10, below.

329.    First, the forensic review analyzed contemporaneous property tax records to

determine whether: (1) borrowers received their property tax bill for the mortgaged property at

the address of the mortgaged property; and (2) borrowers took a property tax exemption on the

mortgaged property that is only available for owner-occupied properties.  Borrowers are likely to

have a tax bill sent to their primary residence to ensure their ability to make timely payment.

However, if borrowers had tax records sent to a different address, then they probably did not actually reside at the mortgaged property.  And if borrowers declined to make certain tax exemption elections dependent on the borrowers residing at the property, then the borrowers also probably did not reside at the mortgaged property.

330.   Second, the forensic review analyzed public records to determine whether borrowers owned any other properties during the same time period in which they owned the securitized property.  The forensic review then examined whether the borrowers consistently identified the securitized property as their mailing address for property tax bills on each concurrently owned property.  Inconsistencies in tax bill mailing addresses for concurrently-owned properties also indicate that the securitized property was not, in fact, owner-occupied.

331.   Third, the forensic review conducted a review of lien records on concurrently-owned properties to determine whether borrowers indicated that any property other than the securitized property was owner-occupied.  This test examines all liens originated after the securitized mortgage and compares owner-occupancy representations with those in the loan tapes.  If liens on concurrently-owned properties indicate that those properties are owner-occupied, then the borrower probably did not reside at the mortgaged property.

332.   Fourth, the forensic review examined the mailing addresses identified for liens on concurrently-owned properties to determine whether the address of the securitized property was listed as the mailing address for bills and other correspondence between borrowers and the lienholders.  If the securitized property address is not identified in either scenario, then that is an indication that the borrower did not reside at the mortgaged property.

333.   Finally, the forensic review studied credit records to help determine whether a given borrower occupied the mortgaged property.  Specifically, the forensic review investigated

whether any creditors were reporting the securitized property's address as the borrower's mailing address six months after the origination of the loan.  Within six months of closing on a mortgage, one would expect borrowers to have changed their billing address with each of their creditors.  If a borrower was telling creditors to send bills to another address even six months after buying the property, it is likely the borrower was living at a different location.

334.    In assessing the accuracy of the Offering Documents' representations about owner-occupancy, the forensic review considered mortgages that failed multiple owner-occupancy tests to not have actually have been backed by owner-occupied properties.  Even with this high threshold, the forensic review revealed systematic overstatements of owner-occupancy rates for the Offerings in Table 10, below.

335.    Table 10, below, shows the difference in the percentage of owner-occupied properties as represented in the Offering Documents and the actual percentage of owner-occupied properties as revealed by the forensic review.  For each Offering in Table 10, a minimum of 49% of the loans were analyzed by the forensic review commissioned by the NCUA Board.  The forensic review shows that for the Offerings in Table 10, the actual percentage of owner-occupied properties was, on average, 16.35% lower than the percentage of owner-occupied properties represented in the Offering Documents.

**Table 10**
***Untrue Statements in the Offering Documents About Owner-Occupancy Status***

| ISSUING ENTITY | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Percentage Overstatement |
|---|---|---|---|
| American Home Mortgage Assets Trust 2007-3 (Group I-2) | 77.24% | 62.95% | 22.7% |
| IndyMac INDX Mortgage Loan Trust 2006-AR25 (Group 4) | 87.08% | 71.71% | 21.43% |
| Ixis Real Estate Capital Trust 2005-HE4 (All Groups) | 93.86% | 83.17% | 12.85% |
| Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 (Group 2) | 92.46% | 81.84% | 12.98% |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX (All Groups) | 68.5% | 59.69% | 14.76% |

| ISSUING ENTITY | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Percentage Overstatement |
|---|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2007-2AX (Group 2) | 82.84% | 70.69% | 17.19% |
| Morgan Stanley Mortgage Loan Trust 2007-5AX (Group 2) | 86.38% | 75.3% | 14.71% |
| RALI Series 2006-QS5 Trust (All Groups) | 60.38% | 51.82% | 16.52% |
| Saxon Asset Securities Trust 2006-3 (All Groups) | 94.65% | 83.02% | 14.01% |

## C.    Other Untrue Statements in the Offering Documents

336.    Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made: (1) the Originators' evaluation of the borrower's capacity and likelihood to repay the loan through application of the stated underwriting standards, including the calculation and use of an accurate "debt-to-income" ratio and the frequency and use of exceptions to those standards; (2) adherence to stated underwriting standards for reduced documentation programs; and (3) the accurate calculation of "loan-to-value" ratio for each mortgaged property and the accuracy of appraisals.

337.    The following table lists the originators that contributed loans to each RMBS, as identified in the Offering Documents.  Under SEC's Regulation AB, the Offering Documents must disclose the originators that contributed more than 10% of the loans underlying the RMBS, and the Offering Documents must include underwriting guidelines for the originators that contributed more than 20% of the loans underlying the RMBS.  *See* 17 C.F.R. § 229.1110 (2005).  For the RMBS listed below, the Offering Documents included only those underwriting guidelines for the Originators that contributed more than 20% of the loans to the RMBS.

**Table 11**
*Originators Supplying Loans for Each RMBS at Issue*

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 02147TAK2 | Alternative Loan Trust 2006-28CB | A-10 | Countywide (100%) |

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | I-2A-2 | American Home (100%) |
| 45661HBD8 | IndyMac INDX Mortgage Loan Trust 2006-AR25 | 4-A-5 | IndyMac (100%) |
| 45071KCP7 | Ixis Real Estate Capital Trust 2005-HE4 | M-2 | First Horizon Home Loan Corp. (23.99%) Fremont (21.67%) First NLC Financial Services, LLC (11.60%) Encore Credit Corp. (9.53%) Rose Mortgage Inc. (8.23%) Lime Financial Services, Ltd. (5.82%) First Bank Mortgage (5.18%) |
| 61750MAF2 | Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 | A-2d | NC Capital Corp. (46.75%) WMC (25.62%) Decision One (27.63%) |
| 61750SAF9 | Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 | A-2d | NC Capital Corp. (56.66% Group 2) Decision One (33.21% Group 2) WMC (10.13% Group 2) |
| 61749BAE3 | Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 | A-2c | New Century (100%) |
| 61748HGT2 | Morgan Stanley Mortgage Loan Trust 2004-11AR | 1-B-1 | MSMC (95.46%) |
| 61750PAD0 | Morgan Stanley Mortgage Loan Trust 2006-13ARX | A-4 | MSMC (86.33%) |
| 61751TAE9 | Morgan Stanley Mortgage Loan Trust 2007-2AX | 2-A-4 | MSMC (72.31% Group 2) GreenPoint (3.45% Group 2) Wachovia Mortgage Corp. (11.78% Group 2) |
| 61751GAE7 | Morgan Stanley Mortgage Loan Trust 2007-5AX | 2-A-4 | MSMC (77.39% Group 2) Wilmington Finance Mortgage (10.12% Group 2) |
| 669884AD0 669884AE8 | NovaStar Mortgage Funding Trust, Series 2006-1 | A-2C A-2D | NovaStar (100%) |
| 749228AM4 | RALI Series 2006-QS4 Trust | A-12 | Homecomings  (31.3%) American Mortgage Express Corp. (10.1%) |
| 75114TAG6 | RALI Series 2006-QS5 Trust | A-7 | Homecomings  (28.1%) National City Mortgage Corp. (16.3%) |
| 75115EAB9 | RALI Series 2006-QS11 Trust | I-A-2 | Homecomings  (35.4% Group 1) Wachovia Mortgage Corp. (10.6% Group 1) |
| 80556AAD9 | Saxon Asset Securities Trust 2006-3 | A-4 | Saxon People's Choice |
| 81744HAD5 81744HAE3 | Sequoia Mortgage Trust 2007-1 | 2-A1 2-A2 | ABN AMRO Mortgage Group, Inc. (48.73% Group 2) MSCC (21.78% Group 2) First Magnus  (20.38% Group 2) |

338.    Examples of material untrue statements and/or omissions of fact in the Offering

Documents of the RMBS listed above follow.

117

1.   **Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood to Repay the Mortgage Loan**

339.   The Alternative Loan Trust 2006-28CB Prospectus Supplement stated:

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

Alternative Loan Trust 2006-28CB Prospectus Supplement at S-40. *See also* Alternative

Loan Trust 2006-28CB Registration Statement, Feb. 7, 2006, at S-52.

340.   The Alternative Loan Trust 2006-28CB Prospectus Supplement stated:

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

Alternative Loan Trust 2006-28CB Prospectus Supplement at S-41. *See also* Alternative Loan

Trust 2006-28CB Registration Statement, Feb. 7, 2006, at S-53.

341.   The Alternative Loan Trust 2006-28CB Prospectus Supplement stated:

The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting

guidelines may be made if compensating factors are demonstrated by a prospective borrower.

Alternative Loan Trust 2006-28CB Prospectus Supplement at S-41.  *See also* Alternative Loan

Trust 2006-28CB Registration Statement, Feb. 7, 2006, at S-53.

> 342.    The Alternative Loan Trust 2006-28CB Prospectus Supplement stated:

> For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

Alternative Loan Trust 2006-28CB Prospectus Supplement at S-42.  *See also* Alternative

Loan Trust 2006-28CB Registration Statement, Feb. 7, 2006, at S-54.

> 343.    The American Home Mortgage Assets Trust 2007-3 Registration Statement

stated:

> The underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan.

American Home Mortgage Assets Trust 2007-3 Registration Statement, Feb. 6, 2007, at 8.

> 344.    The American Home Mortgage Assets Trust 2007-3 Registration Statement

continued:

> The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses.  However, the Loan-to-Value Ratio of the mortgage loan is another critical factor.  In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.

American Home Mortgage Assets Trust 2007-3 Registration Statement, Feb. 6, 2007, at 9.

345.    The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement

stated:

> In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter or Freddie Mac's Loan Prospector automated underwriting systems or they have been manually underwritten by the Originator's underwriters.  The Originator's Alt-A loan products have been approved manually by contract underwriters provided by certain mortgage insurance companies.  American Home Solutions products must receive an approval from the Assetwise automated underwriting system.  For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis.  Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period.  In addition to the monthly housing expense the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense.  When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan.  For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52-53.

346.    The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement

stated:

> The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.  Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.
>
> The Originator underwrites a borrower's creditworthiness based solely on information that The Originator believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-51-52.

347.     The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement

contained the following statement regarding exceptions to the underwriting guidelines:

> The Originator realizes that there may be some acceptable quality loans that fall
> outside published guidelines and encourages "common sense" underwriting.
> Because a multitude of factors are involved in a loan transaction, no set of
> guidelines can contemplate every potential situation.  Therefore, each case is
> weighed individually on its own merits and exceptions to the Originator's
> underwriting guidelines are allowed if sufficient compensating factors exist to
> offset any additional risk due to the exception.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-53.

348.     The IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement

stated at S-84 that:  "IndyMac Bank acquires mortgage loans principally through four channels:

mortgage professionals, consumer direct, correspondent and conduit."

349.     With respect to loans purchased from other originators, the IndyMac INDX

Mortgage Loan Trust 2006-AR25 Prospectus Supplement stated:

> IndyMac Bank approves each mortgage loan seller prior to the initial transaction
> on the basis of the seller's financial and management strength, reputation and
> prior experience. Sellers are periodically reviewed and if their performance, as
> measured by compliance with the applicable loan sale agreement, is
> unsatisfactory, IndyMac Bank will cease doing business with them.

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement at S-85.

350.     The IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement

provided this more elaborate description of the process for "approving" lenders from which

IndyMac purchased loans for securitization:

> IndyMac Bank currently operates two mortgage loan purchase programs as part of
> its correspondent channel:
>
>     1.     Prior Approval Program. Under this program, IndyMac Bank performs a
> full credit review and analysis of each mortgage loan generally with the same
> procedures used for mortgage loans originated through the mortgage professionals
> channel. Only after IndyMac Bank issues an approval notice to a loan originator is
> a mortgage loan eligible for purchase pursuant to this program.

2.      Preferred Delegated Underwriting Program. Under this program, loan originators that meet certain eligibility requirements are allowed to tender mortgage loans for purchase without the need for IndyMac Bank to verify mortgagor information. The eligibility requirements for participation in the Preferred Delegated Underwriting Program vary based on the net worth of the loan originators with more stringent requirements imposed on loan originators with a lower net worth. Loan originators are required to submit a variety of information to IndyMac Bank for review, including their current audited financial statements, their quality control policies and procedures, their current errors and omissions/fidelity insurance coverage evidencing blanket coverage in a minimum amount of $300,000, at least three underwriters' resumes showing at least three years experience or a direct endorsement designation, and at least two references from mortgage insurance companies. Loan originators are required to have an active, traditional warehouse line of credit, which is verified together with the bailee letter and wire instructions. IndyMac Bank requires each loan originator to be recertified on an annual basis to ensure that it continues to meet the minimum eligibility guidelines for the Preferred Delegated Underwriting Program.

Under the Preferred Delegated Underwriting Program, each eligible loan originator is required to underwrite mortgage loans in compliance with IndyMac Bank's underwriting guidelines usually by use of e-MITS or, infrequently, by submission of the mortgage loan to IndyMac Bank for traditional underwriting. A greater percentage of mortgage loans purchased pursuant to this program are selected for post-purchase quality control review than for the other program.

Mortgage loans originated through the conduit channel were generally initially underwritten by the seller to the seller's underwriting guidelines.  IndyMac Bank reviews each seller's guidelines for acceptability, and these guidelines generally meet industry standards and incorporate many of the same factors used by Fannie Mae, Freddie Mac and IndyMac Bank. Each mortgage loan is re-underwritten by IndyMac Bank for compliance with its guidelines based only on the objective characteristics of the mortgage loan, such as FICO, documentation type, loan-to-value ratio, etc., but without reassessing the underwriting procedures originally used. In addition, a portion of the mortgage loans acquired from a seller are subjected to a full re-underwriting.

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement at S-87.

351.    With respect to IndyMac's underwriting standards, the IndyMac INDX Mortgage

Loan Trust 2006-AR25 Prospectus Supplement stated:

IndyMac Bank has two principal underwriting methods designed to be responsive to the needs of its mortgage loan customers: traditional underwriting and e-MITS (Electronic Mortgage Information and Transaction System) underwriting. E-

MITS is an automated, internet-based underwriting and risk-based pricing system. IndyMac Bank believes that e-MITS generally enables it to estimate expected credit loss, interest rate risk and prepayment risk more objectively than traditional underwriting and also provides consistent underwriting decisions. IndyMac Bank has procedures to override an e-MITS decision to allow for compensating factors.

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement at S-85.  *See also*

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus, June 14, 2006, at 25.

352. The IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus made similar

representations as to the purported purpose of the underwriting process:

Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the Property such as property taxes and hazard insurance).

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus, June 14, 2006, at 35-36.

353. The IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus made certain

representations as to "exotic" loans:

Certain of the types of mortgage loans that may be included in an issuing entity may be recently developed and may involve additional uncertainties not present in traditional types of loans. For example, certain of the mortgage loans may provide for escalating or variable payments by the mortgagor. These types of mortgage loans are underwritten on the basis of a judgment that the mortgagors have the ability to make the monthly payments required initially. In some instances, however, a mortgagor's income may not be sufficient to permit continued loan payments as the payments increase. These types of mortgage loans may also be underwritten primarily on the basis of Loan-to-Value Ratios or other favorable credit factors.

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus, June 14, 2006, at 36.

354. The IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement stated with respect to exceptions to IndyMac's underwriting guidelines:

> Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-underwritten and approved under an exception to those underwriting guidelines.
>
> ….
>
> Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement at S-87.

355. The IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus also made certain representations as to exceptions to the underwriting guidelines:

> The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist.

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus, June 14, 2006, at 35-36.

356. The Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement made the following representations regarding the underwriting guidelines generally employed by the numerous originators who contributed loans to the pool:

> The underwriting guidelines are generally intended to evaluate the credit risk of mortgage loans made to borrowers with imperfect credit histories ranging from minor delinquencies to bankruptcy, or borrowers with relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income. Certain exceptions to the underwriting guidelines described herein may be made in the event that compensating factors are demonstrated by a prospective mortgagor. Compensating factors may include, but are not limited to, relatively low loan-to-value ratio, relatively low debt-to-income ratio, better than required credit history, stable employment, financial reserves, and time in residence at the applicant's current address. A significant number of the mortgage loans may represent such underwriting exceptions.

Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement at S-38. *See also* Ixis Real Estate Capital Trust 2005-HE4 Registration Statement, Jan. 7, 2005, at 19.

357.    The Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement included matrices setting forth First Horizon's underwriting standards (at S-42) and continued with respect to exceptions to those standards:

> Exceptions. As described above, the indicated underwriting standards applicable to the mortgage loans include the foregoing categories and characteristics as guidelines only. On a case-by-case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed if the application reflects compensating factors, such as low loan-to-value ratio; stable ownership; low debt ratios; strong residual income; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years.

Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement at S-43.

358.    With respect to Fremont's underwriting standards, the Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement stated:

> Mortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("SCORED PROGRAMS"), subject to various exceptions as described in this section. Fremont's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assess the risk of default by using Credit Scores (as described below under "--Credit Scores") along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratio as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.

Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement at S-44.

359.    The Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement also described a purported quality control procedure employed by Fremont:

> Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error is sent monthly to each loan production office for response. The review findings and branch responses are then reviewed by Fremont's senior management. Adverse findings are tracked monthly. This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement at S-45.

360.    The Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Trust Prospectus

Supplement stated:

> The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines of the responsible parties. See "—Underwriting Guidelines" below for a summary of the underwriting guidelines for the responsible parties whose mortgage loans represent 20% or more of mortgage loans as of the cut-off date.

Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Prospectus Supplement at S-28.   *See also*

Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Free Writing Prospectus, Nov. 15, 2006, at

S-28; Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement at S-20; Morgan Stanley

ABS Capital I Inc. Trust 2006-HE7 Prospectus Supplement at S-27; Morgan Stanley ABS

Capital I Inc. Trust 2006-NC5 Prospectus Supplement at S-26; Morgan Stanley ABS Capital I

Inc. Trust 2006-HE8 Amended Registration Statement, Mar. 10, 2006, at S-35; Morgan Stanley

ABS Capital I Inc. Trust 2006-HE7 Free Writing Prospectus, Oct. 10, 2006, at "The Mortgage

Pool" section; Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Amended Registration

Statement, Mar. 10, 2006, at S-35; Morgan Stanley ABS Capital I Inc. Trust 2006-NC5

Amended Registration Statement, Mar. 10, 2006, at S-35.

126

361.     The Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Trust Prospectus

Supplement stated:

> Underwriting Standards. The mortgage loans originated or acquired by New
> Century, referred to in this section as the originator, were done so in accordance
> with the underwriting guidelines established by it (collectively, the "New Century
> Underwriting Guidelines"). The following is a general summary of the New
> Century Underwriting Guidelines believed to be generally applied, with some
> variation, by the originator. This summary does not purport to be a complete
> description of the underwriting standards of New Century.
>
> The New Century Underwriting Guidelines are primarily intended to assess the
> borrower's ability to repay the mortgage loan, to assess the value of the mortgaged
> property and to evaluate the adequacy of the property as collateral for the
> mortgage loan. All of the mortgage loans in the mortgage pool were also
> underwritten with a view toward the resale of the mortgage loans in the secondary
> mortgage market. While New Century's primary consideration in underwriting a
> mortgage loan is the value of the mortgaged property, New Century also
> considers, among other things, a mortgagor's credit history, repayment ability and
> debt service-to-income ratio, as well as the type and use of the mortgaged
> property.

Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Prospectus Supplement at S-31. *See also*

Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Prospectus Supplement at S-30; Morgan

Stanley ABS Capital I Inc. Trust 2006-NC5 Prospectus Supplement at S-28-29; Morgan Stanley

ABS Capital I Inc. Trust 2006-HE8 Free Writing Prospectus, Nov. 15, 2006, at S-31; Morgan

Stanley ABS Capital I Inc. Trust 2006-HE7 Free Writing Prospectus, Oct. 10, 2006, at "The

Mortgage Pool" section; Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Free Writing

Prospectus, Oct. 26, 2006, at "The Mortgage Pool" section.

362.     With respect to exceptions, the Morgan Stanley ABS Capital I Inc. Trust 2006-

HE8 Trust Prospectus Supplement stated:

> The mortgage loans will have been originated in accordance with the New
> Century Underwriting Guidelines. On a case-by-case basis, exceptions to the New
> Century Underwriting Guidelines are made where compensating factors exist.  It
> is expected that a substantial portion of the mortgage loans will represent these
> exceptions.

127

Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Prospectus Supplement at S-31.  *See also* Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Prospectus Supplement at S-30; Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Prospectus Supplement at S-29; Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Free Writing Prospectus, Nov. 15, 2006, at S-31; Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement at S-37-38; Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Free Writing Prospectus, Nov. 15, 2006, at S-31; Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Free Writing Prospectus, Oct. 10, 2006, at "The Mortgage Pool" section; Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Free Writing Prospectus, Oct. 26, 2006, at "The Mortgage Pool" section.

363.    The Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Trust Prospectus Supplement stated:

> The New Century Underwriting Guidelines have the following categories and criteria for grading the potential likelihood that an applicant will satisfy the repayment obligations of a mortgage loan:
>
> "AA" Risk. Under the "AA" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments) are required for loan-to-value ratios above 90%. The borrower must have no late mortgage payments within the last 12 months on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550, or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No

128

notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition.

…

"A+" Risk. Under the "A+" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments), are required for loan-to-value ratios above 90%. A maximum of one 30 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition.

…

"A-" Risk. Under the "A-" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. A maximum of three 30 day late payments within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than

550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition.

…

"B" Risk. Under the "B" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30 day late payments and a maximum of one 60 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 90 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score less than or equal to 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 may have occurred as long as such bankruptcy has been discharged at least one day prior to funding of the loan. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (such loan may not exceed an 80% loan-to-value ratio for borrowers with a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding 18 months. The mortgaged property must be in at least average condition.

…

"C" Risk. Under the "C" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30 day and 60 day late payments and a maximum of one 90 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 120 days late at the time of funding of the loan. All bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds. No notice of default filings may have occurred during the preceding 12 months. The mortgaged property must be in at least average condition.

…

"C-" Risk. Under the "C-" risk category, an applicant must have a FICO score of 500, or greater. Unlimited 30, 60 and 90 day late payments and a maximum of one 120 day late payment is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 150 days late at the time of funding of the loan. There may be no current notice of default and all bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds. The mortgaged property must be in at least average condition.

Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Prospectus Supplement at S-32-34.  *See also*

Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Prospectus Supplement at S-32-33; Morgan

Stanley ABS Capital I Inc. Trust 2006-NC5 Prospectus Supplement at S-30-32; Morgan Stanley

ABS Capital I Inc. Trust 2006-HE8 Free Writing Prospectus, Nov. 15, 2006, at S-32-34; Morgan

Stanley ABS Capital I Inc. Trust 2006-HE7 Free Writing Prospectus, Oct. 10, 2006, at "The

Mortgage Pool" section; Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Free Writing

Prospectus, Oct. 26, 2006, at "The Mortgage Pool" section.

364.    The Morgan Stanley Mortgage Loan Trust 2007-5AX Prospectus Supplement

provided this description of MSMC's loan purchasing guidelines:

> Based on the data provided in the application and certain verification (if required),
> a determination is made by the original lender that the mortgagor's monthly
> income (if required to be stated) will be sufficient to enable the mortgagor to meet
> its monthly obligations on the mortgage loan and other expenses related to the
> property such as property taxes, utility costs, standard hazard insurance and other
> fixed obligations other than housing expenses.  Generally, scheduled payments on
> a mortgage loan during the first year of its term plus taxes and insurance and all
> scheduled payments on obligations that extend beyond ten months equal no more
> than a specified percentage of the prospective mortgagor's gross income. The
> percentage applied varies on a case by case basis depending on a number of loan
> purchasing criteria, including the Loan-to-Value Ratio of the mortgage loan. The
> originator may also consider the amount of liquid assets available to the
> mortgagor after origination.
>
> . . . .
>
> The adequacy of the mortgaged property as security for repayment of the related
> mortgage loan will generally have been determined by an appraisal in accordance
> with pre-established appraisal procedure guidelines for appraisals established by
> or acceptable to the originator.

Morgan Stanley Mortgage Loan Trust 2007-5AX Prospectus Supplement at S-56-57.  *See also*

Morgan Stanley Mortgage Loan Trust 2007-5AX Registration Statement, Dec. 23, 2005, at S-26;

Morgan Stanley Mortgage Loan Trust 2007-2AX Prospectus Supplement at S-54-55; Morgan

Stanley Mortgage Loan Trust 2006-13ARX Prospectus Supplement at S-40-41; Morgan Stanley

Mortgage Loan Trust 2007-2AX Registration Statement, Dec. 23, 2005, at S-26; Morgan Stanley

Mortgage Loan Trust 2006-13ARX Registration Statement, Dec. 23, 2005, at S-26; Morgan

Stanley Mortgage Loan Trust 2004-11AR Prospectus Supplement at S-49.

365.     With respect to exceptions to underwriting guidelines, the Morgan Stanley

Mortgage Loan Trust 2007-5AX Prospectus Supplement stated:

> …on a case-by-case basis, the Seller may determine that, based upon
> compensating factors, a prospective borrower not strictly qualifying under its loan
> purchasing guidelines warrants an underwriting exception. Compensating factors
> may include, but are not limited to, low loan-to-value ratios, low debt-to-income
> ratios, good credit history, stable employment, financial reserves, and time in
> residence at the applicant's current address. A significant number of the Mortgage
> Loans sold by the Seller to the Issuing Entity may represent underwriting
> exceptions.

Morgan Stanley Mortgage Loan Trust 2007-5AX Prospectus Supplement at S-56.  *See also*

Morgan Stanley Mortgage Loan Trust 2007-2AX Prospectus Supplement at S-54; Morgan

Stanley Mortgage Loan Trust 2006-13ARX Prospectus Supplement at S-40; Morgan Stanley

Mortgage Loan Trust 2004-11AR Prospectus Supplement at S-48.

366.     The Morgan Stanley Mortgage Loan Trust 2007-5AX Prospectus Supplement

also represented that MSMC performed due diligence regarding the lender from which it

purchased the loans as follows:

> Prior to acquiring any residential mortgage loans, MSMC conducts a review of
> the related mortgage loan seller that is based upon the credit quality of the selling
> institution. MSMC's review process may include reviewing select financial
> information for credit and risk assessment and conducting an underwriting
> guideline review, senior level management discussion and/or background checks.
> The scope of the loan due diligence varies based on the credit quality of the
> mortgage loans.
>
> The underwriting guideline review entails a review of the mortgage loan
> origination processes and systems. In addition, such review may involve a
> consideration of corporate policy and procedures relating to state and federal
> predatory lending, origination practices by jurisdiction, historical loan level loss
> experience, quality control practices, significant litigation and/or material
> investors.

Morgan Stanley Mortgage Loan Trust 2007-5AX Prospectus Supplement at S-68.  *See also*

Morgan Stanley Mortgage Loan Trust 2007-5AX Registration Statement, Dec. 23, 2005, at S-34;

Morgan Stanley Mortgage Loan Trust 2007-2AX Prospectus Supplement at S-67; Morgan

Stanley Mortgage Loan Trust 2006-13ARX Prospectus Supplement at S-52; Morgan Stanley

Mortgage Loan Trust 2007-2AX Registration Statement, Dec. 23, 2005, at S-34; Morgan Stanley

Mortgage Loan Trust 2006-13ARX Registration Statement, Dec. 23, 2005, at S-34.

367.    The NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement stated:

The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan.

NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement at S-90.  *See also*

NovaStar Mortgage Funding Trust 2006-1 Registration Statement, Jan. 18, 2006, at S-61.

368.    The NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement stated:

Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history. Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date.

NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement at S-90.  *See also*

NovaStar Mortgage Funding Trust 2006-1 Registration Statement, Jan. 18, 2006, at S-61.

369.    The NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement stated:

On a case-by-case basis, exceptions to the underwriting guidelines are made where the sponsor believes compensating factors exist. Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception. All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor. All loans over $650,000 require the approval of the VP of Operations and Corporate Credit Department or its approved designees. In addition, the President of the sponsor approves all loans

in excess of $1,100,000.

NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement at S-91.  *See also* NovaStar

Mortgage Funding Trust 2006-1 Registration Statement, Jan. 18, 2006, at S-62.

> 370.    The RALI Series 2006-QS5 Trust Prospectus stated:

> The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.

RALI Series 2006-QS5 Trust Prospectus, Mar. 3, 2006, at 12; RALI Series 2006-QS5 Trust

Registration Statement, Jan. 23, 2006, at 13; RALI Series 2006-QS4 Trust Prospectus, Mar. 3,

2006, at 12; RALI Series 2006-QS4 Trust Registration Statement, Jan. 23, 2006, at 13; RALI

Series 2006-QS11 Trust Prospectus, Aug. 8, 2006, at 12.

> 371.    The RALI Series 2006-QS5 Trust Prospectus Supplement stated:

> Program Underwriting Standards.  In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.

RALI Series 2006-QS5 Trust Prospectus Supplement at S-42; RALI Series 2006-QS5 Trust

Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2006-QS4 Trust Prospectus

Supplement at S-43; RALI Series 2006-QS4 Trust Registration Statement, Jan. 23, 2006, at S-

43; RALI Series 2006-QS11 Trust Prospectus Supplement at S-45.

> 372.    The RALI Series 2006-QS5 Trust Prospectus Supplement included the following

statement with respect to the borrower's ability to pay the loan:

> Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.

RALI Series 2006-QS5 Trust Prospectus Supplement at S-42; RALI Series 2006-QS5 Trust

Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2006-QS4 Trust Prospectus

Supplement at S-43; RALI Series 2006-QS4 Trust Registration Statement, Jan. 23, 2006, at S-

43; RALI Series 2006-QS11 Trust Prospectus Supplement at S-46.

373.    The Saxon Asset Securities Trust 2006-3 Prospectus Supplement stated:

> Approximately 80.60% of the initial mortgage loans (based on principal balance) to be included in the trust estate were originated or acquired or will be originated or acquired in accordance with the underwriting guidelines of Saxon Mortgage. The remainder of the mortgage loans were originated by other third party originators in accordance with underwriting guidelines generally comparable to the general underwriting guidelines described below under "—General Underwriting Guidelines." No third party originator will originate more than approximately 9.60% of the mortgage loans (based on principal balance) to be included in the trust estate. The general underwriting guidelines may differ among originators in various respects.

Saxon Asset Securities Trust 2006-3 Prospectus Supplement at S-37.

374.    The Saxon Asset Securities Trust 2006-3 Prospectus Supplement made

representations regarding the "non-conforming" nature of the loans in the pool:

> As a general matter, the mortgage loans were or will be originated in accordance with Saxon Mortgage, Inc.'s mortgage loan program or the underwriting guidelines of third party originators for non-conforming credits—a mortgage loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to credit characteristics that do not meet Fannie Mae or Freddie Mac guidelines.

Saxon Asset Securities Trust 2006-3 Prospectus Supplement at S-20.  *See also* Saxon Asset

Securities Trust 2006-3 Prospectus, Apr. 26, 2006, at 3-4.

375.    With respect to Saxon's underwriting guidelines, the Saxon Asset Securities Trust

2006-3 Prospectus Supplement stated:

> The Saxon Mortgage underwriting guidelines provide for an analysis of the overall situation of the borrower and take into account compensating factors which may be used to offset certain areas of weakness. Specific compensating factors include:
>
>> loan-to-value ratio;
>> mortgage payment history;
>> disposable income;
>> employment stability; and
>> number of years at residence.

Saxon Asset Securities Trust 2006-3 Prospectus Supplement at S-37.  *See also* Saxon Asset

Securities Trust 2006-3 Registration Statement, Feb. 9, 2006, at "The Mortgage Loan Pool"

section.

376.   The Saxon Asset Securities Trust 2006-3 Prospectus Supplement represented:

> Saxon Mortgage customarily employs underwriting guidelines to aid in assessing: the borrower's ability and willingness to repay a loan according to its terms; and whether the value of the property securing the loan will allow the lender to recover its investment if a loan default occurs.

Saxon Asset Securities Trust 2006-3 Prospectus Supplement at S-37-38.  *See also* Saxon Asset

Securities Trust 2006-3 Registration Statement, Feb. 9, 2006, at "The Mortgage Loan Pool"

section.

377.   The Saxon Asset Securities Trust 2006-3 Prospectus Supplement stated:

> Saxon Mortgage may, from time to time, apply underwriting criteria that are either more stringent or more flexible than the general guidelines of the underwriting programs outlined below depending on the economic conditions of a particular market.

Saxon Asset Securities Trust 2006-3 Prospectus Supplement at S-38.  *See also* Saxon Asset

Securities Trust 2006-3 Prospectus, Apr. 26, 2006, at 77.

378.   The Sequoia Mortgage Trust 2007-1 Prospectus Supplement stated:

> AAMG's  Underwriting  Criteria  are  intended  to  evaluate  the  prospective

136

mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgaged property as collateral. AAMG requires each prospective mortgagor to complete an application which includes information about the applicant's assets, liabilities, income, credit history, employment history and other related items, and furnish an authorization to obtain a credit report which summarizes the mortgagor's credit history.

As part of the underwriting process, AAMG may use automated underwriting systems that have been developed by Fannie Mae, Freddie Mac or the Federal Housing Administration. These systems evaluate all aspects of the borrower's credit profile, including credit pattern, not only looking at the borrower's repayment history but also use of credit. The system evaluates the borrower's savings pattern and ability to repay the debt. It also looks at the loan-to-value ratio and the loan program the borrower has requested.

In order to establish the prospective mortgagor's ability to make timely payments, unless otherwise waived as described below, AAMG requires evidence regarding the mortgagor's employment, income and assets, and amount of deposits made to financial institutions where the mortgagor maintains demand or savings accounts. A potential borrower is generally required to submit documentation verifying employment for the most recent two years. Required documentation could include pay stubs, W-2 forms, personal tax returns, business tax returns and financial statements as well as personal or other bank statements evidencing sufficient funds to close. In addition, a prospective borrower's monthly debt as compared to his/her monthly gross income, i.e., the "debt-to-income" ratios, must generally be within the limits set forth in the Underwriting Criteria. Such debt-to-income ratio may be limited based on several underwriting criteria and may vary based on compensating factors.

Sequoia Mortgage Trust 2007-1 Prospectus Supplement at S-59.

379. The Sequoia Mortgage Trust 2007-1 Prospectus Supplement stated:

First Magnus' underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. If necessary, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of the borrower's federal withholding forms and/or current payroll earnings statements. A credit report summarizing the prospective borrower's credit history or non-traditional credit history (in the case of foreign national applicants) is also obtained. This information is then processed by underwriters employed or

contracted by First Magnus to review and evaluate the prospective borrower's credit profile.

Based on the data provided in the application and certain verifications (if applicable), a determination is made regarding the prospective borrower's ability to meet its monthly obligations on the mortgage loan and other expenses related to the mortgaged property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses). Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.

Sequoia Mortgage Trust 2007-1 Prospectus Supplement at S-61.

380.    The Sequoia Mortgage Trust 2007-1 Prospectus Supplement also represented:

In addition, First Magnus may make certain exceptions to the underwriting guidelines described herein if, in First Magnus' discretion, compensating factors are demonstrated by a prospective borrower.

Sequoia Mortgage Trust 2007-1 Prospectus Supplement at S-60.

381.    The Sequoia Mortgage Trust 2007-1 Prospectus Supplement stated:

MSCC's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a mortgage loan is required to submit an application in writing or via telephone, which elicits pertinent information about the prospective borrower including, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. MSCC employs underwriters to scrutinize the prospective borrower's credit profile. If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements. With respect to every prospective borrower, a credit report summarizing the prospective borrower's credit history is obtained.

…

A potential borrower's ability to make the proposed loan payments is measured by the applicant's income, credit, residence stability and assets. One test to determine this ability is the debt-to-income ratio, which is the borrower's total monthly debt service divided by total monthly gross income. MSCC typically

allows for a debt-to-income ratio of 50%. Debt-to-income exceptions must be approved by the appropriate level underwriter, and supported by compensating factors.

…

Exceptions to these policies are typically made when other compensating factors are present, such as high net worth.

Sequoia Mortgage Trust 2007-1 Prospectus Supplement at S-63-64.

382.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed.  The preceding statements were untrue at the time they were made because, as alleged herein, the Originators did not adhere to the stated underwriting guidelines, did not effectively evaluate the borrowers' ability or likelihood to repay the loans, did not properly evaluate whether the borrower's debt-to-income ratio supported a conclusion that the borrower had the means to meet his/her monthly obligations, and did not ensure that adequate compensating factors justified the granting of exceptions to guidelines. Rather, as alleged herein, the Originators systematically disregarded the stated underwriting guidelines in order to increase the volume of mortgages originated (*see supra* Section VII.D). Further evidence of the fact that the loans in the pools collateralizing the Certificates at issue are the product of a systematic disregard of underwriting guidelines is found in, among other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the rate at which actual gross losses outpaced expected gross losses within the first year after the offerings (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

## 2. Untrue Statements Concerning Reduced Documentation Programs

383. The Alternative Loan Trust 2006-28CB Prospectus Supplement stated:

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

…

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

…

> Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Alternative Loan Trust 2006-28CB Prospectus Supplement at S-43-45. *See also* Alternative

Loan Trust 2006-28CB Registration Statement, Feb. 7, 2006, at S-55-57.

384. The American Home Mortgage Assets Trust 2007-3 Registration Statement made the following representations about the documentation programs employed by the originators:

> The mortgage loans will be originated under "full/alternative", "stated income/verified assets", "stated income/stated assets", "no documentation" or "no ratio" programs. The "full/alternative" documentation programs generally verify income and assets in accordance with Fannie Mae/Freddie Mac automated underwriting requirements. The stated income/verified assets, stated income/stated assets, no documentation or no ratio programs generally require less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, under both "full/alternative" documentation programs, at least one month of income documentation is provided. This documentation is also required to include year-to-date income or prior year income in case the former is not sufficient to establish consistent income. Generally under a "stated income verified assets" program no verification of a mortgagor's income is undertaken by the origination however, verification of the mortgagor's assets is obtained. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no documentation" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score. Generally, under a "no ratio" program, the mortgagor is not required to disclose their income although the nature of employment is disclosed. Additionally, on a "no ratio" program assets are verified.

American Home Mortgage Assets Trust 2007-3 Registration Statement, Feb. 6, 2007, at 8-9.

385.    The IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement

also made various representations regarding the documentation programs employed:

> IndyMac Bank purchases loans that have been originated under one of seven
> documentation programs: Full/Alternate, FastForward, Limited, Stated Income,
> No Ratio, No Income/No Asset and No Doc.  In general, documentation types that
> provide for less than full documentation of employment, income and liquid assets
> require higher credit quality and have lower loan-to-value ratios and loan amount
> limits.

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement at S-86.

386.    The Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement made the

following representations with respect to the documentation programs allegedly employed by

Fremont:

> There are the three documentation types, Full Documentation ("FULL
> DOCUMENTATION"), Easy Documentation ("EASY DOCUMENTATION")
> and Stated Income ("STATED INCOME"). Fremont's underwriters verify the
> income of each applicant under various documentation types as follows: under
> Full Documentation, applicants are generally required to submit verification of
> stable income for the periods of one to two years preceding the application
> dependent on credit profile; under Easy Documentation, the borrower is qualified
> based on verification of adequate cash flow by means of personal or business
> bank statements; under Stated Income, applicants are qualified based on monthly
> income as stated on the mortgage application. The income is not verified under
> the Stated Income program; however, the income stated must be reasonable and
> customary for the applicant's line of work.

Ixis Real Estate Capital Trust 2005-HE4 Prospectus Supplement at S-44.

387.    The Morgan Stanley Mortgage Loan Trust 2007-5AX Prospectus Supplement

stated:

> Certain of the mortgage loans have been originated under alternative, reduced
> documentation, no-stated-income, no-documentation, no-ratio or stated
> income/stated assets programs, which require less documentation and verification
> than do traditional full documentation programs. Generally, under an alternative
> documentation program, the borrower provides alternate forms of documentation
> to verify employment, income and assets. Under a reduced documentation

> program, no verification of one of either a mortgagor's income or a mortgagor's assets is undertaken by the originator. Under a no-stated-income program or a no-ratio program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a stated income/stated assets program, no verification of both a mortgagor's income and a mortgagor's assets is undertaken by the originator. Under a no-documentation program, no verification of a mortgagor's income or assets is undertaken by the originator and such information may not even be stated by the mortgagor. The loan purchasing decisions for such mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the Loan-to-Value Ratio at origination.

Morgan Stanley Mortgage Loan Trust 2007-5AX Prospectus Supplement at S-56-57. *See also* Morgan Stanley Mortgage Loan Trust 2007-2AX Prospectus Supplement at S-55; Morgan Stanley Mortgage Loan Trust 2006-13ARX Prospectus Supplement at S-41; Morgan Stanley Mortgage Loan Trust 2004-11AR Prospectus Supplement at S-49.

388.    The Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Prospectus Supplement stated:

> The mortgage loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property.
> …
>
> The New Century Underwriting Guidelines require that the income of each applicant for a mortgage loan under the full and limited documentation programs be verified. The specific income documentation required for New Century's various programs is as follows: under the full documentation program, applicants usually are required to submit one written form of verification from the employer of stable income for at least 12 months for salaried employees and 24 months for self-employed applicants or for any special program applicant with a credit score of less than 580; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements.

144

> Under the stated income program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria.  All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment.

Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Prospectus Supplement at S-32.  *See also*

Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Prospectus Supplement at S-31; Morgan

Stanley ABS Capital I Inc. Trust 2006-NC5 Prospectus Supplement at S-29-30; Morgan Stanley

ABS Capital I Inc. Trust 2006-HE8 Free Writing Prospectus, Nov. 15, 2006, at S-32; Morgan

Stanley ABS Capital I Inc. Trust 2006-HE7 Free Writing Prospectus, Oct. 10, 2006, at "The

Mortgage Pool" section; Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Free Writing

Prospectus, Oct. 26, 2006, at "The Mortgage Pool" section.

389.    The NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement

represented:

> The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation", "Stated Income", "No Documentation", "No Income/No Asset", "Streamline" and "24-Month Bank Statement." Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or prior two years W-2 forms and most recent pay stub. Under the Limited Documentation and 24-Month Bank Statement programs, no such verification is required, however, bank statements for the most recent consecutive 12- or 24-month period are required to evidence cash flow.

NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement at S-90.  *See also* NovaStar

Mortgage Funding Trust 2006-1 Registration Statement, Jan. 18, 2006, at S-61.

390.    The NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement stated:

> Under the Stated Income program, an applicant may be qualified based on monthly income as stated in the loan application. Under the "No Documentation" program, an applicant provides no information as it relates to their income. Under the "No Income/No Asset" program, the applicant's income and assets are not verified, however the applicant's employment is verified.

NovaStar Mortgage Funding Trust 2006-1 Prospectus Supplement at S-90.  *See also*

NovaStar Mortgage Funding Trust 2006-1 Registration Statement, Jan. 18, 2006, at S-61.

391.   The RALI Series 2006-QS5 Trust Prospectus stated:

General Standards

In most cases, under a traditional "full documentation" program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable payment histories, no income will be required to be stated, or verified, in connection with the loan application.

If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program.  Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated.  For example, a new appraisal of a mortgaged property may not be required if the related original mortgage loan was originated up to 24 months prior to the refinancing.  In addition, a mortgagor's income may not be verified, although continued employment is required to be verified.    In certain circumstances, a mortgagor may be permitted to borrow up to 100% of the outstanding principal amount of the original mortgage loan.  Each mortgage loan underwritten pursuant to this program will be treated as having been underwritten pursuant to the same underwriting documentation program as the mortgage loan that it refinanced, including for purposes of the disclosure in the accompanying prospectus supplement.

If specified in the accompanying prospectus supplement, some mortgage loans may have been originated under "limited documentation," "stated documentation" or "no documentation" programs that require less documentation and verification than do traditional "full documentation" programs.    Under a limited documentation, stated documentation or no documentation program, minimal

146

> investigation into the mortgagor's credit history and income profile is undertaken by the originator and the underwriting may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

RALI Series 2006-QS5 Trust Prospectus, Mar. 3, 2006, at 12-13; RALI Series 2006-QS5 Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2006-QS4 Trust Prospectus, Mar. 3, 2006, at 12-13; RALI Series 2006-QS4 Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2006-QS11 Trust Prospectus, Aug. 8, 2006, at 12-13.

392. The Saxon Asset Securities Trust 2006-3 Prospectus Supplement made the following representations regarding the documentation programs employed by Saxon:

> Saxon Mortgage has four loan documentation programs:

> Full Documentation—underwriter review of the borrower's credit report, handwritten loan application, property appraisal, and the documents that are provided to verify employment and bank deposits, such as W-2's and pay stubs, or signed tax returns for the past two years;

> 12 Months Personal Bank Statements - the underwriter will review 12 months consecutive personal bank statements to document the borrowers stated cash flow;

> Limited Documentation— six months of personal and/or business bank statements are acceptable documentation of the borrower's stated cash flow; and

> Stated Income—the borrower's income as stated on the loan application must be reasonable for the related occupation because the income is not independently verified. The existence of the business and employment is, however, confirmed; and any self-employed business must have been in existence for at least two years.

Saxon Asset Securities Trust 2006-3 Prospectus Supplement at S-38. *See also* Saxon Asset Securities Trust 2006-3 Registration Statement, Feb. 9, 2006, at "The Mortgage Loan Pool" section.

393. The Sequoia Mortgage Trust 2007-1 Prospectus Supplement stated:

> AAMG may originate mortgage loans under a limited mortgage documentation program. However, the mortgagors of these types of loans must have a good credit history and be financially capable of making a larger cash down payment in

147

a purchase, or be willing to finance less of the appraised value in a refinancing than would otherwise be required by AAMG. Currently, the Underwriting Criteria provide that under this type of program only conventional mortgage loans with specified loan-to-value ratios qualify. If the mortgage loan qualifies, AAMG may waive some of its documentation requirements, including eliminating verification of assets, income and employment for the prospective mortgagor.

For conventional loans, AAMG has a reduced documentation program under which a prospective borrower's income or assets are not fully documented. AAMG also has a "no ratio" loan program under which the borrower's assets are fully disclosed and verified, but neither the amount nor the source of the borrower's income is disclosed, and the credit approval process for such a loan does not rely on qualifying ratios. Under the "no documentation" program, verification of a borrower's income and assets is completely removed from the processing of the loan file. The credit approval process for a "no documentation" loan relies entirely on the borrower's credit report and the value of the mortgaged property.

Sequoia Mortgage Trust 2007-1 Prospectus Supplement at S-59.

394.    Sequoia Mortgage Trust 2007-1 Prospectus Supplement also stated:

In addition to the "full/alternative" underwriting guidelines, First Magnus also originates or purchases loans that have been originated under certain limited documentation programs designed to streamline the loan underwriting process. These "stated income," "no ratio," "no income/no assets," "stated income/stated assets," "no documentation with assets," "no documentation" and "lite documentation" programs may not require income, employment or asset verifications. Generally, in order to be eligible for a limited or no documentation program, the mortgaged property must have a loan-to-value ratio that supports the amount of the mortgage loan and the prospective borrower must have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion.

Under the "stated income" documentation and the "no ratio" programs, more emphasis is placed on a prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower rather than on income underwriting. The "stated income" documentation program requires prospective borrowers to provide information regarding their assets and income. Information regarding assets is verified through written communications or bank statements. Information regarding income is not verified. The "no ratio" program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications or bank statements. The "no ratio" program does not require prospective borrowers to provide information regarding their income. In both the "stated income" and "no ratio" programs, the employment history is verified

148

through written or telephonic communication.

Under the "no income/no assets" program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral. Income and assets are not stated on the prospective borrower's application. Disclosure of employment is required and verified through written or telephonic communication.

Under the "stated income/stated assets" program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral. Income is stated on the prospective borrower's application but is not verified. Assets are also stated on the application but are not verified. Employment is verified through written or telephonic communication.

Under the "no documentation with assets" and "no documentation" programs, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral. Under the "no documentation with assets" program, a prospective borrower's assets are stated and verified through written communication or bank statements. A prospective borrower is not required to provide information regarding income or employment. Under the "no documentation with assets" program, a prospective borrower's income and employment are not stated or verified but assets are verified. Under the "no documentation" program, a prospective borrower's income, assets and employment are not stated or verified.

Sequoia Mortgage Trust 2007-1 Prospectus Supplement at S-62.

395.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed.  The preceding statements were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines in order to increase the volume of mortgages originated, emphasizing quantity of loans rather than the quality of those loans (*see supra* Section VII.D).  Further evidence of the fact that the loans in the pools collateralizing the Certificates at issue are the product of a systematic disregard of underwriting guidelines is found in, among other things, the surge in delinquencies and defaults

shortly after the offerings (*see supra* Table 5), the huge discrepancy between expected and actual gross losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

### 3. Untrue Statements Concerning Loan-to-Value Ratios

396. The Alternative Loan Trust 2006-28CB Prospectus Supplement stated:

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan. As used in this prospectus supplement, a refinance mortgage loan is classified as a cash-out refinance mortgage loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan, or $2,000.

Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and

Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Alternative Loan Trust 2006-28CB Prospectus Supplement at S-42-43.  *See also* Alternative

Loan Trust 2006-28CB Registration Statement, Feb. 7, 2006, at S-54-55.

397.    The Alternative Loan Trust 2006-28CB Prospectus Supplement continued:

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 90% and original principal balances ranging up to $1,500,000. The maximum "cash-out" amount permitted is $400,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan.

Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Expanded Underwriting Guidelines generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and

Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Alternative Loan Trust 2006-28CB Prospectus Supplement at S-44.  *See also* Alternative Loan Trust 2006-28CB Registration Statement, Feb. 7, 2006, at S-56.

398.    The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement stated:

> The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property this ratio is based on the lower of the sales price of the property and the appraised value. The Originator sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan.  In general, the Originator requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction or loans on second homes. A lower loan-to-value ratio requires a borrower to have more equity in the property which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all conventional loans in which the loan-to-value ratio exceeds 80%, the Originator requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels.  For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-53.

399.    The IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement stated:

> Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO Credit Score, number of previous late mortgage payments, and the age of any bankruptcy or foreclosure actions.

IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement at S-86.

400.    The Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Prospectus Supplement stated:

> The New Century Underwriting Guidelines generally permit loans on one to four family residential properties to have a loan-to-value ratio at origination of up to 95% with respect to first liens loans. The maximum loan-to-value ratio depends on, among other things, the purpose of the mortgage loan, a borrower's credit history, home ownership history, mortgage payment history or rental payment history, repayment ability and debt service-to-income ratio, as well as the type and use of the property.

The Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Prospectus Supplement at S-32.  *See also* Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Prospectus Supplement at S-31; Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Prospectus Supplement at S-30; Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Free Writing Prospectus, Nov. 15, 2006, at S-32; Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Free Writing Prospectus, Oct. 10, 2006, at "The Mortgage Pool" section; Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Free Writing Prospectus, Oct. 26, 2006, at "The Mortgage Pool" section.

401.    The Sequoia Mortgage Trust 2007-1 Prospectus Supplement represented:

> No Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100%. Approximately 3.77% of the Mortgage Loans had a Loan-to-Value Ratio at origination of greater than 80%. Approximately 14.95% of the Mortgage Loans with a Loan-to-Value Ratio at origination of greater than 80% are covered by a primary mortgage insurance policy.

Sequoia Mortgage Trust 2007-1 Prospectus Supplement at S-30.

402.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made because the riskiness of the RMBS investment is directly dependent on the quality of the underwriting process and adequate assessment and limits on LTV ratios (in addition to accurate appraisals) is key to that process. The preceding statements were untrue at the time they were made because the Originators did

153

not adhere to the maximum LTV ratios as represented in the Offering Documents, encouraged inflated appraisals and frequently granted loans with high LTV ratios with no meaningful assessment of the borrower's ability to repay the loan based on the borrower's credit profile (*see supra* Section VII.D). Further evidence of the fact that the loans in the pools collateralizing the Certificates at issue are the product of a systematic disregard of underwriting guidelines is found in, among other things, the surge in delinquencies and defaults shortly after the offering (*see supra* Table 5), the huge discrepancy between expected and actual gross losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

## IX. THE CLAIMS ARE TIMELY

403.    For actions brought by the NCUA Board as Liquidating Agent, the FCUA extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent. *See* 12 U.S.C. § 1787(b)(14)(B)(i).

404.    The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009. On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into liquidation and appointed itself as Liquidating Agent.

405.    Actions brought under Sections 11 and 12(a)(2) of the Securities Act must be:

> brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . . In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m.

406.    Actions brought under § 17-12a509 of the Kansas Blue Sky law must be brought within "the earlier of two years after discovery of the facts constituting the violation or five years

after the violation." Kan. Stat. Ann. § 17-12a509(j).

407. Actions brought under § 25501 of the California Corporate Securities Law must be brought within "five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire." Cal. Corp. Code § 25506(b).

408. As the Federal Reserve Board noted in November 2008, the "deteriorating lending standards" and "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors." Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

409. The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS. The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

410. Accordingly, the Credit Unions did not discover and could not have discovered the untrue statements and/or misleading omissions in the Offering Documents more than one year prior to March 20, 2009, the date on which the NCUA Board placed them into

conservatorship. A reasonably diligent investor would not have known even to begin investigating misrepresentations in the Offering Documents until at least the date the Certificates were downgraded to a credit rating below investment grade. *See supra* Table 4.

411. In addition, the Credit Unions and/or the NCUA Board as their Liquidating Agent are or were members of putative classes in the cases listed in Table 12, below. Therefore, the NCUA Board's claims are subject to legal tolling of the various periods of limitation pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("American Pipe") and its progeny.

**Table 12**
***Purchases Subject to Tolling Under American Pipe***

| CUSIP | ISSUING ENTITY | PURCHASER | TRADE DATE | AMERICAN PIPE TOLLING COMMENCEMENT DATE |
|-------|----------------|-----------|------------|------------------------------------------|
| 02147TAK2 | Alternative Loan Trust 2006-28CB | U.S. Central | 8/21/2006 | *Luther v. Countrywide,* No. BC380698 (Cal. Super. Ct. L.A. County) Complaint **Filed: November 14, 2007** Removed to No. 12-5125 (C.D.C.A.)<br><br>*Washington v. Countrywide,* No. BC392571 (Cal. Super. Ct. L.A. County) Complaint **Filed: June 12, 2008** consolidated into *Luther v. Countrywide,* No. BC380698 (Cal. Super. Ct. L.A. County - Removed to No. 12-5125 (C.D.C.A.))<br><br>*Maine v. Countrywide,* No. 10-302 (C.D.C.A.) Complaint **Filed: January 14, 2010**<br><br>*Western Conference of Teamsters v. Countrywide,* No. BC449726 (Cal. Super. Ct. L.A. County) Complaint **Filed: November 17, 2010** Removed to No. 12-5122 (C.D.C.A.) |
| 45661HBD8 | IndyMac INDX Mortgage Loan Trust 2006-AR25 | WesCorp | 10/23/2006 | *IBEW Local 103 v. IndyMac,* No. BC405843 (Cal. Super. Ct. L.A. County) Complaint **Filed: January 20, 2009** Removed to No. 09-1520 (C.D.C.A.)<br><br>*Police and Fire Retirement System of Detroit v. IndyMac,* No. 09-4583 (S.D.N.Y.) Complaint **Filed: May 14, 2009** |

| CUSIP | ISSUING ENTITY | PURCHASER | TRADE DATE | AMERICAN PIPE TOLLING COMMENCEMENT DATE |
|-------|---------------|-----------|-----------|----------------------------------------|
| 61750PAD0 | Morgan Stanley Mortgage Loan Trust 2006-13ARX | WesCorp | 1/18/2007 | *Public Employees of Mississippi v. Morgan Stanley*, No. 00226005 (Cal. Super. Ct., Orange County) Complaint **Filed: Dec. 2, 2008** (removed to No. 08-1469 (C.D.C.A.); transferred to No. 09-2137 (S.D.N.Y.));<br><br>*West Virginia Investment v. Morgan Stanley*, No. 09-4414 (S.D.N.Y.) Complaint **Filed:  May 7, 2009** consolidated with *In Re Morgan Stanley Pass-Through Certificates Litigation*, No. 09-2137 (S.D.N.Y.) |
| 61751TAE9 | Morgan Stanley Mortgage Loan Trust 2007-2AX | WesCorp | 1/17/2007 | *West Virginia Investment v. Morgan Stanley*, No. 09-4414 (S.D.N.Y.) Complaint **Filed:  May 7, 2009** consolidated with *In Re Morgan Stanley Pass-Through Certificates Litigation*, No. 09-2137 (S.D.N.Y.) |
| 61751GAE7 | Morgan Stanley Mortgage Loan Trust 2007-5AX | WesCorp | 2/21/2007 | *West Virginia Investment v. Morgan Stanley*, No. 09-4414 (S.D.N.Y.) Complaint **Filed:  May 7, 2009** consolidated with *In Re Morgan Stanley Pass-Through Certificates Litigation*, No. 09-2137 (S.D.N.Y.) |
| 75114TAG6 | RALI Series 2006-QS5 Trust | U.S. Central | 5/15/2006 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint **Filed: May 18, 2009** |
| 75115EAB9 | RALI Series 2006-QS11 Trust | U.S. Central | 9/8/2006 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint **Filed: May 18, 2009** |
| 75115EAB9 | RALI Series 2006-QS11 Trust | U.S. Central | 11/29/2006 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint **Filed: May 18, 2009** |

412.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 11 of the Securities Act (Counts 1-6), the earliest date they were bona fide offered

to the public was April 20, 2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA Board's Section 11 claims are not time-barred.

413.     With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 12(a)(2) (Counts 7-9), the earliest sale was September 28, 2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA Board's Section 12(a)(2) claims are not time-barred.

414.     With respect to those RMBS purchases for which the NCUA Board asserts claims under state law (Counts 10 and 11), the earliest purchase date/offering date with respect to those claims was December 16, 2004, or not more than five years prior to March 20, 2009. Accordingly, the NCUA Board's state law claims are not time-barred.

## X.     CLAIMS FOR RELIEF

### COUNT ONE
### Section 11 of the Securities Act of 1933
### (Alternative Loan Trust 2006-28CB,
### NovaStar Mortgage Funding Trust, Series 2006-1,
### Sequoia Mortgage Trust 2007-1)

415.     The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Alternative Loan Trust 2006-28CB, NovaStar Mortgage Funding Trust, Series 2006-1 and Sequoia Mortgage Trust 2007-1 offerings.

416.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to U.S. Central's purchases of the Alternative Loan Trust 2006-28CB, NovaStar Mortgage Funding Trust, Series 2006-1 and Sequoia Mortgage Trust 2007-1 certificates against Defendant Morgan Stanley, as the underwriter.

417.     At the time the registration statement became effective, it (including the

prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

418. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

419. U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

420. At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

421. Morgan Stanley's conduct as alleged above violated Section 11.

422. U.S. Central and Plaintiff sustained damages as a result of Morgan Stanley's violations of Section 11.

423. WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Morgan Stanley, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT TWO
### Section 11 of the Securities Act of 1933
**(American Home Mortgage Assets Trust 2007-3 and IndyMac INDX Mortgage Loan Trust 2006-AR25)**

424. The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the American Home Mortgage Assets Trust 2007-3 and IndyMac INDX Mortgage Loan Trust 2006-AR25 offerings.

425. The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to WesCorp's purchases of the American Home Mortgage

Assets Trust 2007-3 and IndyMac INDX Mortgage Loan Trust 2006-AR25 certificates against Defendant Morgan Stanley, as the underwriter.

426.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

427.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

428.    WesCorp purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

429.    At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

430.    Morgan Stanley's conduct as alleged above violated Section 11.

431.    WesCorp and Plaintiff sustained damages as a result of Morgan Stanley's violations of Section 11.

432.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Morgan Stanley, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT THREE
### Section 11 of the Securities Act of 1933
### (Morgan Stanley ABS Capital I Inc. Trust 2006-HE7,
### Morgan Stanley ABS Capital I Inc. Trust 2006-HE8,
### Morgan Stanley ABS Capital I Inc. Trust 2006-NC5)

433.    The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than

Morgan Stanley ABS Capital I Inc., or specific to offerings other than the Morgan Stanley ABS Capital I Inc. Trust 2006-HE7, Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, Morgan Stanley ABS Capital I Inc. Trust 2006-NC5, offerings.

434.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to U.S. Central's purchases of the Morgan Stanley ABS Capital I Inc. Trust 2006-HE7, Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 certificates against Defendant Morgan Stanley, as the underwriter, and against Defendant Morgan Stanley ABS Capital I Inc., as the issuer.

435.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

436.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

437.    U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

438.    At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

439.    Morgan Stanley's and Morgan Stanley ABS Capital I Inc.'s conduct as alleged above violated Section 11.

440.    U.S. Central and Plaintiff sustained damages as a result of Morgan Stanley's and Morgan Stanley ABS Capital I Inc.'s violations of Section 11.

441.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its

favor against Defendant Morgan Stanley and Defendant Morgan Stanley ABS Capital I Inc.,

jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such

other relief as the Court deems appropriate and just.

**COUNT FOUR**
**Section 11 of the Securities Act of 1933**
**(Morgan Stanley Mortgage Loan Trust 2006-13ARX,**
**Morgan Stanley Mortgage Loan Trust 2007-2AX,**
**Morgan Stanley Mortgage Loan Trust 2007-5AX)**

442.    The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as

though fully set forth here, except those paragraphs specific to the Issuer Defendants other than

Morgan Stanley Capital I Inc., or specific to offerings other than the Morgan Stanley Mortgage

Loan Trust 2006-13ARX, Morgan Stanley Mortgage Loan Trust 2007-2AX and Morgan Stanley

Mortgage Loan Trust 2007-5AX offerings.

443.    The NCUA Board brings this cause of action pursuant to Section 11 of the

Securities Act of 1933, with respect to WesCorp's purchases of the Morgan Stanley Mortgage

Loan Trust 2006-13ARX, Morgan Stanley Mortgage Loan Trust 2007-2AX and Morgan Stanley

Mortgage Loan Trust 2007-5AX certificates against Defendant Morgan Stanley, as the

underwriter, and against Defendant Morgan Stanley Capital I Inc., as the issuer.

444.    At the time the registration statement became effective, it (including the

prospectus and any prospectus supplements) contained untrue statements and omitted facts that

were necessary to make the statements made not misleading, as alleged above.

445.    The untrue statements and omitted facts were material because a reasonably

prudent investor deciding whether to purchase the certificates would have viewed them as

important and as substantially altering the total mix of information available, as alleged above.

446.    WesCorp purchased the certificates pursuant to and traceable to a defective

162

registration statement, as alleged above.

447.    At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

448.    Morgan Stanley's and Morgan Stanley Capital I Inc.'s conduct as alleged above violated Section 11.

449.    WesCorp and Plaintiff sustained damages as a result of Morgan Stanley's and Morgan Stanley Capital I Inc.'s violations of Section 11.

450.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Morgan Stanley and Defendant Morgan Stanley Capital I Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### COUNT FIVE
**Section 11 of the Securities Act of 1933
(RALI Series 2006-QS4 Trust,
RALI Series 2006-QS5 Trust,
RALI Series 2006-QS11 Trust)**

451.    The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than RALI Series 2006-QS4 Trust, RALI Series 2006-QS5 Trust, and RALI Series 2006-QS11 Trust offerings.

452.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to U.S. Central's purchases of the RALI Series 2006-QS4 Trust, RALI Series 2006-QS5 Trust, and RALI Series 2006-QS11 certificates against Defendant Morgan Stanley, as the underwriter.

453.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that

were necessary to make the statements made not misleading, as alleged above.

454.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

455.     U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

456.     At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

457.     Morgan Stanley's conduct as alleged above violated Section 11.

458.     U.S. Central and Plaintiff sustained damages as a result of Morgan Stanley's violations of Section 11.

459.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Morgan Stanley, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT SIX
### Section 11 of the Securities Act of 1933
### (Saxon Asset Securities Trust 2006-3)

460.     The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Saxon Asset Securities Company, or specific to offerings other than Saxon Asset Securities Trust 2006-3 offering.

461.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to U.S. Central's purchase of the Saxon Asset Securities Trust 2006-3 certificate against Defendant Morgan Stanley, as the underwriter, and against

Defendant Saxon Asset Securities Company, as the issuer.

462.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

463.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

464.    U.S. Central purchased the certificate pursuant to and traceable to a defective registration statement, as alleged above.

465.    At the time U.S. Central purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

466.    Morgan Stanley's and Saxon Asset Securities Company's conduct as alleged above violated Section 11.

467.    U.S. Central and Plaintiff sustained damages as a result of Morgan Stanley's and Saxon Asset Securities Company's violations of Section 11.

468.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Morgan Stanley and Defendant Saxon Asset Securities Company, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT SEVEN
### Section 12(a)(2) of the Securities Act of 1933
### (Morgan Stanley ABS Capital I Inc. Trust 2006-HE7,
### Morgan Stanley ABS Capital I Inc. Trust 2006-HE8,
### Morgan Stanley ABS Capital I Inc. Trust 2006-NC5)

469.    The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as

though fully set forth here, except those paragraphs specific to offerings other than the Morgan Stanley ABS Capital I Inc. Trust 2006-HE7, Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 and Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 offerings.

470.     The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act of 1933, with respect to U.S. Central's purchases of the Morgan Stanley ABS Capital I Inc. Trust 2006-HE7, Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, and Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 certificates against Defendants Morgan Stanley and Morgan Stanley ABS Capital I Inc. as the statutory sellers and/or offerors of those certificates.

471.     Defendants Morgan Stanley and Morgan Stanley ABS Capital I Inc. offered to sell and sold the securities to U.S. Central through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

472.     Defendants Morgan Stanley and Morgan Stanley ABS Capital I Inc. offered to sell and sold the securities, for its own financial gain, to U.S. Central by means of the prospectuses and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

473.     The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

474.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

475.     U.S. Central purchased the certificates on the initial offering pursuant to the prospectuses and/or prospectus supplements.

476.     At the time U.S. Central purchased the certificates, it did not know of the untrue

statements and omissions contained in the prospectuses and/or prospectus supplements.

477. Defendants Morgan Stanley's and Morgan Stanley ABS Capital I Inc.'s conduct as alleged above violated Section 12(a)(2).

478. U.S. Central and Plaintiff sustained damages as a result of Defendants Morgan Stanley's and Morgan Stanley ABS Capital I Inc.'s violations of Section 12(a)(2).

479. Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration U.S. Central paid for the certificates, minus principal and interest received.

480. WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendants Morgan Stanley and Morgan Stanley ABS Capital I Inc., awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

### COUNT EIGHT
**Section 12(a)(2) of the Securities Act of 1933**
**(Saxon Asset Securities Trust 2006-3)**

481. The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Saxon Asset Securities Trust 2006-3 offering.

482. The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act of 1933, with respect to U.S. Central's purchase of the Saxon Asset Securities Trust 2006-3 certificate against Defendants Morgan Stanley and Saxon Asset Securities Company as the statutory sellers and/or offerors of this certificate.

483. Defendants Morgan Stanley and Saxon Asset Securities Company offered to sell and sold the security to U.S. Central through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

484.     Defendants Morgan Stanley and Saxon Asset Securities Company offered to sell and sold the security, for its own financial gain, to U.S. Central by means of the prospectuses and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

485.     The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

486.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

487.     U.S. Central purchased the certificate on the initial offering pursuant to the prospectuses and/or prospectus supplements.

488.     At the time U.S. Central purchased the certificate, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

489.     Defendants Morgan Stanley's and Saxon Asset Securities Company's conduct as alleged above violated Section 12(a)(2).

490.     U.S. Central and Plaintiff sustained damages as a result of Defendants Morgan Stanley's and Saxon Asset Securities Company's violations of Section 12(a)(2).

491.     Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration U.S. Central paid for the certificate, minus principal and interest received.

492.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendants Morgan Stanley and Saxon Asset Securities Company, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## COUNT NINE

### Section 12(a)(2) of the Securities Act of 1933
### (Morgan Stanley Mortgage Loan Trust 2007-2AX,
### Morgan Stanley Mortgage Loan Trust 2007-5AX)

493.    The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Morgan Stanley Mortgage Loan Trust 2007-2AX and Morgan Stanley Mortgage Loan Trust 2007-5AX offerings.

494.    The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act of 1933, with respect to WesCorp's purchases of the Morgan Stanley Mortgage Loan Trust 2007-2AX and Morgan Stanley Mortgage Loan Trust 2007-5AX certificates against Defendants Morgan Stanley and Morgan Stanley Capital I Inc. as the statutory sellers and/or offerors of this certificate.

495.    Defendants Morgan Stanley and Morgan Stanley Capital I Inc. offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

496.    Defendants Morgan Stanley and Morgan Stanley Capital I Inc. offered to sell and sold, for its own financial gain, the securities to WesCorp by means of the prospectuses and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

497.    The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

498.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

499.     WesCorp purchased the certificates on the initial offering pursuant to the prospectuses and/or prospectus supplements.

500.     At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

501.     Defendants Morgan Stanley's and Morgan Stanley Capital I Inc.'s conduct as alleged above violated Section 12(a)(2).

502.     WesCorp and Plaintiff sustained damages as a result of Defendants Morgan Stanley's and Morgan Stanley Capital I Inc.'s violations of Section 12(a)(2).

503.     Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration WesCorp paid for the certificates, minus principal and interest received.

504.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendants Morgan Stanley and Morgan Stanley Capital I Inc., awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

### COUNT TEN
**Violation of the California Corporate Securities Law of 1968**
**Cal. Corp. Code §§ 25401 and 25501**
**(IndyMac INDX Mortgage Loan Trust 2006-AR25,**
**Ixis Real Estate Capital Trust, 2005-HE4,**
**Morgan Stanley Mortgage Loan Trust 2004-11AR,**
**Morgan Stanley Mortgage Loan Trust 2006-13ARX,**
**Morgan Stanley Mortgage Loan Trust 2007-2AX,**
**Morgan Stanley Mortgage Loan Trust 2007-5AX)**

505.     The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than IndyMac INDX Mortgage Loan Trust 2006-AR25, Ixis Real Estate Capital Trust 2005-HE4, Morgan Stanley Mortgage Loan Trust 2004-11AR, Morgan Stanley Mortgage Loan Trust 2006-13ARX,

Morgan Stanley Mortgage Loan Trust 2007-2AX and Morgan Stanley Mortgage Loan Trust 2007-5AX offerings.

506.    The NCUA Board brings this cause of action pursuant to Sections 25401 and 25501 of the California Corporate Securities Law of 1968, with respect to WesCorp's purchases of the IndyMac INDX Mortgage Loan Trust 2006-AR25, Ixis Real Estate Capital Trust 2005-HE4, Morgan Stanley Mortgage Loan Trust 2004-11AR, Morgan Stanley Mortgage Loan Trust 2006-13ARX, Morgan Stanley Mortgage Loan Trust 2007-2AX and Morgan Stanley Mortgage Loan Trust 2007-5AX certificates against Defendant Morgan Stanley as the seller of those certificates.

507.    Defendant Morgan Stanley offered to sell and sold the securities to WesCorp by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

508.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

509.    At the time WesCorp purchased the certificates, it did not know of these untruths or omissions.

510.    Defendant Morgan Stanley sold the certificates to WesCorp in California.

511.    Defendant Morgan Stanley's sales of the certificates violated Cal. Corp. Code § 25401.

512.    WesCorp and Plaintiff sustained damages as a result of Defendant Morgan Stanley's violations of Cal. Corp. Code § 25401.

513.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Morgan Stanley, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

### COUNT ELEVEN
**Violation of the Kansas Blue Sky Law**
**Kan. Stat. Ann. § 17-12a509**
**(Morgan Stanley ABS Capital I Trust 2006-HE7,**
**Morgan Stanley ABS Capital I Inc. Trust 2006-HE8,**
**Morgan Stanley ABS Capital I Inc. Trust 2006-NC5,**
**Saxon Asset Securities Trust 2006-3)**

514.     The NCUA Board realleges paragraphs 1 through 414 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than Morgan Stanley ABS Capital I Trust 2006-HE7, Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 and Saxon Asset Securities Trust 2006-3 offerings.

515.     The NCUA Board brings this cause of action pursuant to Section 17-12a509 of the Kansas Uniform Securities Act, with respect to U.S. Central's purchases of the Morgan Stanley ABS Capital I Trust 2006-HE7, Morgan Stanley ABS Capital I Inc. Trust 2006-HE8, Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 and Saxon Asset Securities Trust 2006-3 certificates against Defendant Morgan Stanley as the seller of those certificates.

516.     Defendant Morgan Stanley offered to sell and sold the securities to U.S. Central by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

517.     The untrue statements and omitted facts were material because a reasonably

172

prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

518.    Defendant Morgan Stanley sold the certificates to U.S. Central in Kansas.

519.    At the time U.S. Central purchased the certificates, it did not know of these untruths and omissions.

520.    If U.S. Central had known about these untruths and omissions, it would not have purchased the securities from Defendant Morgan Stanley.

521.    Defendant Morgan Stanley's sales of the certificates violated Kan. Stat. Ann. § 17-12a509(b).

522.    U.S. Central and Plaintiff sustained damages as a result of Defendant Morgan Stanley's violations of Kan. Stat. Ann. § 17-12a509(b).

523.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Morgan Stanley, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

### <u>Jury Demand and Designation of Place of Trial</u>

Plaintiff hereby demands a trial by jury of all issues properly triable.  Pursuant to Local Rule 40.2(a), Plaintiff hereby designates Kansas City, Kansas as the place of trial of this action.

Dated:  August 16, 2013

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of U.S. Central Federal
Credit Union Union and of Western Corporate
Federal Credit Union


By:  /s/ Norman E. Siegel
Norman E. Siegel (D. Kan. #70354)
Rachel E. Schwartz (Kan. #21782)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751


Stephen M. Tillery
Douglas R. Sprong
Peter H. Rachman
Robert L. King
Diane E. Moore
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525

Mark C. Hansen
David C. Frederick
Wan J. Kim
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999

*Attorneys for the National Credit Union
Administration Board*


Of Counsel:
Michael J. McKenna, General Counsel
John K. Ianno, Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314

174